# EXHIBIT 6

Deposition of Kahn, Litwin & Renza.

Testimony of John Renza and Robert Davies.

Pages 1, 10, 11, 24, 25, 26, 27, 28, 29, 30, 40, 41, 42, 54, 55, 56, 57, 58, 59, 60, 68, 69, 70, 77, 81, 82, 83, 90, 91, 92, 93, 99.

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

No. 07-420-ML

VOTTA & VOTTA LAW OFFICES, LTD.

Plaintiff,

vs.

UNUM LIFE INSURANCE COMPANY OF AMERICA, ALIAS

Defendant.

KEEPER OF THE RECORDS DEPOSITION OF KAHN, LITWIN, RENZA & CO., LTD., AND JOHN S. RENZA, JR., AND ROBERT DAVIES INDIVIDUALLY, taken in behalf of the defendant, before Charlene Jones, duly appointed Commissoner within and for the State of Rhode Island, at the offices of Kahn, Litwin, Renza & Co., Ltd., 951 North Main Street, Providence, Rhode Island, on Monday, June 23, 2008, commencing at 1:06 p.m.

FLYNN REPORTING ASSOCIATES

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303

So primarily we would develop an 11-month actual, 10 or 11-month depending, and then I will setup a meeting and I'll do that meeting myself with the Votta & Votta partners and primarily would talk about year-end tax planning as we're approaching year end. At which point we would then take back to our office, once they give me the estimated receipts for the month of December -- because remember I'm going in in usually November and it sometimes depends. Every year is a little different. It depends if it's a busy time of the year. Then we'll get the final information and come up with what the results of operations would be for purposes of tax planning, and that's the one time a year that I do meet with them. It's about an hour meeting.

**Q.** So if we're staying with the time period January 1, 2005, you would have been meeting with partners at the, what, October/November of 2005?

A. Usually, yeah. Is '05 the year in question; is that the --

**Q.** Let me ask you --

A. Sorry.

**Q.** Let me ask you a follow-up question. Do

you recall that at some point that Joseph Votta left the practice?

A. Yes.

**Q.** And you recall that there were three partners --

A. Correct.

**Q.** -- as of January 1, 2005, three partners at Votta & Votta, Stephen, Jill and Joseph?

A. There are still three partners.

**Q.** Do you recall -- and you do recall at some point that Joseph stopped practicing, correct?

A. Yes.

**Q.** Do you recall about when that was?

A. That was around the beginning of that year, and if I remember correctly from looking at previous documents, around the middle of April of that year we actually did have a meeting here. I mentioned a minute ago that I meet annual, but I'm thinking in terms of my annual year-end tax planning meeting, but that year with Joe's health issues, we actually met in I'm going to say -- I don't remember exactly, but it was in that period at the beginning of that year in order to help

practicing, in terms of his concerns on the accounting issues --

A. Yeah.

**Q.** -- what were his concerns?

A. I don't know if you could call them concerns as much as we were wrapping up that year he wanted be sure he was treated fairly, and when I say, "treated fairly", he worked the first quarter of the first three months of that year, and he was reimbursed based on his efforts, and you know, money he brought in and efforts of working actively as a partner.

**Q.** Did he have any concerns about getting some additional funds because he was not working at that time?

A. Well, I think he was. Yeah, I think he was probably under some pressure.

**Q.** Do you recall talking to him about that?

A. Well, I think it's like anything else. You know, everybody wants to get what they're "entitled to", and I think that was one of the reasons I tried to get involved to help them do that, do it equitably, and to kind of leave open for Joe the opportunity to come back at any time.

That's why he's still a partner in the firm. So that if he should get better, it gives him an opportunity to come back whenever he wants. It's a working situation. It's like these small practices only work if each partner is producing income.

**Q.** In terms of Joe getting what he was entitled to --

A. Yeah.

**Q.** -- certainly he must have had some concerns about getting his share --

A. Yes.

**Q.** -- of the profits --

A. Yes.

**Q.** -- given that he did work for the first quarter of the year?

A. Yeah, yeah.

**Q.** Was he also concerned about anything else that he felt that he was entitled to at that time?

A. One of the questions he did ask me is, what would the value of the practice be, and basically we said, you know, this is a small practice. They did not want to pay us to do a

formal valuation because the intent was he was not going to leave. He was probably going to stay or to come back, just not work right now until he got better hopefully. So our point was, hey, listen you have what they call, you know, this work in process, time that you've spent on that you haven't collected, receivables perhaps maybe on a case. The value of the equipment was really not worth very much. It's really a small practice.

**Q.** So Joe had asked the question about what would the value of the practice be --

A. Right.

**Q.** -- in the event that he was to not return to the practice; is that the premise that it came out of?

A. Maybe. I mean it's like anything else. When you look at these small businesses what are they worth. They're really worth the ability of each professional to generate income from which they primarily earn a living. So at the end of the day when everything is said and done, what is left in relationship to non-cash assets or receivables or work in process. It's the value

of the tables and the chairs, which we all know is not -- I don't know if you've ever been to their practice, but it's a small tiny practice. It probably occupies, I want to say, I don't know, 1,500 square feet. It's a small little place.

**Q.** So in terms of before the meeting that you had --

A. Yes.

**Q.** -- and I understand that there was a meeting in April of 2006 --

A. Right.

**Q.** -- with the three Vottas?

A. Right.

**Q.** I want to say children, but that's not the right -- the three Votta partners --

A. Partners, yeah, who are also brothers and sister.

**Q.** Right. How many conversations do you think you had with Joe leading up to that meeting?

A. I think a -- you know, let's put it this way. It was at least three, maybe five, and I probably say that with each of them, and again, I

don't remember exactly because I know we did have the ultimate meeting when all of those checks were signed and the pledge agreement was signed in this room right here. This is where we did it.

**Q.** Before the meeting, did you have some back and forth with Joe about the numbers?

A. Oh, yeah, we did. Yes. Yes.

**Q.** And did you or your firm --

A. Yeah.

**Q.** -- make any effort to determine what the book value of Votta & Votta was?

A. Yeah, we did.

**Q.** Who asked you to do that?

A. I think they all wanted me to do that.

**Q.** Why did they want you to do that?

A. Just to get an idea of what value is there. Should Joe need some money, he could have pledged the stock and have gotten some money. That was actually what I recommended because I think what their intention was to, "leave the door open", if Joe ever wanted to come back. That's what we did or tried to do in the process.

**Q.** Certainly you also spoke with Jill and

Stephen --

A. Yes.

**Q.** -- before the meeting?

A. Yes.

**Q.** What do you recall talking to Jill about?

A. Basically the same question that Joe had. I think at this point perhaps they were not really talking maybe, and again, I was trying to be a mediator to help the brothers and sister get along and work this thing out, and it probably, when I say, "probably", you could certainly -- Bob Davies, if you'd like to ask him, a book value calculation, and I think that's what that big check is that you see, the 33,000, and we came up with an approximate value. We said, "Listen, your assets, your cash, your receivables, your net of your liabilities, you got a value of about 100 grand in this place. If you need some money, one of the things you can do is pledge your stock. We'll give you a check. If you want to come back, you're welcome back any time you want to come back." That's why to this day he still gets a K-1. He's still listed as a

shareholder. He's just not getting any money because he's not working, and they are agreed to that by the way.

**Q.** So before the meeting in April, one of the tasks that you had to facilitate things between the Votta partners --

A. Right.

**Q.** -- was to determine what Joe's profit distribution would be --

A. Correct.

**Q.** -- for 2005 --

A. Yes, those three months that he worked. That's right.

**Q.** -- because he only worked a quarter of the year?

A. Yes.

**Q.** And also to determine that if he wanted some money, what would be his share of the book value of the corporation?

A. Correct, exactly.

**Q.** Now I also under that there is a AAA account?

A. Yes, an Accumulated Adjustment Account.

**Q.** What is that?

ask him his mental stability or what he felt. He seemed fine at the meeting actually.

**Q.** What about in communications that you had with him before the meeting, did he seem undecided about returning to work?

A. Yeah, exactly. I think he was unsure. You know, I think the discussion was that the way we were trying to approach this is to accomplish two things. It gave him the option because he would still be a shareholder and he could come back when he wanted to be, and secondly, it gave him the money he needed for his own personal situation.

**Q.** So who did the talking at the meeting?

A. You know, I probably coordinated it. What I probably said was, you know, "I'm glad everyone's here. We can get this resolved. Joe here are the checks. Just sign this." It's a pledge agreement of the stock back to the company. We're carrying it on the books as a loan to him, and I said that to him, "Joe, hopefully you can come back." Actually it was kind of an emotional thing to be honest. Poor Jill was crying, and I mean it was a tough thing.

I mean they were more concerned about their mom. She's going through a tough time with this whole thing.

**Q.** Concerned because the mom was upset that Joe wasn't working?

A. I think a combination of everything. It's her son. He wasn't well. It's his brother and sister. I'm sure they had their own issues that they're dealing with, you know, from a family standpoint.

**Q.** Now you mentioned a pledge agreement?

A. Yes.

**Q.** What pledge agreement was that?

A. Yes. What happened was because he was taking out all of his equity in the form of cash but wanted to remain as a shareholder, the point was what better way to protect it is to give him the money and have him sign his stock over as a collateral for the loan. So that's basically what he did. He signed the collateral agreement and he got his checks, which you have there.

**Q.** So when you talk about a pledge agreement, you're talking about the fact that he signed over his stock certificates to

Votta & Votta?

A. He didn't give it up. He just pledge it back as security for the stock. In other words, he still has the right to vote it. He didn't give up anything on it as far as I know.

**Q.** So I've marked as Exhibit Number 3, Jack, the three checks that I understand Joe received at the meeting?

A. Correct.

**Q.** Were those --

A. Actually they weren't all at the meeting.

**Q.** Okay.

A. When I say that -- let me tell you what I'm saying.

**Q.** All right.

A. I'm just looking at the dates.

**Q.** So let's start with -- okay. Was there a check that he had received before the meeting?

A. Well, based on this date it looks like it --

**Q.** Okay.

A. -- 12/29/05, unless they held it and gave it to him at that meeting. I don't know the

**Q.** I understand the stock certificates were signed?

A. Right.

**Q.** Was there any other documentation signed at the meeting?

A. I don't think so.

**Q.** Do you recall Joe asking Steve to prepare a piece of paper saying that he didn't have to pay the loan back?

A. I don't remember that.

**Q.** You don't remember any discussion whatsoever about --

A. I don't.

**Q.** -- terms of repayment?

A. I don't think we did. I really don't remember. The reason in my own mind would have been, well, hopefully he'll come back; you know, that kind of thing.

**Q.** Okay.

A. Yeah.

**Q.** And if he came back to get -- so if he came back, would he have to repay the loan?

A. Well, I mean at some point. There's a loan payable to him that is owed. So certainly

if he were to come back, it would be. You know, you think it would be.

**Q.** How is the loan carried on Votta & Votta's books?

A. As a loan. You'll see it on the balance sheet of the tax return. Again, remember we only do tax returns. We do not do financial statements, but you'll be able to see it on the tax return that Bob Davies can bring up.

**Q.** As far as you know, there was no promissory note signed for this loan?

A. No.

**Q.** No discussion about a rate of interest?

A. No.

**Q.** No discussion about repayment terms?

A. No.

**Q.** And in terms you said that earlier that a stock certificate was signed at the meeting?

A. Right.

**Q.** I'm going to show you a stock certificate that has been produced to me that we've marked as Exhibit Number 5.

(Handing of document)

A. Right.

**Q.** Is this the stock certificate that was signed at the meeting?

A. Yes, because I signed it right here as the witness.

**Q.** And that's your signature --

A. Yes, it is.

**Q.** -- on the second page, which would be the back of the stock certificate?

A. Correct, that's my signature.

**Q.** Now in looking at this, how is this a pledge agreement?

A. Well, I would assume Votta & Votta was holding the stock certificate, and on this he -- I mean if you read the back of it -- I mean I didn't remember this from years back -- it says, "represented by the within certificate hereby irrevocably constitutes and appoints Jill S. Votta, attorney, to transfer on the books". So she's got the right, I guess, to liquidate it.

**Q.** But there was no separate pledge agreement signed, right?

A. I don't think -- all that was signed, if I recall, was -- unless you can show me something

else because I really don't remember.

**Q.** I'm trying to see if there is something else. So as I understand it, the only things that were signed as to the loan that you're talking about, the $33,000, was the receipt --

A. Yeah.

**Q.** -- the document we marked receipt that we've marked as Exhibit Number 4?

A. Yes.

**Q.** And this stock certificate that we marked as Exhibit Number 5?

A. Correct.

**Q.** And that's all you can remember about this loan?

A. Yep.

**Q.** Just so that I'm clear, when you talk about a pledge agreement being signed, you're referring to the stock certificate?

A. The fact that they had the stock, yeah.

**Q.** And you're saying that Joe and Stephen's idea was to give Joe a loan --

A. The money.

**Q.** -- of the $33,000 --

A. Right, which approximated what we all

thought was the value of the company.

Q. And he would pledge his stock back --

A. Correct.

Q. -- as security for the loan?

A. Correct. He would still be listed and held as a shareholder, which he is.

Q. So if I understand it correctly, if Joe was to next week payoff the $33,000 --

A. Right.

Q. -- he would get his stock back?

A. Correct, exactly.

Q. And if he never pays off the $33,000, then the stock is then reassigned to Votta & Votta?

A. Right. But at some point if he were to do that, he would have to pay taxes on that money because remember no taxes have been paid on the 33,000.

Q. So if Joe determines that he's never returning --

A. Right.

Q. -- then he'd have to pay taxes on the 33,000?

A. He would, yes. And it would be

long-term capital gain.

**Q.** So he wouldn't be paying --

A. He wouldn't be paying the highest rate. He'd be paying roughly 15 percent.

**Q.** He wouldn't be paying ordinary income?

A. Correct.

**Q.** He'd be paying long-term capital gain?

A. Capital gain, correct.

**Q.** At the meeting in April, was Joseph aware that he was going to get a loan before he came to the meeting?

A. Yeah. There were no surprises for anyone at the meeting.

**Q.** Okay. In terms of the discussion with Jill and Stephen and Joe about the loan, whose idea was it to be a loan?

A. Probably ours.

**Q.** Is there a financial or an accounting benefit to calling this a loan as opposed to a buyout?

A. Well, there's certainly an advantage to Joe that he's not paying any taxes on it, and it keeps the door open for him to have the ability to come back, and that was his sister and

brother's intention, hoping he would get better and come back.

**Q.** And what about to Votta & Votta, is there an advantage to the law firm --

A. Not really.

**Q.** -- to calling it a loan?

A. It's really a detriment to the law firm because they're out-of-pocket of cash of 33,690. It would be like, you know, me and my practice. If one of my partners says, you know, "I want out. Can I have a check?" "Sure, we'll give you the check, but you know, you're going to come back hopefully some day." But if we knew they'd never come back, we'd want to take that as part of basis and let them pay the taxes on it.

**Q.** Now how long -- so if Joe -- I mean how long can the law firm call this a loan --

A. It's a good question.

**Q.** -- if he never comes back?

A. It's a good question. I think at some point down the road they're going to all have to face this how we're going to deal with this. Certainly the question becomes, if you're not coming back and you don't want to be a

their package because we're pretty much a paperless office, and what that means is, all of this when I say we put it in their file, it scans in electronically into each client's individual file.

**Q.** And then the hard copy goes back to the client?

A. The hard copy is, but if you look at our tax booklet we give people at the end of the year, it's a fancy little thing, and you open it up, left side is a summary of their current year, prior year, any increase, decrease. It's a summary sheet, under which is all of their documentation, which should include a copy of their K-1, and then on the right side is a formal copy of returns filed with the federal government and any states, and it's just in a pretty fancy -- we think it's nice.

**Q.** Now I know that for the year 2006 Joseph also received --

A. Correct.

**Q.** -- or a K-1 was prepared for Joe for Votta & Votta?

A. Correct, yes.

**Q.** On what shares of stock are you basing the issuance of the K-1?

A. On the stock that Joe, Jill and Steve still have. They each have a third of the corporation.

**Q.** So in terms of if I'm going to look to a stock certificate for Joe, the K-1 is issued based on the stock that's marked as Exhibit Number 5?

A. Correct, yes. He's still a one-third shareholder.

**Q.** Does Joe know that?

A. I would think he does. He gets the K-1 every year as part of our records.

**Q.** It's your understanding that Joe did not have any involvement in Votta & Votta in '06, he didn't perform any services?

A. When did he leave?

**Q.** '05, March of '05?

A. Right. So '06 he would have not, correct.

**Q.** '06 no involvement?

A. Correct.

**Q.** '07 no involvement as well?

A. Correct, yes.

**Q.** Did Joe receive a K-1 for tax year 2007?

A. Yes.

**Q.** Has that been completed already?

A. Yes, yes. We can give you a copy of it if you need it.

**Q.** And the same process would occur where the K-1 ends up in Joe's electronic file?

A. Yes.

**Q.** His tax return is prepared?

A. Yes.

**Q.** And then the hard copy of the K-1 would go to him --

A. It should be, yeah.

**Q.** -- in his file?

A. In his packet, yeah.

**Q.** In his packet with the tax return?

A. Yes.

**Q.** Is that provided to your client or someone like Joe after the meeting when the taxes were done --

A. Yes.

**Q.** -- or when he comes in to sign?

A. Well, in many cases what we will do --

A. Correct, yes. And the other shareholders. Everybody is treated the same.

**Q.** Okay. That's the questions I have on these documents. Do you have questions, Bernie, that you wanted to ask?

MR. HEALY: Very briefly.

MS. VORSTER: Okay.

Examination by Mr. Healy:

**Q.** Mr. Renza, in 2006 in addition to the loan to Joseph in the sum of I guess it was 33,690.66, if you know, did Jill and Stephen receive loans in the same or similar amounts for the year 2006?

A. They may have. I don't remember. You would have to ask Bob Davies to show you the work papers.

**Q.** That would be Mr. Davies' expertise?

A. Yes.

**Q.** As far as if I understand it correctly, as your company's concerned, does Joseph Votta remain a shareholder of Votta & Votta?

A. Absolutely.

MR. HEALY: Nothing further.

**Q.** Now staying with the 2006 tax returns that we've marked as Exhibit Number 8, did Mr. Joseph Votta receive a K-1 --

A. Yes, he did.

**Q.** -- that year? And also in terms of any loans from shareholders?

A. There were loans recorded.

**Q.** Is there an entry in the tax return regarding loans from shareholders?

A. There's a line item shown as a net liability that is combined payables to two of the shareholders and a receivable for Joe Votta.

**Q.** If you could show me where that is on the tax return?

A. It's right here on this line.

**Q.** So we're looking at line Number 19?

A. Yes.

**Q.** That's line Number 19. Which of those entries shows the receivable from Joe Votta?

A. As I said, this is a net number recorded with loans payable and loans receivable from shareholders.

**Q.** So the number that you're looking at is

$103,000 and this is for the previous year?
A. This is for the current year.
**Q.** So the previous year would be loans in 2005?
A. Yes.
**Q.** And the current year would be loans in 2006?
A. Right.
**Q.** So the 2006 loans was a --
A. Net loan.
**Q.** -- net loan? Where would I look to see any receivables from Joe Votta?
A. The trial balances.
**Q.** So in looking at line item Number 19, does any of that reflect any loan receivable from Joe Votta?
A. Yes. On line 19 of 2006, I'd have to look at the 2005, but I think though it does include a loan receivable for 2006.
**Q.** But if the loan's not made until 2006 --
A. This is the end of 2006.
**Q.** So did Joe have any outstanding loans at the end of the year 2005 for any receivable?
A. I'd have to look at the trial balance.

Q. So when you look at the trial balance --
A. You want to look at 2006 because it would have comparative years on there.
Q. Great. Let me hand you then the trial balances that you've given me.
A. Okay. At the end of 2006 there was 40,522 recorded as a receivable from Joe, Joe Votta, and there were payables to Steve Votta of 35,309 and change, and a loan payable to Jill Votta of 26,309 and change, and that netted out to the 21,096 that you see here on the tax return.
Q. So let me just identify the documents that you were looking at, and these are the trial balances for the period ending December 31, 2006?
A. '06.
Q. Now I have a document called, "Working Trial Balance"?
A. Yes.
Q. And that's what you were looking at?
A. Yes.
MS. VORSTER: So we're going to mark that as the next exhibit, which would be Exhibit 10.

**Q.** To whom, who would you have directed the question to?

A. It may have been to Jack Renza. It may have been to Jill Votta.

**Q.** But in any event were you informed that Joseph was still a shareholder as of 2006?

A. That's correct.

**Q.** Did anybody explain to you the basis on which they were considering him to be a shareholder?

A. No. All I was told was that he was a shareholder.

**Q.** And you don't recall whether it was Mr. Renza or whether it was Joe Votta who you spoke to?

A. I don't recall.

**Q.** Is that the same for 2007 --

A. Yes.

**Q.** -- did you make inquiry about who the shareholders were?

A. Yes.

**Q.** And were informed that Joseph Votta was still a shareholder?

A. Was still a shareholder.

Q. Do you recall who gave you that information --
A. No, I don't.
Q. -- for the tax year for 2007?
A. No, I don't.
Q. Now looking at the tax return for 2007, if I again turn to line Number 19, I see that there's a -- do any of the numbers that we're seeing on 19 pertain to any loan payable from Joseph?
A. Yes.
Q. Which does?
A. Well, they would have been reflected in both the beginning and ending balance.
Q. And the ending balance you're saying is the 71,096?
A. That's correct.
Q. Next to that figure you have an asterisk in ink with some handwriting on that page?
A. Right.
Q. Did you place that there?
A. Yes.
Q. What does that mean?
A. It just means that netted in this number

is a loan receivable from Joe Votta.

Q. And the receivable as of 2007 from Joe Votta is 40,522.29?

A. That's correct. It's the same balance as the previous year.

Q. So same number?

A. Yes. Nothing occurred in 2007 to change his loan balance.

Q. And there was no indication that any interest was added --

A. No.

Q. -- to the loan balance --

A. No.

Q. -- because Joe hadn't made a payment?

A. Right.

Q. And in deed Joe hadn't made a payment?

A. That's correct.

Q. Hadn't made a payment in 2006 to your knowledge, correct?

A. That's right.

Q. And didn't make a payment in 2007 to your knowledge, correct?

A. Yes.

Q. Looking at the K-1 for Joseph Votta for

2007 that's attached to Exhibit Number 9, in looking at that document, can you tell whether that K-1 issued to Joseph Votta in 2007 would have created any additional tax obligation for him that year?

A. Without adding up the numbers, no, I cannot. Approximately close to washing out the zero.

**Q.** And if it doesn't wash out to zero, it's, as you say, pretty close?

A. Yes.

**Q.** Did you bring any work sheets for 2007 with you?

A. Other than the trial balance --

**Q.** Trial balance, okay?

A. -- and the cash receipts and disbursements summary.

**Q.** Okay.

A. Sorry. Attached to the trail balances are the journal entries that we made to record all these transactions.

MS. VORSTER: So I'm going to mark as the next exhibits the Working Trial Balance and then the Cash Receipts/Cash Disbursements for

A. I don't know. I don't recall. Some returns are filed electronically. Some are just filed paper.

Q. And you don't recall which one --

A. No.

Q. -- Votta & Votta chooses to do?

A. No.

Q. Regardless of which, if it was electronically filed, are the K-1's provided here Exhibit 15, attached to Exhibit 9 and attached to Exhibit 10, are those the ones that would have been provided to the Internal Revenue Service?

A. Yes.

Q. And if they were filed by Votta & Votta in a paper form, are these the ones that you provided to the client for filing?

A. Yes.

Q. Were you given a copy, sir, of the subpoena that was served on Kahn, Litwin and Renza?

A. Yes.

Q. Were you given the task of gathering the documents responsive to the subpoena?

A. Yes.