UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | |
|---|---|
| VOTTA & VOTTA LAW OFFICES, LTD.,<br>Plaintiff<br><br>v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA, ALIAS,<br>Defendant | C.A. NO. 07-420-ML |

**DEFENDANT'S MEMORANDUM IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

## NATURE AND STATUS OF THE PROCEEDINGS

This is an action in which the plaintiff, Votta & Votta Law Offices, LTD. ("V&V"), seeks to recover benefits under a business overhead expense policy issued by the defendant, Unum Life Insurance Company of America ("Unum") ("the BOE policy"), to its insured Joseph Votta, Jr. ("Joseph").

Joseph was a trial attorney and a partner, along with his brother and sister, in the law firm of V&V. In August 2005, Unum received notice that Joseph was filing a claim for benefits under the BOE policy and his individual disability income policy, also issued by Unum. In February 2006, Joseph assigned his rights under the BOE policy to V&V. Unum paid benefits under the BOE policy to V&V through April 2006. Unum denied further benefits under the BOE policy when it determined that after April 2006 Joseph no longer had an ownership interest in V&V.

Following Unum's denial of further benefits under the BOE policy, V&V filed this case in the Rhode Island Superior Court, which Unum removed to this Court on November 15, 2007.

Discovery was completed on July 7, 2008. Per the Order issued at the Rule 16 Scheduling Conference, cross-motions for summary judgment were due on August 8, 2005. That date was extended by joint motion to August 20, 2008.

Unum moves for summary judgment on grounds that as a matter of law the BOE policy does not provide benefits when the insured has sold or transferred his interest in the business. The undisputed material facts establish that in April 2006 Joseph signed over his interest in V&V in exchange for a payment representing one-third of the book value of the firm; Joseph believed that he had been bought out; Joseph has no obligation to repay the money he received; and Joseph has not had any responsibility for any portion of V&V's monthly expenses. Therefore, based on the undisputed material facts V&V is not entitled to any additional benefits under the BOE policy. This memorandum and Unum's Statement of Undisputed Facts are submitted in support of that motion.

## STATEMENT OF FACTS

Unum incorporates by reference its Statement of Undisputed Material Facts, prepared pursuant to Fed. R. Civ. P. 56 and L. R. Cv. 56 and filed contemporaneously with this memorandum.

## ARGUMENT

### I. Standard of Review

A motion for summary judgment will be granted where there exists no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Freadman v. Metropolitan Property and Rhode Island Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007). Material facts are facts with "the capacity to sway the outcome of litigation under the applicable law." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). The movant has the

burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing evidence that would support a jury verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Id. "Establishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise." Cadle Co., 116 F.3d at 960. There is no issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

## II. The BOE Policy Does Not Provide Benefits Where The Insured No Longer Has An Interest In His Business.

The BOE policy provides that if the insured is Totally Disabled, "[Unum] will pay the smaller of:

> 1. the Maximum Overhead Expense Benefit; or
>
> 2. the covered overhead expenses incurred during the month for which the benefit is payable
>
> in any month after you have satisfied the Elimination Period that:
>
> 1. you are totally disabled;
>
> 2. your total disability is the result of injury or sickness which caused you to satisfy the Elimination Period; and
>
> 3. the total amount paid for that disability does not exceed the Total Overhead Expense Benefit.

(Statement of Undisputed Facts, ¶2, hereafter "Stmt Und. Facts").

Under the BOE policy "Covered Overhead Expenses" means "your share of the usual and customary business expenses . . . which you or your business incurs on a regular basis and are essential to your established business operation." (Id. at ¶3).

As a matter of law, a BOE policy does not cover expenses incurred by a business after the insured has transferred his interest in that business. Wilson v. Monarch Life Ins. Co., 971 F.2d 312, 313 (9th Cir. Or. 1992) (Benefits denied where plaintiff sold his chiropractic business because he did not incur any covered overhead expenses in running that business after its sale and during the period for which he claimed benefits. Mere collection of accounts receivable does not constitute "running" a chiropractic office or business.); Chenvert v. The Paul Revere Life Insurance Company, 2004 U.S. Dist. LEXIS 14947 (D. Del. 2004) (Holding that the policy language provides coverage for certain expenses incurred while the insured's business is in operation. When plaintiff ceased operation of his dental practice, he no longer incurred expenses covered under the policy.); Twin Tiers Eye Care Assocs., P.C. v. First Unum Life Ins. Co., 270 A.D.2d 918 (N.Y. App. Div. 4th Dep't 2000), (Where the plaintiff was no longer a shareholder in the corporation he was not "regularly liable" for, and could not "actual[ly] incur," any monthly overhead expense during the period of his disability).

In order to recover under a BOE policy, the insured must continue to conduct his business. Richardson v. Guardian Life Ins. Co. of Am., 161 Ore. App. 615, 617 (Or. Ct. App. 1999) is instructive. Richardson was the sole shareholder of a dental practice. In 1987, he purchased two business overhead expense policies from Guardian. The definition of covered expenses in the policies issued by Guardian is similar to the BOE policy in this case.

Under the Guardian policy, covered expenses mean regular business expenses:

> which you normally incur in the conduct of your business or profession; which require a cash payment; and which the United States Internal Revenue Service accepts as tax deductible business overhead expenses. (emphasis added).
>
> As part of your proof of loss while you are disabled, you must give us a written statement of the covered expenses you incur each month.

Id. at 619.

In March 1996, Richardson's health began to deteriorate and he was no longer able to work by May 8, 1996. He entered into a stock purchase agreement with one of his employees, including a provision binding the plaintiff to pay the overhead expenses for one year after the sale. The agreement was expressly made retroactive, effective May 8, 1976. Under these facts Guardian, denied payment under the BOE policies, because the policies only covered expenses Richardson incurred in conducting his business or profession. Guardian asserted that the claimed expenses were incurred in the plaintiff's business at a time when plaintiff no longer conducted a business. Id. at 620.

The Guardian policy, like the BOE policy, defined "total disability" as:

> Total disability means that, because of sickness or injury, you are not able to perform the major duties of your occupation.
>
> Occupation means your regular occupation or profession at the time you become totally disabled."

Based on this definition, Richardson, like V&V, argued that he was a dentist at the time he became totally disabled and, therefore, that he was not required to practice his profession during the period when covered expenses were incurred. Id. Like the BOE policy, the policies in Richardson defined covered expenses as "regular business expenses which you normally incur in the conduct of your business or profession[.]"

The court found that because the term "covered expenses" is defined in the policies, that meaning controls and that to be covered, the expenses must be incurred by the plaintiff in the

conduct of his business. The policy did not further define the word "conduct." However, the Court determined that the word does have a plain meaning in this context; namely, to describe "the act, manner, or process of * * * carrying forward (as a business * * * )." Webster's Third New Int'l Dictionary, 473 (unabridged ed. 1993). Moreover, in order to be covered, expenses must be incurred in "your" (the insured's) business. Thus, the court concluded that the plain meaning of the policies' definition of covered expenses shows the intention that the insured must actually be in business in order to incur covered expenses. Id. at 621.[1]

The BOE policy language in this case is similar to that in Richardson. As in Richardson, the BOE policy defines Covered Expenses as "your share of the usual and customary business expenses . . .which you or your business incurs . . ." (Stmt. Und. Facts ¶3) (emphasis added). Therefore, as a matter of law the BOE policy's definition of covered expenses means that Joseph must be in business in order to incur covered expenses. Where Joseph has transferred his interest in his business, he no longer has a business and is no longer in business, and does not incur expenses covered by the BOE policy.

During the BOE policy claim process, V&V argued that "ownership of the business need not continue during the disability" and that "nothing that happens [after the claim accrues] affects liability under the policy." In essence, they believe that as long as Joseph had an ownership interest in V&V on the date he became disabled, he could have sold his interest the next day and still collected benefits under the policy. This argument is similar to the

[1] A case reaching a different conclusion is factually distinguishable from the case at hand. In Lincoln Dental Arts Clinic, LTD v. The Mutual Life Ins. Co. of New York, 1993 U.S. Dist. LEXIS 8779 (N.D.Ill. 1993), the policy stated that an insured need only be a shareholder at the start of his disability to qualify for benefits. Specifically the policy provided that "[i]f at the start of disability [the insured is] an employee and shareholder of a corporation, we will consider Covered Overhead Expenses incurred by you". Therefore, the Court found that despite the fact that the insured sold his share of the company after he became disabled, the company was still eligible to receive benefits because under this specific language of this policy what mattered was that the insured was a shareholder the day his disability began. There is no such language present in the case at hand and therefore the holding of Lincoln is inapplicable to this case.

unsuccessful position the plaintiff took in Richardson, supra. It also contradicts the very purpose of the BOE policy. A BOE policy is designed to help an insured cover the business expenses he is still incurring despite the fact that he is not generating income, and to preserve the business so that the insured can return to it. When an insured transfers his interest in the business he is no longer incurring any expenses and is therefore not entitled to benefits. A BOE policy "covers an insured's monthly fixed business overhead expenses for a limited period of time as a stop gap measure to allow an insured to retain additional help and/or make arrangements for the continuation of his business. Thus, when an insured ceases to operate his business, coverage ends." Chenvert v. The Paul Revere Life Ins. Co., 2004 U.S. Dist. LEXIS 14947 (D. Del. 2003).

Here, Joseph transferred his share of the business in April 2006 and no longer incurs expenses associated with his business. In April 2006, Joseph received payments representing one-third of the book value of V&V and liquidation of his shareholder's AAA, or retained earnings account at V&V. (Stmt Und. Facts ¶42). His share in V&V has been paid to him. And, based on the face of his stock certificate, Joseph "sold, assigned, or transferred" his stock in V&V. (Id. ¶51). It is further undisputed that since Unum stopped paying on the BOE policy, V&V has not made demand on Joseph for his payment for his share of V&V's overhead expenses. (Id. ¶63). Thus, despite claiming that Joseph is liable for one-third of V&V's expenses, has not made a single payment to V&V towards those expenses since he walked out the door in March 2005, and he has not been asked to do so. Further corroboration that Joseph has no obligation for on-going business expenses is the fact that when Unum wrote to his attorney on two occasions in December 2006, first asking for information about Joseph's ownership interest in V&V, then explaining why further payments on the BOE policy would not be made because the evidence indicated that he had transferred his ownership interest, Joseph did

not respond. (Id. ¶¶25, 27, 28, 29). Indeed, this issue was apparently of no concern to him given that he did not even see either letter from Unum. (Id. ¶29). The conclusion to be drawn from these facts is that Joseph transferred his interest in April 2006 and had no obligation for any share of V&V's business expenses after that date. As such, since Unum had paid benefits through April 2006, no further benefits are due under the BOE policy.

Faced with these facts, V&V claims that ownership after the date of disability is irrelevant. V&V points to two provisions in the policy that refer to covered expenses being the ones an insured was liable for "before disability began." (Id. ¶34). Specifically, the BOE Policy states that "covered overhead expenses are . . . ones for which you were liable in the normal conduct of business before disability began." Under Claim Information the BOE Policy also states that "[w]e may also require evidence that you were liable for an overhead expense before disability began." V&V claims these two provisions necessitate a finding that the only ownership status that matters is Joseph's status before disability began, and that nothing that happens after that date affects the claim. To the contrary, these two provisions address how benefits are calculated, not how eligibility is determined. How much the benefit will be is based on those expenses for which an insured was liable before disability began. These two provisions do not change the fact that in order for the benefit to be payable in the first place, Joseph must continue to have an ownership interest in V&V, continue to incur business expenses, and continue to be liable for those business expenses.

## III. The BOE Policy Permits Unum To Request Information To Determine If A Benefit Is Payable.

The BOE policy specifically states that in order for benefits to be payable certain conditions must be met: "We must be given the information <u>we need</u> to determine if a benefit is payable and how much that benefit should be." (Id. ¶4) (emphasis added). Based on this

language, Unum had the right to request that V&V provide written confirmation and or proof of ownership in order to determine if Joseph was eligible for benefits under the BOE policy. The BOE policy gives Unum the right to determine what information they need. Unum had the right to request proof of ownership from V&V. Likewise, V&V had an obligation to provide that information in order to receive benefits under the BOE policy.

Based on the information in the IME report indicating that Joseph had sold his share of V&V, and a statement to the contrary made by Steven, Unum made repeated requests for proof of Joseph's ownership status:

- On June 1, 2006, Unum requested via fax a copy of either the purchase and sale agreement, or copies of both sides of Joseph's stock certificate so they could determine the actual buy-out date. (Id. ¶14).

- On September 27, 2006, Unum wrote to Steven and requested that he put in writing whether or not Joseph still held a one-third interest in V&V. (Id. ¶18).

- On October 16, 2006, Unum sent letters to both V&V and Joseph's counsel again requesting confirmation in writing that Joseph continued to have an ownership interest in V&V. (Id. ¶20).

- On October 19, 2006, Unum responded to Steven's request for the policy provision that gives Unum the right to ask for this information, directing his attention to the relevant Policy provisions. Unum again requested verification of Mr. Votta's ownership interest in V&V. (Id. ¶21).

- On October 27, 2006, Unum requested confirmation of ownership status from Joseph's attorney. Unum spoke to Jennifer, an assistant to Joseph's attorney, who stated that she "recall[ed] [Joseph] signing something or saying that he sold his share in April 2006." (Id. ¶22).

- On December 7, 2006, Unum sent a pointed letter to both Joseph's counsel and Steven explaining that Joseph had told one of his health care providers that he had sold his share of the business and was relieved by it. Based on this information, Unum again requested verification of Joseph's status as an owner of V&V. (Id. ¶25).

- On December 29, 2006, Unum wrote to Joseph's attorney stating that Unum had concluded based on Attorney Deluca's lack of response, as well as a lack of response from V&V, that Joseph no longer had an ownership interest in V&V and

therefore no longer had any share of the usual and customary expenses of V&V. (Id. ¶28).

- On January 22, 2007, Unum told V&V's counsel that it would consider any documentation he wished to submit demonstrating that Joseph was responsible for a portion of the usual and customary business expenses for V&V. (Id. ¶31).

Despite these numerous requests, V&V refused to provide Unum with written confirmation of Joseph's ownership status or any proof of ownership, taking the position that Unum had no right under the BOE policy to request this information. Indeed, if it was so clear that Joseph only received a loan in April 2006, providing information to that effect would have answered Unum's question in order for it to consider further benefits. Now that discovery in this case is completed, it is clear that if V&V produced the stock certificate Joseph signed in April 2006 when Unum requested it in June 2006, the certificate would have established that Joseph indeed "sold, assigned or transferred" his shares in V&V to the corporation. (Id. ¶51). Nowhere on the stock certificate does it state that it is pledged for a loan and there is no pledge agreement. (Id. ¶51-52). It is undisputed that no one at V&V contacted Joseph to ask him to confirm to Unum that he had received a loan. (Id. ¶38). And the reason for that is simple – based on statements he made, his wife made, and his attorney made, Joseph believed he had been bought out.

Instead, after months of delaying a response to Unum, V&V changed its tune and V&V agreed to provide information about Joseph's ownership status. (Id. ¶34). They provided the 2006 K-1 issued by V&V to Joseph. The K-1 was not available to V&V in 2006 when it was arguing with Unum that proof of ownership was not required because V&V had not completed its taxes. (Id. ¶61). Nevertheless, V&V claimed the K-1 is evidence of Joseph's continued ownership in V&V. While some information about the loan was provided, V&V never told Unum that the "loan" was for Joseph's one-third share of the book value of V&V, and that

Joseph signed his stock certificate to V&V without any evidence of a pledge. Moreover, while V&V holds out the K-1 as evidence of ownership, the K-1 is a "wash" for tax purposes for Joseph. (Id. ¶62). Indeed, Joseph did not even know that he received a K-1 for tax year 2006. (Id. ¶60). It was not until April 2008, when Joseph first saw a reference to V&V on his tax return, that he called his accountant for clarification believing it was a mistake. (Id. ¶58).

Under the BOE policy, Unum was entitled to request information regarding Joseph's ownership in V&V. V&V refused to produce it. (Id. ¶¶19, 24, 26, 30, 32). The after the fact information that they have produced does not establish that Joseph retained an ownership interest in V&V and remained responsible for expenses incurred by his business.

## IV. The Undisputed Material Facts Establish That As Of April 2006, Joseph No Longer Had An Ownership Interest In Votta &Votta.

### A. In April 2006 Joseph Transferred His Interest in V&V in Exchange For One-Third of the Book Value of The Firm.

Joseph stopped working at V&V on March 31, 2005. (Id. ¶6). Since that time he has not even walked through the doors at V&V. (Id. ¶65). In August 2005, Joseph wrote to his mother and siblings requesting that he be paid money he was owed from his bonus account for 2003 and 2004, as well as the $40,000 he was supposed to receive as a 2004 bonus pertaining to an overhead benefit paid in January 2005. (Id. ¶40). Concerned that Joseph was ill and needed money, V&V asked its accountant, John Renza ("Renza") to act as facilitator to respond to Joseph's request for money. (Id. ¶41). At V&V's request, Renza evaluated the book value of V&V. (Id.).

On April 13, 2006 Joseph met with Jill, Steven and Renza. During this meeting Joseph was given three checks. One of these checks, for $33,690.66, represented Joseph's one-third share of the book value of V&V. (Id. ¶42). In exchange for this check, Joseph signed the back of his stock certificate indicating that he "hereby sells, assigns and transfers unto Votta & Votta

Law Offices, Ltd." his shares in the firm. (Id. ¶51). Joseph also signed a receipt acknowledging that the money he received was a "loan" from V&V. (Id. ¶44). Joseph concedes that he did not ask V&V for a loan. ((Id. ¶44). There was no discussion at the April 13, 2006 meeting regarding repayment terms of the loan. There has never been a discussion about interest to be paid on the loan. There is no understanding on when the loan is to be repaid. (Id. ¶45). In fact, when Joseph questioned whether he had to pay the money back, Steven told him they would "cross that bridge when [they] came to it" and may even have given Joseph a note saying "paid in full." (Id. ¶46).

The parties to the loan are not even aware of the principal amount of the loan. Jill and Steven believe the loan is the $33,690.66 check issued to Joseph. (Id. ¶48). However, according to V&V's records, the loan to Joseph is recorded as $40,522.29. (Id. ¶49). Joseph is not aware that V&V was carrying a loan of approximately $40,000. He does not know if he has an obligation to pay a $40,000 loan to V&V. And, he has no recollection of what the numbers are with respect to the loan he received from V&V. (Id. ¶50).

Six weeks after the April 2006 transaction, Renza billed V&V for work on "purchase of Joe Votta's interest in the corporation." (Id. ¶54). Then consistent with a buy-out of a shareholder, six weeks after the April transaction, V&V terminated Joseph's health insurance while he was totally disabled, despite their professed concerns for his health and financial status. (Id. ¶55). Although V&V claims that Joseph still remains responsible for a one-third share of V&V's business expenses, V&V has not asked Joseph to pay any of the business expenses of the firm. (Id. ¶63). Joseph has not made any payments to V&V after April 2006. (Id. ¶64). The undisputed facts establish that on April 13, 2006, Joseph transferred his interest in V&V, regardless of how V&V treats the transaction on its financial records.

B. Joseph Believed That He Had Transferred His Interest In Votta & Votta.

The undisputed facts also establish that as of April 13, 2006, Joseph believed he had transferred his interests in V&V. Seven days after receiving the payments from V&V Joseph appeared for an IME with Dr. Barry Wall, M.D, in connection with his individual disability claim. (Id. ¶9). Dr. Wall records that Joseph also told his treating physicians in April 2006 that V&V "recently bought him out" and that he had sold his share of the business and was relieved by it. (Id. ¶¶9, 10, 11). Similarly, Joseph's wife, in her interview with Dr. Wall, stated that: "He and the family signed some papers over a month ago [which would be April 2006]. They had been talking about cutting him loose. He is relieved by this." (Id. ¶12). Joseph concedes that he told Dr. Wall that he had "settled up" with his siblings and answered affirmatively when Dr. Wall asked him if he had been bought out. Joseph also admits that he may have told his medical providers that he had sold his share of the business. (Id. ¶53).

Even in October of 2006 Joseph still believed that the April 2006 transaction was a buyout. (Id. ¶57). On October 31, 2006, Joseph's attorney sent Jill a letter stating that Unum was requesting information on Joseph's ownership status but "Joe believes he signed away any interest in Votta &Votta in April 2006." (Id. ¶56). Consistent with this belief, neither Joseph nor his attorney ever responded to Unum's letters of December 7, 2006 or December 27, 2006 to provide information or to to deny Unum's belief that Joseph had sold his share of V&V. (Id. ¶27, 29).

Even as late as April 2008, Joseph believed he no longer had an interest in V&V. Proir to April 2008, Joseph was unaware that he had received a K-1 for 2006. (Id. ¶58). It was only when Joseph reviewed his 2007 tax return in April 2008 that he noticed for the first time his return included a K-1 form listing him as an owner of V&V. Confused, he contacted Renza, the

firm's accountant, for clarification. (Id.). Joseph concedes that in a meeting with his attorney on the morning of his deposition, he learned of the tax consequences of calling the $33,690.66 payment a buy-out rather than a loan and that he has not paid taxes on the $33,690.66. (Id. ¶59) While, V&V may have treated the $33,690.66 as a loan, Joseph believed that he had transferred his interest in V&V.

**V. As A Matter Of Law, The April 2006 Transaction Was Not A Loan.**

V&V claims that the April 2006 transaction was a shareholder loan for which Joseph pledged his stock, and as such remained a shareholder in V&V. Regardless of V&V's treatment of this transaction, there can be no loan without an obligation to repay. The undisputed facts establish that there was no pledge agreement or promissory note signed by the parties. There was no discussion about interest to be paid or repayment terms. Joseph has no obligation to repay the money he received. Indeed he has not made a single payment on the loan. While stock can be pledged without a corresponding pledge agreement, it must still be pledged as security for something. (R.I Gen. Laws §9-203). There can be no valid pledge of stock here without a valid loan. Id. A loan in its most basic form must be "a lending." A loan has most often defined as "[d]elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it with or without interest. Boerner v. Colwell Co., 21 Cal.3d 37 (1978)(emphasis added). Therefore, in order for the loan to be valid there must be an agreement to repay the money.

A loan, according to Webster's Third New International Dictionary, is "money lent at interest," or "something lent for the borrower's temporary use on condition that it or its equivalent be returned." Legal authorities have defined the term to mean, "Anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its

equivalent in kind, with or without compensation for its use." Liberty National Bank & Trust Co. v. Travelers Indemnity Co., 295 N.Y.S.2d 983, 986 (Sup. Ct. 1968). See also, e.g., Freeman v. Marine Midland Bank, 510 F. Supp. 826, 830 (E.D.N.Y. 1981), affirmed, 697 F.2d 290 (2d Cir. 1982)(loan is "an agreement pursuant to which one party transfers or delivers money or personal property to another in exchange for a promise to repay such property"); Black's Law Dictionary 844 (5th ed. 1979); Biggs v. Lyng, 644 F. Supp. 998, 1002 (E.D.N.Y. 1986). As such, there simply cannot be a loan where Joseph has no obligation to repay the money.

V&V points to the following evidence in support of their claim that the April 13, 2006 transaction was a loan: (1) V&V is carrying a "loan" on its books; (2) V&V has treated Joseph as a stock holder on their tax returns; and (3) Joseph signed a document acknowledging his receipt of a loan from V&V. However, the "loan" V&V is carrying on the books is for $40,522.29, not the $33,690.66 referenced in the check and receipt. (Stmt. Und. Facts ¶44, 49). Not only is there no obligation to repay this loan, but the parties are not even in agreement about the principal amount of the loan. While V&V's accountant has prepared a K-1 tax form for Joseph's 2006 and 2007 tax returns, Joseph did not even know that he had received a K-1 until April 2008. Upon review of his 2007 tax return, Joseph was confused to see a reference to V&V and he called Renza for clarification. (Id. ¶58, 60). Moreover, Joseph's K-1 is a "wash" in terms of tax liability and has no tax implications for Joseph. (Id. ¶62). In V&V's accountant's own words, V&V has "treated" the April 13, 2006 transaction as a loan. (Id. ¶43). Finally, while Joseph signed a receipt acknowledging a loan from V&V, there is no agreement about repayment and Steven believes that he may have given him a note saying "paid in full." (Id. ¶45, 46). Thus, regardless of V&V's characterization of the April 13, 2006 transaction, without an obligation to repay there is no loan.

## VI. Unum's Decision Not To Pay Further Benefits Under The BOE Policy Was Not In Bad Faith

Under Rhode Island law, bad faith is established when the proof demonstrates that the insurer declined coverage or refused payment without a reasonable basis in fact or law for the denial. Skaling v. Aetna Inc. Co., 799 A. 997, 1010 (R.I. 2002). The decision of the insurance company must be judged by what was before it at the time the decision was made. Id. at 1010. Not every refusal to pay amounts to bad faith. A plaintiff must demonstrate an absence of a reasonable basis in law or in fact for denying the claim or an intentional or reckless failure to properly investigate the claim and subject the result to cognitive evaluation. Id. 1012.

While reviewing V&V's claim under the BOE policy, Unum received the IME report from Dr. Wall, which contained several statements regarding Joseph's sale of his share in V&V. (Stmt. Und. Facts ¶¶9-12). At about the same time, Unum also received a letter from V&V stating that Joseph was a "one-third owner and shareholder in V&V and is responsible for one-third of the expenses." (Id. ¶13). Based on these representations, and since it appeared that Joseph had not been bought out until April 2006, Unum made payment under the BOE policy up to April 30, 2006. (Id. ¶¶14-20). Unum, based on its reasonable interpretation of the BOE provisions, asked V&V to provide evidence of Joseph's continued ownership in V&V.

To obtain information about Joseph's ownership of V&V, Unum took the following steps:

- On June 1, 2006, Unum requested via fax a copy of either the purchase and sale agreement, or copies of both sides of Joseph's stock certificate so they could determine the actual buy-out date. (Id. ¶14).
- On September 27, 2006, Unum wrote to Steven and requested that he put in writing whether or not Joseph still held a one-third interest in V&V. (Id. ¶18).
- On October 16, 2006, Unum sent letters to both V&V and Joseph's counsel again requesting confirmation in writing that Joseph continued to have an ownership interest in V&V. (Id. ¶20).

- On October 19, 2006, Unum responded to Steven's request for the policy provision that gives Unum the right to ask for this information, directing his attention to the relevant Policy provisions. Unum again requested verification of Mr. Votta's ownership interest in V&V. (Id. ¶21).

- On October 27, 2006, Unum requested confirmation of ownership status from Joseph's attorney. Unum spoke to Jennifer, an assistant to Joseph's attorney, who stated that she "recall[ed] [Joseph] signing something or saying that he sold his share in April 2006." (Id. ¶22).

- On December 7, 2006, Unum sent a pointed letter to both Joseph's counsel and Steven explaining that Joseph had told one of his health care providers that he had sold his share of the business. Based on this information, Unum again requested verification of Joseph's status as an owner of V&V. (Id. ¶25).

- On December 29, 2006, Unum wrote to Joseph's attorney stating that Unum had concluded based on Attorney Deluca's lack of response, as well as a lack of response from V&V, that Joseph no longer had an ownership interest in V&V and therefore no longer had any share of the usual and customary expenses of V&V. (Id. ¶28).

- On January 22, 2007, Unum told V&V's counsel that it would consider any documentation he wished to submit demonstrating that Joseph was responsible for a portion of the usual and customary business expenses for V&V. (Id. ¶31).

Joseph refused to respond to Unum's request for information. V&V refused to provide any information regarding Joseph's ownership in V&V from October 2006 through June 2007. Then in June 2007, a year after Unum had initially asked for this information, after waiting until after tax season to prepare its 2006 tax returns, V&V produced a K-1 for Joseph. V&V claimed that the K-1 was sufficient evidence of Joseph's continued ownership in V&V. V&V also gave Unum cursory information about the loan, and the pledge of Joseph's stock as security for the loan. (Id. ¶34). V&V, through their attorney, informed Unum that there was "no other documentation to evidence [Joseph's] current ownership of V&V." (Id.).

However, given the position that V&V takes in this case, Joseph's stock certificate, which V&V says has only been pledged to V&V, is evidence of Joseph's ownership. But the stock certificate was not produced to Unum during the claim, despite Unum's request to see it.

Indeed, the obvious reason it was not produced is because the stock certificate on its face does not make the slightest mention of it being pledged. Rather, the stock certificate Joseph signed states that he "sells, assigns and transfers" his stock to V&V.

While V&V claims that Unum acted in bad faith in its decision not to pay benefits under the BOE policy after April 30, 2006, what is striking is all of the information regarding the so-called loan that V&V did not provide. V&V did not tell Unum that:

- The loan to Joseph represented his one-third share of the book value of V&V;
- Joseph also received full payment of his retained earnings account at V&V;
- There was no discussion about repayment of the loan;
- There was no discussion about interest on this loan;
- Joseph has no obligation to repay the loan;
- Joseph may even have been told and given a document to reassure him that the loan was paid in full;
- The loan amount carried on V&V's financial records is different from the loan the partners believe they gave Joseph;
- Joseph does not know the amount of the loan;
- Six weeks after the loan was made, V&V's accountant billed them for his time spent on the "purchase of Joe Votta's interest in the corporation;"
- Six weeks after the loan, despite their concern for Joseph's health and financial well-being, V&V terminated Joseph's health insurance while he was totally disabled;
- While it was demanding that Unum pay under the BOE policy, V&V was aware, via an October 31, 2006 letter from Attorney Deluca that "Joseph believes he signed away any interest in V&V in April of 2006.;"
- Although the K-1 was issued to Joseph in 2006, it was a wash tax-wise, and had no tax implications for him;
- The 2006 K-1 was not given to Joseph directly by V&V. Joseph did not even know he had received a K-1 for 2006 until April 2008;
- Joseph has not walked through the doors of V&V since they day he left in March 2005, and has made no payments to V&V;
- Even after Unum stopped benefits under the BOE policy, V&V has not made demand on Joseph for his share of the overhead business expenses.

Unum made repeated attempts to obtain the information necessary to determine whether further payments were due under the BOE policy. Both V&V and the insured refused to respond. While V&V did provide some response, it did not provide the stock certificate Unum had requested. Joseph's stock certificate is evidence of Joseph's ownership yet V&V claimed "no documents," other than the K-1 existed to show Joseph's ownership in V&V. The information V&V produced was not sufficient to change Unum's decision that further benefits under the BOE policy were not warranted. Unum has not acted in bad faith.

## CONCLUSION

For all of the foregoing reasons, Unum requests that this Court enter summary judgment on its behalf.

UNUM LIFE INSURANCE COMPANY
OF AMERICA

By its attorney,

/s/ Joan O. Vorster

Joan O. Vorster, Esq. (#5784)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax: (508) 791-8502

Dated: August 20, 2008

CERTIFICATE OF SERVICE

I, Joan O. Vorster, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 20, 2008.

/s/ Joan O. Vorster
Joan O. Vorster, Esq.

Dated: August 20, 2008