UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | |
|---|---|
| VOTTA & VOTTA LAW OFFICES, LTD.,<br>Plaintiff<br><br>v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA, ALIAS,<br>Defendant | C.A. NO. 07-420-ML |

**UNUM LIFE INSURANCE COMPANY OF AMERICA'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to L.R. Cv. 56, the defendant, Unum Life Insurance Company of America ("Unum"), submits the following statement of undisputed material facts:

The Policy

1. Unum issued two disability insurance policies to Joseph Votta, Jr. ("Joseph"); an individual disability insurance policy and a business overhead expense disability income ("BOE") policy. A copy of the BOE Policy is attached to the Affidavit of April Allard ("Allard Aff.") as Tab A. The BOE policy is at issue in this case.

2. The BOE policy provides that if the insured is Totally Disabled, "[Unum] will pay the smaller of:

> 1. the Maximum Overhead Expense Benefit; or
>
> 2. the covered overhead expenses incurred during the month for which the benefit is payable
>
> in any month after you have satisfied the Elimination Period that:
>
> 1. you are totally disabled;

2. your total disability is the result of injury or sickness which caused you to satisfy the elimination period; and

3. the total amount paid for that disability does not exceed the Total Overhead Expense Benefit.[1]

(Id. at p.8).

3. Under the BOE Policy:

"Covered overhead expenses" means your share of the usual and customary business expenses that are not excluded below which you or your business incurs on a regular basis and are essential to your established business operation.

Covered overhead expenses are normally paid from earnings that depend on your presence and individual effort; they continue during disability and they are the ones for which you were liable in the normal conduct of the business before disability began.

(emphasis added) (Id. p.8).

4. Under Claim Information, the Policy provides:

We must be given information which we need to determine if a benefit is payable and how much that benefit should be . . . We may also require evidence that you were liable for an overhead expense before disability began.

(Id. at p.11).

The Claim Under the BOE Policy

5. Prior to his disability, Joseph worked as a trial attorney. He was a partner in Votta & Votta ("V&V"), along with his brother, Steven Votta ("Steven") and his sister, Jill Votta ("Jill"). (Id. at UASP00016).

[1] After a 60 day elimination period, the BOE policy pays a maximum monthly benefit of $6,404.00. The total overhead business expense benefit available under the policy is $153,696.00. (Id. at p.3). Given Joseph's date of disability, the benefit period for the BOE policy is June 1, 2005 to May 31, 2007. Unum paid benefits to V&V for the period of June 1, 2005 to April 30, 2006 for a total of $69,841.00. Unum does not dispute that Joseph was totally disabled during the benefit period for the BOE policy.

6. Joseph stopped working at V&V on March 31, 2005. (See deposition of Joseph Votta at 7:23-8:01 (hereinafter referred to as "Joseph Depo," attached to the Affidavit of Joan O. Vorster as Tab A ("Vorster Aff."))

7. On August 31, 2005, Joseph submitted a claim for total disability benefits under both his individual disability policy and the BOE policy, claiming to be disabled beginning on April 1, 2005. (Allard Aff., Tab B at UACL00016 and 18).

8. While the individual disability claim was being evaluated, on March 3, 2006, Steven sent an authorization and assignment of rights under the BOE policy to Unum. According to the assignment, which is dated February 27, 2006, Joseph authorized Unum to "discuss and negotiate any benefits to which I may be entitled" with his siblings and law partners, Jill and Steven. He also authorized Unum to pay all benefits directly to V&V. Steven made a claim on the BOE policy for V&V. (Vorster Aff., Tab J, Steven Votta Deposition, Exhibit 3 hereinafter "Steven Depo.").

9. On April 20, 2006, as part of Unum's evaluation of his disability claim, Joseph appeared for an Independent Medical Examination ("IME") with Barry Wall, M.D. (A redacted copy of Dr. Wall's IME report is attached to the Allard Aff. at Tab C).

10. In his IME report to Unum dated May 12, 2006, Dr. Wall recorded that Joseph's treating physician, Dr. Ruggiano, informed him that Joseph's "business recently bought him out." (Allard Aff., Tab C at UACL00242).

11. Dr. Wall's report also stated that Dr. Kenner, another heath care provider, reported to Dr. Wall that she had seen Joseph on April 18, 2006 and "[h]e had just sold his share of the business and was relieved by it. Although his family business partners owed him money, he took what they gave him." (Id. at UACL00244).

12. Dr. Wall also recorded that Joseph's wife stated that: "[h]e and the family signed some papers over a month ago [which would be April 2006]. They had been talking about cutting him loose. He is relieved by this." (Id. at UACL00245).

13. However, by letter dated May 17, 2006, in connection with V&V's claim under the BOE policy, Steven informed Unum that "Joseph S. Votta, Jr. is a one-third owner and shareholder of Votta & Votta Law Offices, Ltd., and as such is responsible for one-third of expenses." (Vorster Aff. Tab K, Steven Depo, Exhibit 5).

14. Given the statements in the IME report indicating that Joseph had sold his share of V&V, and Steven's statement to the contrary, Unum asked for information regarding Joseph's ownership in V&V. Specifically, on June 1, 2006, Unum requested via fax, a copy of either the purchase and sale agreement, or copies of both sides of Joseph's stock certificate so Unum could determine the actual buy-out date. (Vorster Aff. Tab L, See Steven Depo, Exhibit 6).

15. When Unum did not receive a response to the June 1, 2005 fax, the disability benefits specialist assigned to the claim called Steven, who informed her in an August 10, 2006 telephone call, that there had been no "buy-out;" that he loaned Joseph some money that Joseph would pay back at a later date; that Joseph could come back to work any time; and that Joseph was still a one-third owner, responsible for expenses. (Allard Aff., Tab D at UACL00331-332).

16. During this telephone call, Unum informed Steven that in an independent medical exam, Joseph told the examiner that he had sold his portion of the business and severed family ties. Steven stated that he was not sure why his brother made that comment because no formal buy-out had occurred. He further stated that he had not seen his brother since April 2006 when he loaned him the money. (Id.).

17. Based on Steven's representations during this telephone call, Unum paid benefits under the BOE policy from June 2005 to November 2005 for a total of $38,424. (Vorster Aff. Tab N, Steven Depo, Exhibit 8).

18. As part of Unum's consideration of further payment under the BOE policy, on September 27, 2006, Unum wrote to Steven to ask him to confirm in writing that Joseph still held a one-third interest in V&V. (Vorster Aff., Tab P, Steven Depo, Exhibit 10).

19. Rather than provide the confirmation Unum requested, by way of a letter dated October 13, 2006, Steven demanded to know what section of the BOE Policy allowed Unum to request written statements and insisted that Unum indicate, "indicate any section(s) of the policy that make this matter relevant to our claim." (Vorster Aff., Tab Q, Steven Depo, Exhibit 11.

20. On October 16, 2006, Unum sent a letter to V&V and Joseph's counsel approving benefits under the BOE Policy through April 30, 2006 for a total of $31,417.00. Unum again requested from both parties confirmation in writing that Joseph continued to have an ownership interest in V&V. (Allard Aff., Tab E at UACL00870, UACL00871).

21. On October 19, 2006, Unum responded to Steven's October 13, 2006 letter, directing his attention to the Policy conditions which state "We must be given information which we need to determine if a benefit is payable and how much that benefit may be . . . We may also require evidence that you were liable for an overhead expense before disability began." Unum again requested verification of Joseph's ownership interest in V&V. (Allard Aff., Tab F at UACL00874, and Tab A at p. 11).

22. Having received no information from V&V, Unum inquired of Joseph, through his attorney Amato A. DeLuca. On October 27, 2006, Jennifer, Attorney DeLuca's assistant,

stated in a telephone call with Unum that she "recall[ed] [Joseph] signing something or saying that he sold his share in April 2006." (Allard Aff., Tab G at UACL00884).

23. On October 31, 2006, Jennifer from Joseph's attorney's office again contacted Unum and stated that she would have an answer to Unum's questions regarding the sale of Joseph's shares in April. (Allard Aff., Tab H at UACL00885).

24. On November 2, 2006, V&V again wrote to Unum refusing to give confirmation as to Joseph's ownership interest in writing, formally demanding additional payments, and claiming that Unum had no right to request written confirmation of Joseph's ownership interest. (Vorster Aff., Tab R, Steven Depo, Exhibit 13; and Tab I, Steven Depo at 63:13-65:23).

25. On December 7, 2006, Unum wrote to both Joseph's counsel and Steven explaining that Joseph had told his health care providers that he had sold his share of the business. Based on this information, Unum again requested verification of Joseph's status as an owner of V&V and asked for specific information about Joseph's ownership in V&V. (Vorster Aff., Tab G, Joseph Depo, Exhibit 9; and Tab I, Steven Depo at 65:24-67:17).

26. Rather than provide any written verification of Joseph's ownership, V&V retained legal counsel, who in a letter dated December 27, 2006, took the position that "ownership of business need not continue during the disability," "that liability is determined at the time the claim accrues," and that "nothing that happens thereafter affects liability under the Policy." V&V refused to produce information regarding Joseph's ownership status. (Allard Aff., Tab I at UACL00927-929).

27. Neither Joseph nor his attorney responded to Unum's December 7, 2006 request. In fact, Joseph does not believe that he ever saw the letter. (Vorster Aff., Tab A, Joseph Depo at 88:01-08).

28. On December 29, 2006, Unum wrote to Joseph's counsel stating that Unum had concluded based on Joseph's attorney's lack of response, as well as a lack of response from V&V, that Joseph no longer had an ownership interest in V&V and therefore no longer had any share of the usual and customary expenses of V&V, such that no further benefits would need to be paid under the BOE policy. (Vorster Aff., Tab H, Joseph Depo, Exhibit 10).

29. Joseph never saw the December 29, 2006 letter and neither he nor his attorney provided Unum with any contradictory evidence. (Vorster Aff., Tab A, Joseph Depo at 89:06-16.

30. By letter dated January 12, 2007, V&V continued to contest Unum's right to obtain information with respect to Joseph's ownership interest. V&V argued that a transfer of ownership after a claim accrues has no affect upon the claim. V&V demanded to know where in the policy there is a requirement that the insured has to continue to be liable for the expenses after his disability has begun. (Allard Aff., Tab J at UACL01109-1110).

31. In a letter dated January 22, 2007, Unum responded to V&V's counsel stating that it would consider any documentation he wished to submit demonstrating that Joseph was responsible for a portion of the usual and customary business expenses for V&V. Unum again directed plaintiff's attention to the definition of Covered Overhead Expenses which specifically included "your share of the usual and customary business expenses." (Allard Aff., Tab K at UACL1112-1113).

32. In a letter dated February 22, 2007, V&V again contested Unum's right to require that Joseph continue to be an owner in V&V or that he continue to have liability for a portion of the expenses. V&V refused to release "private information regarding the internal operation of

their practice unless and until the court finds that it is a condition precedent to their right to benefits under the policy." (Allard Aff., Tab L at UACL01126-27).

33. In a letter dated March 7, 2007, Unum informed V&V that it maintains its current position that proof of ownership is required and that the BOE policy gave Unum the right to ask for this information. (Allard Aff., Tab M at UACL01129).

34. Over three months later, on June 22, 2007, V&V changed its tune and decided that it would provide information regarding Joseph's ownership of V&V. V&V enclosed a Schedule K-1 for Joseph, which was prepared in reference to the 2006 tax year. The K-1 lists Joseph's percentage of stock for the current year, 2006, as one-third. V&V also informed Unum that "Joseph Votta, Jr., Esq., received a loan from the Law Office for which he pledged as security the stock issued by Votta & Votta Law Offices, Ltd. to him. The Law Firm currently holds that stock as security for the loan." V&V maintained that this did not constitute a transfer of Joseph's interest in the firm, such that they believe Joseph is still a one-third owner of V&V. Finally, V&V informed Unum that there is no other documentation to evidence his current ownership of V&V. (Vorster Aff., Tab S, Steven Depo, Ex. 15).

35. In a letter dated July 23, 2007, Unum requested documents evidencing the loan, including a signed copy of the loan agreement, copies of documentation indicating that Joseph has paid one-third of the expenses or that he is legally required to payment, and a signed copy of his employment agreement with V&V. (Allard Aff., Tab N at UACL01855-56).

36. V&V replied on September 26, 2007, stating that there is no written loan agreement, no proof of Joseph's responsibility for one-third of expenses, and that he never signed a document that could be described as an employment agreement. (Allard Aff., Tab O at UACL01876-77).

37. Unum responded on October 11, 2007, stating that the information contained in V&V's September letter did not change its decision. (Allard Aff., Tab P at UACL01883).

38. At no time did anyone at V&V ask Joseph to provide any information regarding his ownership status in V&V to Unum. ( Vorster Aff., Tab A at Joseph Depo at 90:19; 91:05).

39. Steven admits that despite Unum's request for a copy of Joseph's stock certificate, he did not produce it to Unum prior to the litigation. (Vorster Aff., Tab M, Steven Depo, Exhibit 7; Tab O, Steven Depo, Exhibit 9; Tab I, Steven Depo at 50:09-51:13; 52:05-12; and Tab A, Joseph Depo at 55:04-17; 57:21-58:22).

V&V Payments to Joseph

40. In discovery Unum learned that while it was evaluating Joseph's claim for disability benefits, in August 2005 Joseph wrote to his mother and siblings requesting that he be paid money he was "owed from his bonus account for 2003 and 2004, as well as the $40,000 he was supposed to receive as a 2004 bonus pertaining to an overhead benefit paid in January 2005." (Vorster Aff., Tab A, Joseph Depo at 33:20-34:04; and Tab B, Joseph Depo, Exhibit 3).

41. At their mother's urging, Jill and Steven asked V&V's accountant, John Renza ("Renza") to act as facilitator to respond to Joseph's requests for money. The family was concerned that Joseph was ill and needed money. At Jill and Steven's request, Renza calculated the book value of V&V. (Vorster Aff., Tab I, Steven Depo at 32:14-22; Tab T, Deposition of Jill Votta at 84:17-21, hereinafter referred to as "Jill Depo"; and Tab V, Deposition of John Renza at 28:09-30:03, hereinafter referred to as "Renza Depo").

42. On April 13, 2006, Joseph met with Renza, Jill and Steven. At this meeting, Joseph received three checks (Vorster Aff., Tab C, Joseph Depo, Exhibit 4). He received a check for $33,690.66, which represented Joe's one-third of the book value of V&V. (Vorster

Aff., Tab V, Renza Depo at 49:19-24; 50:1-8). He received a check for $6,831.63, which represented Joseph's Accumulated Adjustment Account ("AAA Account") at V&V, which is akin to a retained earnings account (Id., Renza Depo at 30:21-24; 31:9-11; 45:23-24, 46:1-10). And, he received a check for $10,828.25 which represented his share of the 2005 bonus V&V paid to shareholders, prorated for the fact that he only worked for the first quarter of 2005 (Vorster Aff., Tab V, Renza Depo at 30:04-16; Tab T, Jill Depo at 60:20-61:04).

43. The $33,690.66 check is labeled "loan to stockholder." According to Renza, although the $33,690.66 check represents Joseph's share of the book value of V&V, it was "treated" by V&V as a loan. (Vorster Aff., Tab V, Renza Depo at 49:19-50:01). Classifying the payment as a loan provided a benefit to Joe because he would not need to pay taxes on the payment. Classifying the payment as a buyout would require Joe to pay long-term capital gains. (Id., Renza Depo at 58:19-24; 59:18-24; 60:1-2).

44. Accordingly, at the meeting Joseph signed a document entitled "receipt" acknowledging that he received a "loan" in the amount of $33,690.66 from V&V on April 13, 2006. (Vorster Aff., Tab A, Joseph Depo at 55:17-56:11; Tab C, Joseph Depo, Exhibit 5). However, despite asking V&V for payment of his bonus account in August 2005, Joseph concedes that he never asked V&V for a loan. (Vorster Aff., Tab A, Joseph Depo at 38:01-06).

45. There was no discussion at the April 13, 2006 meeting regarding repayment terms of the loan. (Vorster Aff., Tab I, Steven Depo at 44:09-12). There has never been a discussion about interest to be paid on the loan. (Id., 37:05-10). There is no understanding as to when the loan is to be repaid. (Vorster Aff., Tab A, Joseph Depo at 51:12-17; 52:03-13; and Tab T, Jill Depo at 83:20-84:14).

46. In fact, Steven recalls Joseph asking at the April 13, 2006 meeting what would happen if he did not want to repay the money. Steven told him they would "cross that bridge when we get to it." Steven believes he may even have given Joseph a note that said "paid in full." (Vorster Aff., Tab I, Steven Depo at 44:13-46:4).

47. Despite being aware that Joseph had applied for disability benefits, V&V did not expect or ask Joseph to repay the loan after he received his disability benefits. (Vorster Aff., Tab I, Steven Depo at 47:07-10).

48. Indeed, neither Joseph, Jill nor Steven are aware of the amount of the loan. At their depositions, Jill, Steven and Joseph all testified that the loan the check was in the amount of $33,690.66. (Vorster Aff., Tab I, Stephen Depo 34:22-35:05; Tab A, Joseph Depo at 48:06-17; and Tab T, Jill depo at 61:16-21).

49. However, according to V&V's financial records, the loan to Joseph is recorded as $40,522.29. (Vorster Aff., Tab V, Renza Depo. 84:3-14).

50. Joseph was not aware that V&V was carrying a loan of approximately $40,000.00; he does not know if he has any obligation to repay a $40,000 loan; and in fact has no recollection of what any of the numbers were with respect to the "loan" he allegedly received from V&V. (Vorster Aff., Tab A, Joseph Depo at 74:08-14; 74:23-75:19).

51. At the April 13, 2006 meeting, Joseph also signed the back of his stock certificate which states that he "sells, assigns and transfers" his stock to V&V. (Vorster Aff., Tab U, Jill Depo, Exhibit 11; Tab A, Joseph Depo at 59:10-60:03.

52. While V&V claims that Joseph signed the back of the stock certificate to pledge it for security for the loan, no corresponding pledge agreement was signed. (Vorster Aff., Tab I, Steven Depo at 40:11-16, 40:17-23).

53. One week after the April 13, 2006 meeting, Joseph appeared for his IME with Dr. Wall. (Vorster Aff., Tab A, Joseph Depo. 63:23-64:01) Joseph concedes that he told Dr. Wall that he had "settled up" with his siblings and answered affirmatively when Dr. Wall asked him if he had been bought out. (Id. at 62:18-63:18). Joseph also admits that he may have told his medical providers that he had sold his share of the business. (Id. at 70:01-06).

54. Six weeks after the April 13, 2006 meeting, on May 30, 2006, Renza sent Jill an invoice for his time at the April 13, 2006 meeting. The entry states "[c]onsulting work and meeting to discuss purchase of Joe Votta's interest in the corporation." (Vorster Aff., Tab W, Renza Depo, Exhibit 14) (emphasis added).

55. On June 1, 2006, while Joseph was totally disabled and at a time when the family claims to have been worried about his health and financial status, V&V notified Joseph that they were terminating his health insurance coverage effective July 2006. (Vorster Aff., Tab E, Joseph Depo, Exhibit 6; Tab A, Joseph Depo at 78:01-12; Tab T, Jill Depo at 39:09-20.

56. In October 2006, after Unum contacted Joseph's attorney to inquire about Joseph's ownership in V&V, Attorney DeLuca in a letter dated October 31, 2006 wrote to V&V and stated:

> "I have been requested by Unum Provident to provide proof that your brother Joseph Votta, Jr. no longer has an interest in Votta & Votta Law Offices Ltd. Joe believes he signed away any interest in Votta & Votta in April of 2006. Please provide me with a copy of such document. . . (emphasis added).

(Vorster Aff., Tab F, Joseph Depo, Exhibit 7).

57. Joseph admits that as of the date of October 31, 2006 letter, he believed that he had signed away any interest in V&V in April, 2006. (Vorster Aff., Tab A, Joseph Depo at 83:11-14).

58. In fact, as late as April 2008, Joseph still believed that he had transferred his interest in V&V. In April 2008 when Joseph received his 2007 tax return, Joseph noticed an entry that referred to V&V. He did not understand the entry and called Renza for clarification. Renza told Joseph that the item on his tax return pertained to his shares at V&V. (Vorster Aff., Tab A, Joseph Depo at 28:17-20; 29:23-30:02; 31:10-22; 93:05-24).

59. Joseph concedes that in a meeting with his attorney on the morning of his deposition, he learned of the tax consequences of calling the $33,690.66 payment a buy-out rather than a loan. (Vorster Aff., Tab A, Joseph Depo at 95:17-96:08). Accordingly, contrary to his previous statements, and statements made by his wife and his lawyer indicating that he had transferred his shares in V&V, Joseph now claims he received a loan, and pledged his stock for that loan. (Vorster Aff., Tab A Joseph Depo 50:08-16; 59:03-10). Joseph has not paid taxes on the $33,690.66 payment. (Vorster Aff., Tab V, Renza Depo at 59:18-60:02).

60. While V&V seeks to establish that Joseph remained a shareholder in 2006 and 2007 because he was issued a K-1 by V&V, Joseph was unaware that he had been issued a K-1 until April 2008. (Vorster Aff., Tab A, Joseph Depo 29:22-30:08). V&V did not give Joseph his K-1 directly. (Id. at 21:21-22:22).

61. The 2006 K-1 V&V issued to Joseph was not available to V&V prior to April 15, 2007. (Vorster Aff., Tab I, Stephen Depo at 70:18-22).

62. Indeed the K-1 issued to Joseph for tax years 2006 and 2007 had no tax implications for Joseph. As Renza confirmed, the K-1s were a "wash" in terms of tax liability. (Vorster Aff., Tab V, Renza Depo 75:10-13, 21-24; 75:1-14)

63. While V&V claims that Joseph is still responsible for one-third of the overhead expenses of V&V, it has not demanded payment from Joseph upon Unum's refusal to pay the

remaining benefits under the policy. (Vorster Aff., Tab T, Jill Depo at 33:14-34:11; Tab I, Steven Depo 16:18-18:03).

64. Joseph has not made any payment for his share of V&V's overhead expenses since leaving the law firm in March 2005. (Vorster Aff., Tab T, Jill Depo at 36:11-15; Tab I, Steven Depo 18:07-24).

65. His siblings and law partners confirm that Joseph has not walked through the doors at V&V since leaving some three and a half years ago in March 2005. (Vorster Aff., Tab T, Jill Depo 12:12-17).

UNUM LIFE INSURANCE COMPANY
OF AMERICA

By its attorney,

/s/ Joan O. Vorster

Joan O. Vorster, Esq. (#5784)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax: (508) 791-8502

Dated: August 20, 2008

CERTIFICATE OF SERVICE

I, Joan O. Vorster, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 20, 2008.

/s/ Joan O. Vorster

Joan O. Vorster, Esq.

Dated: August 20, 2008