# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
No. 07-420-ML

---

VOTTA & VOTTA LAW OFFICES, LTD. )

Plaintiff, )

vs. )

UNUM LIFE INSURANCE COMPANY OF AMERICA, ALIAS)

Defendant. )

---

DEPOSITION OF JOSEPH S. VOTTA, JR., taken in behalf of the defendant, before Charlene Jones, duly appointed Commissioner within and for the State of Rhode Island, at the offices of DeLuca & Weizenbaum, 199 North Main Street, Providence, Rhode Island, on Monday, July 7, 2008, commencing at 9:06 a.m.

FLYNN REPORTING ASSOCIATES

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303



APPEARANCES:

LAW OFFICES OF BERNARD P. HEALY
(by Bernard P. Healy, Esq.)
750 East Avenue
Pawtucket, Rhode Island 02860;
for the Plaintiff.

LAW OFFICES OF MIRICK O'CONNELL
(by Joan O. Vorster, Esq.)
100 Front Street
Worcester, Massachusetts 01608;
for the Defendant.

LAW OFFICES OF DELUCA & WEIZENBAUM
(Amato A. DeLuca, Esq.)
199 North Main Street
Providence, Rhode Island 02903;
for Joseph S. Votta, Jr.



INDEX

Deposition of: Page

JOSEPH S. VOTTA, JR.

Examination by Ms. Vorster 5



EXHIBITS



| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Subpoena | 6 |
| 2 | Subpoena | 7 |
| 3 | Letter | 33 |
| 4 | Copies of Check | 47 |
| 5 | Receipt | 56 |
| 6 | Letter dated 7/31/06 | 78 |
| 7 | Letter dated 10/31/06 | 80 |
| 8 | Invoice to Jill Votta | 84 |
| 9 | Letter dated 12/7/06 | 86 |
| 10 | Letter dated 12/29/06 | 89 |
| 11 | 2006 Tax Returns | 92 |
| 12 | 2007 Tax Returns | 92 |
| 13 | Stock Certificate | 97 |

JOSEPH S. VOTTA, JR., a witness called in behalf of the defendant, first having been duly sworn, on oath deposes and says as follows:

Examination by Ms. Vorster:
Q. Good morning, Mr. Votta. I'm Joan Vorster. I represent the Unum Life Insurance Company of America in this case and I've got a few questions for you this morning.
**A. Sure.**
Q. If I ask you a question you don't understand, please let me know, and as you know from probably being in many depositions in your legal career, our court reporter can't take down a nod of the head. So I'm just going to ask you to speak up and answer affirmatively; okay.
**A. Sure.**
Q. Can you identify yourself for the record by giving me your name and address, please?
**A. Joseph Votta, 4500 Ridge Drive, North Scituate, Rhode Island.**
Q. I understand, Mr. Votta, that you have received a subpoena regarding your attendance



today and I'm going to show you a copy of the subpoena that I served on you?
(Handing of document)
Q. Is that a copy of the subpoena that you received?
**A. Probably.**
MS. VORSTER: Okay. We're going to mark that as the first exhibit, please.
(Document marked Exhibit No. 1 for identification.)

Q. I also understand that you also received a subpoena from Mr. Healy?
**A. Yes.**
Q. I'm going to show you that subpoena as well.
**A. Yes.**
**(Handing of document)**
Q. Is that a copy of the subpoena you received?
**A. Yes.**
MS. VORSTER: Let's mark that as Exhibit Number 2, please.
(Document marked Exhibit No. 2 for identification.)



Q. All right. Now showing you the subpoenas that we've marked as Exhibit Numbers 1 and 2, sir, looking at Number 1, if you turn to the last page there's a Schedule A and it asks you to bring various documents with you. Did you bring any documents with you today?
**A. I did not.**
Q. Did you make a search to determine whether you had any of those documents in your possession that are listed on Schedule A?
**A. Yes, I did.**
Q. Did you search your personal files and records at home for those documents?
**A. No. There were no documents to search for.**
Q. And what makes you say that?
**A. Because the only documents that I believe exist under this was the copy of a K-1 tax form, which I believe my attorney has, and copies of any checks or anything which my attorney also has. I don't have any of those other documents.**
Q. As I understand it, sir, you stopped working at Votta & Votta on March 31, 2005?



**A. Yes.**
Q. Is that correct?
**A. M-hm.**
Q. And you have not been back to work at Votta & Votta since then --
**A. No.**
Q. -- is that correct? In 2005 after you left Votta & Votta, did you communicate by e-mail with either Stephen or Jill Votta?
**A. No.**
Q. And what about them communicating with you via e-mail?
**A. No.**
Q. Was that just not a method of communication that you used --
**A. No.**
Q. -- with your brother and sister?
**A. No.**
Q. What about with your mother Camille, did you communicate with her by e-mail --
**A. No.**
Q. -- from your residence? No. What about you and her from the law firm?
**A. What, by e-mail?**

Page 21

still a shareholder in Votta & Votta?
MR. DELUCA: I object. Go ahead.
**A. I can remember having a question about my tax return that there was something on there pertaining to Votta & Votta that I was surprised to see or just didn't understand and he explained to me that as a shareholder that's how the taxes were.**
Q. What was the thing that you were surprised to see on your tax return?
**A. I think it had to do with the loan. I don't understand taxes very well.**
Q. Was it a K-1?
**A. You know, it might have been. I don't know about those kinds of things.**
Q. You recall that before leaving Votta & Votta you received a W-2 for your compensation you received during the year, correct?
**A. I believe so, yes.**
Q. And you also received a K-1 as a shareholder or principal of the firm, correct?
**A. You know, I really don't know. There was always things that the accountant took care**

Page 22

**of.**
Q. Before you left Votta & Votta, would you receive your K-1 or your W-2 at home?
**A. No.**
Q. How would those documents be provided to you?
**A. I don't know. They would just be stapled to my tax return by somebody. I don't know how it works.**
Q. Would they be mailed to you before you prepared your tax return?
**A. I don't know. I don't know how that works. My understanding is that the accountant takes care of that.**
Q. What about when you prepared your taxes for the year 2006 and 2007, after you had left Votta & Votta, did you receive a K-1 in the mail from anyone at Votta & Votta?
**A. I don't know.**
Q. Did you ever receive a K-1 in the mail to your home?
**A. I don't know.**
Q. When was the first time that you saw your K-1 for 2006?

Page 23

**A. I don't know.**
Q. When was the first time you saw your K-1 for the year 2007?
**A. I don't know.**
Q. When you looked at your tax return and saw something that you were surprised to see, you believe that it was about the loan from Votta & Votta?
**A. That's what it was explained to me that it had to do with my shares that I still held and I believe it was also something germane to the loan that I had with them.**
Q. And this was a conversation that you had with Mr. Renza?
**A. Yeah.**
Q. Did you have it with him when you were actually signing your tax return?
MR. DELUCA: Objection.
**A. No, I don't think I had that conversation with him when I signed the papers.**
Q. When did you have the conversation with him then?
**A. Are you talking about when I signed the papers in 2006?**

Page 24

Q. No. No, when you signed your tax return. When your tax return was prepared for the year 2006 --
**A. Yeah.**
Q. -- did you have the conversation with Mr. Renza when you signed the tax return?
MR. DELUCA: Objection.
**A. I don't know.**
Q. Was the conversation with Mr. Renza in person?
**A. No, I don't believe it was.**
Q. Was it over the phone?
**A. Yeah, that's my recollection.**
Q. Was it a matter -- let me back up. How did you receive your tax return for 2006, did you get it in the mail, did you go to the office and pick it up?
**A. I go to the office and pick it up.**
Q. When you would go to the office and pick it up, would you review it while you were there?
**A. Usually not.**
Q. Would you sit and meet with anybody at Renza's office when you would pick up your tax return?

Page 25

**A. Usually not.**
Q. So it was just a matter you go, get it, go home?
**A. Yeah.**
Q. Did you electronically file your tax return --
**A. No.**
Q. -- in 2006?
**A. I don't believe so.**
Q. So after you -- how would you know that your tax return for 2006 was prepared?
**A. They'd call me up and say, "Taxes are ready. Come pick them up."**
Q. So Mr. Renza's office would do all the preparation for your tax return without you present?
**A. Yeah.**
Q. Before picking up the tax return for 2006, did you have any meeting with any of the accountants at Mr. Renza's office to prepare the tax return?
**A. No.**
Q. Was that the way it had been for you for years beforehand?

Page 26

**A. Yeah.**
Q. They would -- the accounting firm would just prepare the tax return for you?
**A. Yeah.**
Q. What about personal documents, would you send those to the accounting firm before your return was prepared?
**A. I don't know what you mean.**
Q. What about statements regarding mortgage interest or other items that you might have that would be deductions on your tax return, how would you get those documents to your accountant?
**A. They would send us a letter and say, "please provide us with this information", and we would give it to them.**
Q. Do you believe that that's what occurred to prepare your tax return for the year 2006?
**A. Yes.**
Q. So after you picked up your tax return for 2006 from Mr. Renza's office, what did you do with it next?
**A. Signed it.**
Q. Did you review it before you signed it?
**A. Only to the extent of where the little**

Page 27

**arrows were to sign. No, I did not review it.**
Q. How did you find out that -- how did you determine that there was something on that tax return that you were surprised to see?
**A. I believe in my 2007 tax return I noticed something that I didn't understand and I called Mr. Renza's office.**
Q. So it was your 2007 tax return that you noticed something you didn't understand?
**A. I believe so.**
Q. Not the 2006 tax return?
**A. You know, I really can't say for sure, but I do know that it was the 2007 one that I made at least a call on. The 2006 one I wouldn't want to mislead you and say one way or the other.**
Q. So you can't say one way or the other whether you made a call to Mr. Renza with respect to the 2006 return?
**A. Right.**
Q. So with respect to the 2006 return, as I understand it, your memory is you didn't review it, correct?
**A. Right.**
Q. And you signed it?

Page 28

**A. Right.**
Q. And sent it into the Internal Revenue Service?
**A. Right.**
Q. And your wife signed it as well?
**A. Yes.**
Q. You file a joint return?
**A. Yes.**
Q. And then it's my understanding from your testimony when you got your 2007 tax return, that's when you do recall speaking to Mr. Renza?
**A. Yes.**
Q. And it's on the 2007 tax return where you saw something that you were surprised to see?
**A. Something that I didn't understand would be probably a better description.**
Q. So you saw something on the 2007 return that you didn't understand and that's when you spoke to Mr. Renza, correct?
**A. Yes.**
Q. And with respect to the preparation of your 2007 tax return, was it the same procedure as the 2006 return?
**A. Yes.**

Page 29

Q. It was a matter that Mr. Renza's office would prepare the return for you and you would just go and pick it up?
**A. Yes.**
Q. And was it some time after taking the 2007 return home, did you review it at that time?
**A. Not review it as an accountant or anything, but I signed it, and as I flipped through the pages, I saw something I didn't understand or something that my wife didn't understand or something, and I called him up and said, "Why is this here?" And he called me back or one of his helpers called me back and said, "That's because you still have stock", and things like that.**
Q. So did you actually speak to Mr. Renza?
**A. Yeah.**
Q. Who was the helper that called, did a helper call you back?
**A. Mr. Renza did, but I may have left a message with somebody, you know.**
Q. All right. Did you find out when you had that -- let me back up a bit. When did you have this conversation with Mr. Renza?

Page 30

**A. Some time after I received my -- it would have been probably April of 2008 maybe.**
Q. Now before that conversation with Mr. Renza, did you realize that you had received a K-1 for the year 2006?
**A. I don't know, you know. I really don't follow things like K-1 and stuff like that. I don't know.**
Q. Before when you had -- before the conversation with Mr. Renza, did you understand that you had received a K-1 for the year 2007?
**A. No, I don't think I specifically knew that. I don't really know what a K-1 is.**
Q. The item that you didn't understand on your 2007 tax return, can you tell me anymore specifically what it was?
**A. It was a page and it said, "Votta & Votta Law Offices", and something and I just didn't understand it. So I called him up and said, "is this a mistake", or "is this supposed to --" -- "what is this?"**
Q. Why did you think it was a mistake?
**A. Well, I didn't understand it.**
Q. So when you say you didn't understand it

Page 31

is you didn't understand why it was on your tax return?
**A. Right. I guess my initial reaction --**
MR. DELUCA: You answered the question.
THE WITNESS: Yeah.
MR. DELUCA: Wait for another question.
THE WITNESS: All right.
Q. The item that you didn't understand, did that pertain to you being a shareholder or principal at Votta & Votta?
**A. No. I don't know specifically. I know there was something on there that I didn't understand what it was. So I just called him up and said, you know, "What is this thing?"**
Q. And what did he say to you the best you can recall?
**A. They said that that's the thing that pertains to your shares at Votta & Votta, and there may have been something else that pertained to the loan too. I don't remember, but.**
Q. Okay. Now prior to having that conversation with Mr. Votta -- excuse me, with

Page 32

Mr. Renza in April of 2008, did you believe that you were still a shareholder of Votta & Votta?
**A. Yeah.**
Q. Why so?
**A. Because I had shares that I had not parted with.**
Q. Now going back to 2005, did you at any time ask Votta & Votta for money after you left?
**A. I don't know. I don't recall. I don't think so.**
Q. Let me show you a document, Mr. Votta, and see if that helps you remember?
(Handing of document)
MR. DELUCA: Can I have the question read back, please?
(Prior question read by Reporter.)
Q. Mr. Votta, I have shown you a document dated August 2nd, 2005. It appears to bear your signature at the bottom. Is that your signature?
**A. Yeah, it probably is.**
Q. Is this a document that you typed up?
**A. It probably is.**
Q. Something that you authored?
**A. Possibly, yeah.**

Page 33

Q. Would anybody else have written it?
**A. No.**
MS. VORSTER: Let me mark it as the next exhibit, please, which would be Number 3.
(Document marked Exhibit No. 3 for identification.)

Q. Looking at Exhibit Number 3, sir, did you after you left Votta & Votta in 2005 ask anyone at Votta & Votta for money?
**A. Apparently I did, yes.**
Q. The document that we marked as Exhibit Number 3 is from you to Cam, Steve and Jill at Votta & Votta, correct?
**A. Yes.**
Q. Steve and Jill are your siblings, correct?
**A. Yes.**
Q. And Cam is your mother, correct?
**A. Yes.**
Q. And you asked them there for the money that you're owed from your bonus account for 2003 and 2004, as well as the $40,000 you were supposed to receive as a 2004 bonus pertaining to an overhead benefit paid in January 2005,

Page 34

correct?
**A. I don't understand that. I don't --**
MR. DELUCA: Just answer --
**A. Yes, that's what it says.**
MR. DELUCA: -- her question.
**A. Yeah.**
Q. What part of this don't you understand?
**A. That I was supposed to receive the 2004 bonus from the -- that part.**
Q. The bonus pertaining to the -- the 2004 bonus pertaining to the $100,000 overhead --
**A. Yes.**
Q. -- insurance benefit, that's the part you don't understand?
**A. Yes.**
Q. At the time that you sent this, did you believe that you were owed money from your bonus account for 2003 and 2004?
**A. Yes, I did.**
Q. What was the bonus account?
**A. It's a profit sharing account.**
Q. Did you have conversations with either Steve or Jill regarding this note?
**A. I really don't recall. I don't --**

Page 35

MR. DELUCA: You answered the question.
Q. Do you recall having any conversations with Cam regarding this note?
**A. No.**
Q. Do you recall having any conversations with anyone about this note after you wrote it?
**A. I may have had -- I may have gotten a call from the accountant or something. I really don't remember back then.**
Q. How much did you think was in -- you were owed for your bonus account for 2003 and 2004?
**A. I have no idea.**
Q. How did you get this note to the people to whom it is addressed?
**A. I don't know. I believe I probably mailed it.**
Q. As I understand you, your recollection is that there was a response from the accountant regarding this note?
MR. DELUCA: Objection.
**A. There may have been.**
Q. Why do you say that?

Page 36

**A. Because I do not remember speaking with Steve, Jill or Cam about it.**
Q. Who was the accountant?
**A. Jack Renza.**
Q. What do you recall, if anything, about Jack's involvement after this note?
MR. DELUCA: Involvement in what?
Q. In any payment of money to you?
MR. DELUCA: Are we talking -- excuse me for interrupting. Are you referring specifically to this note or are you talking about later when he gets money?
Q. Let me ask you another question, sir.
**A. Okay.**
Q. Do you recall any communication with Mr. Renza regarding this note?
**A. No.**
Q. Do you recall speaking with Mr. Renza after you sent this note?
MR. DELUCA: About this note?
MS. VORSTER: No, just in general.
Q. Just in general?
**A. Not specifically, no.**
Q. At any --

**A. I mean I'm sure I spoke to him after August 2005, but I don't remember when.**
Q. Why are you sure that you spoke to him?
**A. Well, because he prepared my taxes the following year and probably chatted with him then at the very least.**
Q. Do you recall speaking with Mr. Renza after August 2nd of 2005 regarding any money you were to receive from Votta & Votta?
**A. Yes.**
Q. What did you talk to him about?
**A. He told me that they were trying to work on something to get me some money and that they would let me know or something like that, something to that effect.**
Q. Besides the note that we've marked as Exhibit Number 3, did you request -- did you ask for money from anyone else at Votta & Votta?
**A. I don't think so.**
Q. Besides the note that we've marked as Exhibit Number 3, did you talk to either Cam, Steve or Jill in 2005 regarding obtaining any money from the firm?
**A. I don't know.**



Q. Did you at any time ask Votta & Votta for a loan in 2005?
**A. I don't know.**
Q. Did you ask Votta & Votta for a loan at any time in 2006?
**A. I don't know.**
Q. So in terms of your request for money from Votta & Votta, is the note that we've marked as Exhibit Number 3 the only request that you can recall?
MR. DELUCA: Just so we're clear, when you make reference to a note, you don't mean a legal --
MS. VORSTER: No, no. Exhibit Number 3.
MR. DELUCA: -- note? You're just referring to a communication.
MS. VORSTER: Right.
**A. I'm sorry, what was your question?**
Q. Is the letter or the document that we've marked as Exhibit Number 3 the only request for money that you made to Votta & Votta?
**A. I would have to say yes. I mean I don't even recall this; but, yeah. I don't recall any**



**others.**
Q. Do you recall speaking to Mr. Renza and telling him that you needed some money in 2005?
**A. No, I don't remember.**
Q. Now you told me that when you spoke to Mr. Renza, your recollection is that he mentioned they were working on something to get you some money?
**A. That's right, yeah.**
Q. What was the money that they were working on getting for you?
**A. At the time I didn't know.**
Q. What did you want?
**A. I don't know.**
Q. What did you think you were entitled to?
**A. I didn't know that either.**
Q. Did you tell Mr. Renza at all what you wanted in terms of money?
**A. I don't believe I did.**
Q. Did he tell you what he was working on for you?
**A. Shortly before that meeting in April.**
Q. And what did he tell you at that time?
**A. He said, "Come to my office. We're**



**going to have some checks for you. I'll have you sign some papers." I said, "Okay."**
Q. Did you have -- before that conversation with Mr. Renza telling you to come to the office, how many times do you recall talking to him before that?
**A. I don't know.**
Q. Do you recall one conversation with him when he said, "come to my office and we'll sign some papers and I'll have some checks for you", right?
**A. Yes.**
Q. And you recall one conversation where he said that they were working on something to get you some money?
**A. That's right.**
Q. Do you recall any other conversations with Mr. Renza?
**A. At the meeting in April of 2006.**
Q. Anything else other than that?
**A. I have had conversations with him.**
Q. You did?
**A. He's my accountant.**
Q. Focusing in on the money that you were

Page 45

**A. I did not have any set plans to do anything at that time.**
Q. As of the time of the April 2006 meeting, did you see returning to work at Votta & Votta as a possibility for you?
MR. DELUCA: Object.
**A. It was unknown.**
Q. Did you have any desire to return to work --
MR. DELUCA: Objection.
Q. -- at Votta & Votta in April of 2006?
MR. DELUCA: Objection.
**A. I was being treated medically. I was not thinking about returning to work at that time.**
Q. As of the April 2006 meeting, did you think that in the future you might return to work at Votta & Votta?
MR. DELUCA: Objection.
**A. It was a possibility.**
Q. And why did you think it was a possibility that you might return to work --
MR. DELUCA: I object.
Q. -- at Votta & Votta?

Page 46

MR. DELUCA: Object.
**A. Because I didn't know what I was doing at that point.**
Q. And you didn't know what you were doing in terms of what you were going to do in the future regarding work?
**A. Yes.**
Q. So at the April 2006 meeting, what did you receive in terms of money from Votta & Votta?
**A. I'd have to see copies of the checks to give you the exact numbers, but I think it was one check 33,000 and change, and there was I believe another check or possibly a third check in lesser amounts, much lesser amounts.**
Q. I'm going to show you, Mr. Votta, what I have received for checks or copies of checks.
(Handing of document)
**A. All right. Yeah, those are the checks I received.**
MS. VORSTER: We're going to mark this as the next exhibit, which would be Number 4 now.
(Document marked Exhibit No. 4 for identification.)

Page 47

Q. So looking at Exhibit Number 4, there are three checks copied on the document that we've marked as Exhibit Number 4, correct?
**A. Yes.**
Q. If we start from the bottom, there's a check there for $10,828.25. What is your understanding what that check was for?
**A. It says, "2005 bonus in full."**
Q. And what was the bonus?
**A. I'm assuming that was my --**
MR. DELUCA: Don't assume. If you know, tell her.
**A. I think it was the profit sharing bonus from 2005.**
Q. And was that your share of the profits generated by the firm in 2005 --
**A. Yeah.**
Q. -- for the period of time that you worked --
**A. Essentially, yes.**
Q. -- because you worked the first quarters of 2005?
**A. Yes.**
Q. And the next check, which is in the amount of $6,831.63, what was that for?

Page 48

**A. They call that a AAA account. It's some sort of an accounting account device. I had money in there somehow and I don't understand it and they paid it to me.**
Q. And what about the top check, what was that for?
**A. This was the loan.**
Q. How much was the loan for?
**A. 33 -- well, this says, "33, 690." So I'm assuming it's the amount.**
Q. $33,690.66?
**A. Yes, and 66 cents.**
Q. And your understanding of that number, the 33,690.66, is your one-third share of the book value of Votta & Votta?
**A. Yes.**
Q. And the meeting occurred -- this is the meeting -- you received these checks at the meeting that occurred in April of 2006, correct?
**A. Yes.**
Q. Jill was at the meeting, correct?
**A. Yes.**
Q. As was Stephen?

Page 49

A. **Yes.**
Q. As was you?
A. **Yes.**
Q. And Mr. Renza?
A. **Yes.**
Q. Anyone else?
A. **No.**
Q. How long did the meeting last?
A. **Ten minutes.**
Q. And where was it?
A. **At Mr. Renza's office.**
Q. Did you have any discussion about the amounts of the checks?
MR. DELUCA: At the meeting you mean?
MS. VORSTER: Yes, at the meeting.
A. **Yes, they explained to me what the amounts were and they gave me the checks.**
Q. At that meeting you also learned that you were receiving a loan for the 33,690.66?
MR. DELUCA: Object.
A. **Yes.**
Q. Is that correct?
MR. DELUCA: Observe.
A. **Yes.**

Page 50

Q. And --
A. **But I don't know if I learned for the first time; but, yeah, that was explained to me that it was a loan.**
Q. When would you have learned about it before then?
A. **I don't know.**
Q. And your understanding is that when you received this check in the amount of 33,690.66 that that was a loan that you were receiving from Votta & Votta, correct?
A. **That's right.**
Q. And that is the amount of the loan, the 33,690.66, correct?
A. **I'm assuming that because that's what the numbers on the check are. That's right.**
Q. Just to back up, did you talk to Mr. Renza about your deposition today?
A. **No.**
Q. Did you talk to anybody at his accounting office about your deposition today?
A. **No.**
Q. Did you talk to Mr. Renza about the lawsuit between Votta & Votta and you?

Page 51

A. **No.**
Q. How about anybody from his accounting office?
A. **No.**
Q. At the meeting was there any discussion about the amounts of the three checks?
A. **Yeah.**
Q. Tell me what you recall?
A. **They said they valued the firm and this was one-third of my stock value and that that's how they came up with it.**
Q. Why were you getting a loan?
A. **Because I needed the money and they were loaning it to me.**
Q. But you hadn't asked for a loan, right?
MR. DELUCA: Object.
A. **Not specifically.**
Q. Now the explanation regarding the loan, was that done by Mr. Renza at the meeting?
A. **Yeah.**
Q. Whose idea was it to give you a loan?
A. **I don't know.**
Q. Was it yours?
A. **No.**

Page 52

MR. DELUCA: Object.
Q. So when do you have to pay the loan back?
A. **I don't know.**
Q. Did you have any discussion about the repayment terms?
A. **No. It was left open.**
Q. By whom?
A. **I don't know.**
Q. How was it left open? I don't understand what you mean by that.
A. **There was no specific payment schedule at that time that I was aware of.**
Q. Is there a specific payment schedule now?
A. **Not that I'm aware of.**
Q. Have you ever become aware of a specific payment schedule?
A. **I don't think so. Not that I can recall.**
Q. So do you have to pay that loan back?
A. **Yeah.**
Q. When do you have to pay it back?
A. **I don't know.**

Q. And on what terms would you have to pay it back?
**A. I don't know.**
Q. At the meeting did you have any discussion with either Stephen or Jill about paying the loan back?
**A. I think Jill may have said something to the effect of, "You pay us back when you can."**
Q. And that's it?
**A. And Mr. Renza said something to that effect also.**
Q. "Pay us back when you can"?
**A. Yeah.**
Q. So at some point you need to pay the loan back?
**A. Yeah.**
Q. But you don't know when?
**A. Right.**
Q. Have you made any payments?
**A. No.**
Q. Is there a rate of interest?
**A. Yeah, I think there is.**
Q. What is it?
**A. I don't know.**



Q. Who would know?
**A. I don't remember.**
Q. You don't remember the rate of interest?
**A. No.**
Q. Any discussion about what the rate of interest would be?
**A. No.**
Q. Do you have anything in writing about when this loan had to be paid back?
**A. No.**
Q. Did you ask Stephen to make a document at that meeting about when this loan had to be paid back?
**A. I don't think so.**
Q. Did you have a discussion at that meeting with Stephen about the fact that you don't have to pay that loan back?
**A. No.**
Q. Did you ask Stephen to write a document for you regarding when that loan needed to be paid back?
MR. DELUCA: Objection.
**A. No, I don't think so.**
Q. Do you have any documents that you



prepared regarding repayment on the loan?
**A. No.**
Q. Did you ask Stephen or Jill to sign anything at your meeting --
**A. No.**
Q. -- regarding repayment of the loan?
**A. No, not that I recall.**
Q. Were there any other documents signed at the meeting?
**A. I don't think so, but I don't have a great memory of it.**
Q. I'm going to show you a document that's been produced to me, sir.
(Handing of document)
MS. VORSTER: We'll mark this as the next exhibit, please.
Q. Actually before we do that, let me ask you, Mr. Votta, is that your signature on the document that's entitled, "Receipt" --
**A. Yes.**
Q. -- that I've just shown you?
**A. Yes.**
Q. And it's dated April 13th, '06?
**A. Yeah.**



Q. Is that your handwriting in terms of the date?
**A. I think so.**
Q. Do you recall signing that document?
**A. No.**
Q. Okay. Do you recall if that document was signed at the April 13, 2006 meeting?
**A. Probably, yeah.**
Q. But you have no recollection of signing it when you received the checks?
**A. Specifically, no, I don't.**
MS. VORSTER: Let's mark this as Exhibit 5.
(Document marked Exhibit No. 5 for identification.)

Q. Now earlier in the deposition you told me that you recall signing a promissory note and another document at the meeting. What was the promissory note?
**A. The promissory note was for the loan.**
Q. Now I haven't seen a promissory note. Tell me what it looked like?
**A. It was a typical promissory note that said, you know, for consideration and promised to**

**pay, blah, blah, blah.**
Q. How many pages was it?
**A. I think it was one.**
Q. But it said -- but you're saying it was a typical promissory note that you signed?
**A. Yeah.**
Q. Was that document signed at the April 13, 2006 meeting?
**A. Yes.**
Q. And that you recall signing?
**A. I'm sorry?**
Q. That promissory note you do recall signing?
**A. Yes.**
Q. But you don't recall signing the document that we've marked as receipt --
MR. DELUCA: Objection. Asked and answered.
Q. -- and marked as Exhibit Number 5?
MR. DELUCA: Objection.
**A. That's right.**
Q. What happened to the promissory note after you signed it?
MR. DELUCA: Objection.



**A. The accountant took it.**
Q. Is it your understanding that that promissory note set forth terms of repayment, interest rate, et cetera?
**A. Yeah.**
Q. And then you also mentioned that you signed a short agreement at the April meeting. What was that?
**A. It may have -- again, I'm not positive about this. I remember signing a promissory note and there may have been something else. Maybe it was this receipt. I don't know. I remember I thought I had to sign two things. Maybe that was it. I don't know.**
Q. I'm going to show you, Mr. Votta, what we've marked as Exhibit Number 11 at Jill Votta's deposition. I'll show it to your attorney first?
(Handing of document)
MS. VORSTER: I apologize, but I don't have copies of the stock certificate for everyone.
Q. I'm showing you a stock certificate that was marked at the deposition of Jill Votta. My question for you, sir, there's a second page and



if your signature appears on the second page?
**A. Yes.**
Q. Do you recall signing the stock certificate?
**A. Yes.**
Q. When did you sign that?
**A. At the meeting.**
Q. What was your purpose in signing the stock certificate?
**A. Pledging my stock towards the loan.**
Q. Looking at the stock certificate, the second page, it doesn't say anything about pledging for a loan; is that correct?
MR. DELUCA: Object.
**A. I don't know, but probably not.**
Q. Why is that?
**A. I don't know.**
Q. Did you prepare that document?
**A. No.**
Q. Who prepared it?
**A. I don't know.**
Q. Who asked you to sign it?
**A. The accountant.**
Q. Who took possession of the stock



certificate after you signed it?
**A. I don't know. My recollection is the accountant took all the papers, but I don't know.**
Q. I notice the stock certificate isn't dated. Were you asked not to date it?
**A. No.**
Q. How come you didn't date it when you signed it?
**A. I don't know.**
Q. Just didn't?
**A. I don't know.**
Q. But nobody specifically asked you not to date it?
**A. Right. I don't see a spot for the date on it.**
MR. DELUCA: Right here.
THE WITNESS: Oh.
Q. And what were you told, if anything, about why you were being asked to sign the stock certificate?
**A. It was --**
MR. DELUCA: Objection. Asked and answered.
**A. Pledged for the loan.**

Q. So if I understand your testimony, the stock was pledged for the 33,000 and change, the check for the 33,000 that you received?
**A. Right.**
Q. So if you return to work at Votta & Votta, how do you get your stock back from the pledge?
**A. I don't know. I would imagine that when I paid it back that they would unpledge it somehow.**
Q. So if you paid back the 33,000 tomorrow, you would get your stock back?
**A. I still have the stock. It's just pledged.**
Q. But it would be returned to you to be held in your name; is that correct?
MR. DELUCA: I object.
**A. I don't know if I can answer the question the way you phrased it.**
Q. Now when you receive the 33,690.66, did you believe you were getting a loan?
MR. DELUCA: Object. Asked and answered.
**A. Yeah.**



Q. Did you at any time believe that you were getting bought out for Votta & Votta?
**A. No.**
Q. Never?
MR. DELUCA: Objection. Asked and answered.
**A. No. I was --**
MR. DELUCA: You answered the question. The answer was no.
Q. Were there any discussions about you being bought out from Votta & Votta before the April meeting?
**A. No.**
Q. When you left the April meeting, did you believe that you had been bought out from Votta & Votta?
**A. No.**
Q. Did you ever tell anybody that you had been bought out from Votta & Votta?
**A. I may have used that phrase. I may have used that phrase.**
Q. Why would you have used that phrase?
**A. Because it was shortly after that meeting I had an impartial medical evaluation by Dr. Wall at the request of the insurance company and he had asked me some things about interacting with the firm, and I had indicated to him that that those concerns were quelled at the time and that he said, "Oh, they buy you out?" And I think I said something like that.**
**He mentioned the word, "stock", which I thought was unusual for a doctor. He said, "Did you sign stock and stuff?" And I said, "Yeah, yeah", and just left it at that.**
**I also may have used the term settle up. I think I used that term. That was the term that I used, "settle up", meaning that they paid me some of the money that they had owed me from the 2005.**



Q. M-hm.
**A. And I believe he said, "So they bought you out?" And I think I acknowledged affirmatively.**
Q. So I just want to understand what you just told me. You had an IME with Dr. Wall, correct?
**A. Yeah.**
Q. And the IME occurred soon after you had this April 2006 meeting, correct?



**A. A day or two.**
Q. A day or two later?
**A. Ironically.**
Q. And you told Dr. Wall there were certain concerns that had been quelled. I guess my question was, what are the concerns that had been quelled?
**A. Was getting the money owed to me from my firm.**
Q. So you had concerns about getting some of the money owed to you from the firm?
**A. Right.**
Q. And that had occurred, right?
**A. Right. And I told him that I got some money from the firm just recently.**
Q. From what I understand of the three -- let me back up. Of the three checks that we marked on the document that we've labeled as Exhibit Number 4, which of those checks pertain to the money that was owed to you from the firm?
**A. It would have been the 10,828 and I really --**
MR. DELUCA: You answered the

**A. I told them that I received money from the firm.**
Q. So if one of your medical providers reported to Dr. Wall that you had just sold your share of the business and was relieved by it, would that be a true statement?
**A. I was relieved after that meeting. I was relieved from getting money. The part about selling my share is I think probably inaccurate. I think it's -- you know, I had gotten a loan for my share.**
Q. Let me back up a bit. So in the event that one of your medical providers reported to Dr. Wall that you had just sold your share of the business, would that be inaccurate?
MR. DELUCA: Objection. Asked and answered. Answer it again.
**A. Would that be inaccurate?**
Q. Yes.
**A. Technically, yes.**
Q. What about untechnically?
**A. Yes.**
Q. So why would you say, "technically yes"?
**A. I'm trying to clarify.**



Q. Do you recall in any of your discussions with any of your medical providers, both of them, telling them, and I'm going to ask you this, telling them that you had sold your share of the business?
**A. It may have been expressed that way.**
Q. So you expressed it that way to your medical providers, but what you're telling me today is that's not what happened at that meeting?
MR. DELUCA: I object.
**A. I'm not sure I understand what you're asking me.**
Q. Here's what I'm trying to understand, as I understand your testimony, you're telling me that you would have expressed to your medical providers that you had sold your share of the business, right?
MR. DELUCA: I object.
**A. I had pledged my share of the business.**
Q. So you've told them that you had pledged your share of the business, not sold it?
**A. I don't think I went into that kind of detail. I told them that I got money and that I**



**had settled up is what I said. I said I had settled up with them and that I was relieved by it because I didn't know if they were going to pay me and I was relieved that they paid me.**
Q. In terms of your wife's conversation with Dr. Wall, you certainly knew that she was going to speak with him, correct?
**A. Yeah.**
Q. I don't want to know discussions between you and your wife, but was your wife aware that you had had the meeting in April of 2006?
**A. Oh, yes.**
Q. And she was aware that you had signed some papers at that meeting?
**A. Yes.**
Q. And when you say that you told your medical providers that you had settled up with your law firm -- I mean with your law firm, did you give them anymore detail beyond that?
**A. I don't believe so.**
Q. Now in terms of the document that we've marked as receipt, Mr. Votta, you have here that you received this Check Number 6189 representing a loan payable from Votta & Votta, correct?



**A. Yes.**
Q. Did you sign anything else regarding the loan that day? You mentioned that document and a promissory note. Anything else?
**A. I probably also mentioned there may have been another document. It may have been this receipt that you have labeled as Exhibit 5 or something else. I don't know, but that's what I recall is a promissory note.**
Q. Did you have the understanding that you would only have to repay this loan if you returned to work at Votta & Votta?
**A. No.**
Q. Did you have any concerns about receiving a loan -- well, let me back up. The repayment obligation, is that specified in the promissory note?
**A. Obligation to repay is, yeah.**
Q. So you believe that there is a written document that talks about your obligation to repay?
MR. DELUCA: I object. Asked and answered several times.
**A. Yes.**

Page 73

Q. Did you transfer any real estate at that meeting in April 2006 from you and Stephen?
**A. Yes.**
Q. Did that transfer of real estate have anything to do with the money that you received from Votta & Votta?
**A. No. Oh, no. No.**
Q. Was that a completely separate transaction?
**A. Oh, yeah.**
Q. Why did you do that transfer at that time?
**A. I had added my brother as a joint tenant on a piece of property that I owned as a matter of convenience, and I wanted to get that in my name and my wife's name.**
Q. So did you make the transfer from you and Stephen to you and your wife at that April 16 meeting, signed the document for that?
**A. Yeah.**
Q. Why did you do it at that meeting?
**A. It was his suggestion.**
Q. Did he even -- did he know that he was on that property with you?

Page 74

**A. I don't know.**
Q. So then how did he suggest it?
**A. Because I told him, "I need you to sign off on this deed."**
Q. Now as I understand it, your obligation to repay is the 33,690; is that correct?
**A. Yeah.**
Q. Have you ever learned that the loan that's being carried on Votta & Votta's books is actually a little over $40,000?
**A. No.**
Q. Do you have an obligation to repay a loan to Votta & Votta that's over $40,000?
**A. I'm not sure.**
Q. Have you ever had any discussions with anybody about that?
**A. No.**
Q. Have you ever had discussions with Mr. Renza's office regarding a loan that you owe to Votta & Votta, and I'll get the exact number for you, in the amount of 40,522.29?
**A. No.**
Q. So your understanding is that what you owe is 33,690.66?

Page 75

**A. No. My understanding is that what I said was those are the numbers on the checks. So I'm assuming that was the number on the note. I don't remember what it was. So if you're telling me it's 40,000, maybe that's it. I don't know. I don't know how that works.**
Q. But you don't recall any discussion with anybody that you actually have a loan payable to Votta & Votta in the amount of 40,522.29?
**A. Specifically in those numbers, no. I mean Mr. Renza explained to me I had a loan. I don't remember those numbers. I don't remember any of the numbers.**
Q. You don't remember any of the numbers?
**A. Before you showed me these checks.**
Q. So until I showed you the check that's on the top of Exhibit Number 4, you didn't remember what the amount of the loan was?
**A. Right.**
Q. Did you receive any advice about your tax liability for any of the payments that you received -- any of the checks that you received that we've marked as Exhibit Number 4?
**A. No, not specifically.**

Page 76

Q. Have you at any time spoken with anyone at Mr. Renza's accounting firm regarding your tax liability for the check in the amount of, what is it, 33,690.66?
**A. Just what I told you before about my 2007 tax return I called up and had a question about something that I didn't understand and it had something to do with this, so.**
Q. How about any conversations with Mr. Renza regarding your tax liability for the check in the amount of 6,831.63?
**A. No. Whatever tax liability he takes care of that.**
Q. So you wouldn't have talked to him about it?
**A. No.**
Q. You would just trust him to take care of it?
**A. Yeah.**
Q. Now before you left Votta & Votta as the shareholder, did you get any insurance benefits from them?
**A. What do you mean?**
Q. Like health insurance?

Page 77

A. Yeah.
Q. Any pension benefits?
A. No -- oh, yeah. Yeah, I did I think.
Q. Did the pension benefits continue after you left Votta & Votta?
A. I think they might have been paid in 2005. I don't recall. I know at some point they stopped.
Q. At some point -- actually does Votta & Votta still pay for your health insurance?
A. No. They stopped that. They said they couldn't afford it.
Q. How did you learn about that?
A. They told me at the meeting, "In so many days you're going to have to start getting your own health insurance." I don't know whether it was 30 days or 60 days or something. That's my recollection. I could be off on the dates, but.
Q. Then at some point did you get a letter from them indicating that they were going to stop your health insurance?
A. You know, maybe. I might have, yeah. I don't recall specifically.

Page 78

Q. I'm going to show you a letter, sir, dated June 1st, 2006.
(Handing of document)
A. Yeah, I remember getting this.
Q. This is a letter from Jill and Stephen indicating that your health insurance coverage with Blue Cross would be paid through July 31 of 2006, correct?
A. Yes.
MS. VORSTER: We're going to mark that as the next exhibit, please, which I believe would be 6.
(Document marked Exhibit No. 6 for identification.)

Q. Now the letter that we've marked as Exhibit Number 6 talks about that the letter is going to serve as their official notice to you that they are no longer going to pay for your medical coverage. When did you receive unofficial notice?
MR. DELUCA: I object.
Q. Or did you receive notice before that?
A. I knew. I did receive notice, yeah. They told me. I believe it was at the meeting.

Page 79

Q. Did you have any objection to them stopping your health insurance?
MR. DELUCA: I object.
A. They were calling the shots.
Q. At the time they terminated your health insurance as of July 31, 2006, were you essentially on medical leave from Votta & Votta, was that your status?
A. Yeah, I believe so.
Q. Had other shareholders at Votta & Votta taken medical leave?
A. I don't know.
Q. How about Jill, did she take a medical leave before you went out?
A. She had an operation. She had an operation and she was out for a little while, yeah.
Q. Was her health insurance terminated during that time?
MR. DELUCA: I object. What relevance does that have?
MS. VORSTER: I think it has a lot of relevance.
A. I don't know.

Page 80

Q. You don't know?
A. No.
Q. And it's your understanding that your health insurance was terminated because they could not afford to pay it?
MR. DELUCA: Objection.
A. Yeah.
Q. I'm going to show you, Mr. Votta, a letter dated October 31, 2006.
(Handing of document)
Q. Do you recall seeing that letter dated October 31, 2006?
A. No.
MS. VORSTER: I'm going to mark it as the next exhibit.
(Document marked Exhibit No. 7 for identification.)

Q. We've marked this letter dated October 31, 2006 as Exhibit Number 7. My question for you, sir, is, did you learn around that time, October of 2006, that Unum was asking questions regarding your ownership interest in Votta & Votta?
A. I'm sorry, what are you asking me?

Q. Around October of 2006, around that time period, take it in the fall of 2006, did you learn that Unum was asking questions regarding your ownership interest in Votta & Votta?
**A. No, I don't recall this letter.**
Q. But do you recall learning that Unum had made an inquiry about your ownership interest?
**A. No, I don't.**
Q. I'm going to take you to the second line there.
**A. M-hm.**
Q. The second sentence.
**A. M-hm.**
Q. And Attorney DeLuca was your attorney as of October 31 of 2006, correct?
**A. Yes.**
Q. And he writes there -- well, you can see in the first line that, "Attorney DeLuca has been requested by Unum Providence to provide proof that your brother, Joseph Votta, Junior no longer has an interest in Votta & Votta Law Offices, LTD"; is that correct?
**A. Yes.**
Q. Do you see that?



**A. M-hm.**
Q. The next line there reads, "Joe believes that he has signed away any interest in Votta & Votta in April of 2006." Do you see that line?
**A. Yes.**
Q. Is that statement accurate?
**A. You know, this might be the source of the confusion. This may have been -- I'm trying to remember. This may have been when it was clarified that I hadn't signed away my interest, that I had just pledged the stock. That may have been it.**
Q. So you think you received clarification regarding that issue in October 31 of 2006?
**A. Possibly.**
Q. So you received clarification then that you had only pledged your stock?
**A. Well, yeah, because if I informed Mr. DeLuca that I believe I had signed away my interest, that's probably when he clarified to me that I hadn't.**
Q. When Renza clarified to you that you hadn't?



**A. No, Mr. DeLuca. I mean I'm reading this letter that says, "Joe believes he signed any interest in April of '06. Please provide me with a copy of such document." So I don't think I had -- I did not have the document, and that may have been my understanding possibly, you know; incorrectly, but that's what it looks like.**
Q. So let me ask you this. As of October 31, 2006 was it your understanding -- let me back up and ask the question better.
As of October 2006 did you believe that you had signed away any interest in Votta & Votta in April of 2006?
**A. According to that letter it does.**
Q. I'm going to show you another document, Mr. Votta, and I'm going to ask you if you have ever seen that document?
(Handing of document)
**A. No.**
MS. VORSTER: Let me mark it for identification as Exhibit 8.
(Document marked Exhibit No. 8 for identification.)

Q. I'm going to show you what we've marked



as Exhibit Number 8. Do you recognize this as an invoice?
**A. No, never saw it.**
Q. Never saw it. Do you recognize it as an invoice to Jill?
**A. I don't know what it is.**
Q. So look at the bottom, the last entry there, it talks about, "Consulting work and meeting to discuss purchase of Joe Votta's interest in the corporation." Do you see that?
**A. Yeah.**
Q. Was there ever a meeting to discuss the purchase of Joe Votta's interest in the corporation?
**A. Not with me.**
Q. So to the extent that this statement is included in this invoice, that's inaccurate?
MR. DELUCA: I object.
MR. HEALY: I object.
**A. I have no idea.**
Q. But as far as you know, there was never any -- let me back up. Was there any consulting work to discuss the purchase of your interest in the corporation?

MR. DELUCA: I object.
MR. HEALY: I object.
**A. No, not as far as I know.**
Q. Anybody ever talk to you about that?
**A. No.**
Q. Was there discussions -- before you had the April 2006 meeting, were there discussions about purchase of your interest in the corporation?
MR. DELUCA: I object. You've been over this extensively and you've asked him that repeatedly, and I think in all fairness we should move on.
Q. Were there?
**A. I'm sorry.**
Q. Were there discussions about purchasing your interest in the corporation before the April meeting?
**A. Not to me.**
Q. Now I'm going to show you, sir, a letter dated December 7th.
(Handing of document)
**A. Okay.**
Q. Have you seen this letter --



**A. Yeah.**
Q. -- dated December 7, 2006 --
**A. Yeah.**
Q. -- that I've just shown you?
**A. Yeah.**
Q. And it's addressed to Attorney DeLuca --
**A. M-hm.**
Q. -- and to Votta & Votta, correct?
**A. Yeah.**
MS. VORSTER: If we can mark that as the next exhibit, please.
MR. DELUCA: It's addressed to Mr. Votta. Oh, I'm sorry. It says, "Votta & Votta", but then it says, "Dear Mr. DeLuca and Dear Mr. Votta."
MS. VORSTER: Okay.
MR. DELUCA: So we're clear.
(Document marked Exhibit No. 9 for identification.)

(Off the record)
MS. VORSTER: Back on the record.
Q. Mr. Votta, I'm going to draw your attention to Exhibit Number 9. I'm going to give you a copy of it.



(Handing of document)
**A. Uh-huh.**
Q. Exhibit Number 9 is the letter dated December 7, 2006. Now let me take you to the last paragraph on the first page of Exhibit Number 9, and the letter talks about Dr. Wall having the opportunity to speak with one of your attending physicians Dr. Kenner.
**A. Yes.**
Q. Do you see that?
**A. Yes.**
Q. And then it quotes -- there's a quote on the top paragraph on page 2.
**A. M-hm.**
Q. When you received this letter, did you see that quote?
**A. When I received this letter?**
Q. Yes.
**A. I didn't receive this letter.**
Q. I thought you said you had seen it?
**A. I don't believe so.**
Q. So you don't believe you've ever seen the letter dated December 7th?
**A. Right.**



Q. You don't think you -- okay. I misunderstood you. To your knowledge was a response -- did you ever prepare a response via yourself or through your attorney to this letter dated December 7, 2006?
**A. I don't know. I don't believe I prepared a response. If Mr. DeLuca did, I don't know.**
Q. Now the letter was also addressed to Mr. Stephen Votta. Do you see that on the first page?
**A. No -- oh, yeah. Attention, yep.**
Q. Around the time of this letter in December of 2006, did you get any kind of an inquiry from Stephen Votta --
**A. No.**
Q. -- about responding to this letter?
**A. No.**
Q. Did you communicate -- to your knowledge was there any -- there was no request for information from Stephen --
**A. No.**
Q. -- about this letter to respond to it?
**A. No.**

Q. And then I'm going to show you a letter dated December 29, 2006 and it's addressed to your attorney.
**A. M-hm.**
**(Handing of document)**
Q. My question for you, sir, is, do you recall seeing the letter dated December 29, 2006?
**A. No.**
MS. VORSTER: We'll mark the letter as the next exhibit.
(Document marked Exhibit No. 10 for identification.)

Q. So we've marked as Exhibit Number 10 the letter dated December 29, 2006 and this you say you've never seen?
**A. Right.**
Q. Did you learn at some point, sir, that Unum was not paying benefits under the business overhead policy?
**A. Yes.**
Q. At some point did you begin to get premium bills on the business overhead policy?
**A. Yes.**
MR. DELUCA: Which letter are you



looking at now?
MS. VORSTER: December 29, Exhibit Number 10.
MR. DELUCA: Okay, sorry. Go ahead.
Q. Did you begin to get premium bills under the business overhead policy?
**A. Yes.**
Q. Have you continued to pay those bills?
**A. In the overhead policy?**
Q. Right.
**A. No. I forwarded them to the office.**
Q. So when you would receive a premium bill for the business overhead policy, you would forward it to Votta & Votta?
**A. Yeah.**
Q. And it would be up to them to continue to pay the premium?
**A. Yeah.**
Q. In 2006 did anyone from Votta & Votta ask you to provide any information regarding ownership status in Votta & Votta?
**A. No.**
Q. Did anybody ask you to provide a letter or a statement or an affidavit saying that you



had received a loan and had pledged your stock?
**A. I don't believe so.**
Q. Nobody from Votta & Votta asked you for that information?
**A. I don't believe so. Not that I can recall.**
Q. Did you receive any notices from Unum regarding the status of the business overhead policy in 2008?
**A. I got a bill from them. That's all.**
Q. That's it --
**A. I believe --**
Q. -- a bill in 2008?
**A. I believe that's all I received.**
Q. Was the business overhead policy on annual or semi-annual billing to your knowledge?
**A. I think it was on annual.**
Q. And you received a bill in 2008?
**A. M-hm.**
Q. Is that yes?
**A. Yes.**
Q. And you gave it to Votta & Votta for payment?
**A. Yes.**



Q. How would you go about doing that?
**A. I would either mail it or I would give it to my mom.**
MS. VORSTER: Why don't we take a break so we can look at the tax returns.
MR. DELUCA: Okay.
(Off the record)
MR. DELUCA: Let the record reflect please that I provided to Unum's counsel Mr. Votta's tax returns for 2006 and 2007.
(Documents marked Exhibit Nos. 11 and 12 for identification.)

MS. VORSTER: So we've marked as Exhibits Number 11 and 12 Mr. Votta's tax returns for 2006 and 2007 respectively.
Q. Mr. Votta, looking at the tax return for 2007 --
**A. Yes.**
Q. -- if I recall your testimony correctly from earlier today, you mentioned that there was something on that tax return regarding Votta & Votta that I believe you said you didn't understand. What was it?
**A. I don't know.**

Page 93

Q. You can't tell at all?
**A. It was just something that I -- I don't know which page it was. I really don't remember. You're asking me to try to find the page?**
Q. Do you know what it was that you didn't understand that you called Mr. Renza about?
**A. Well, all I can tell you is it was something that said, "Votta & Votta", and I didn't understand it.**
Q. So if I take your -- make your reference out to page 6 of the tax return for 2007 --
**A. Yeah, that might have been it.**
Q. Right?
**A. Yeah.**
Q. We got there, "K-1 Votta & Votta Law Offices".
**A. Right.**
Q. Is that what you didn't understand?
**A. Right.**
Q. What didn't you understand about that?
**A. Well, I guess I thought this was showing interest or income or something. I thought it was showing income and I wasn't receiving any income and I called up to ask about that.**

Page 94

Q. Did you learn at that time that the K-1 was essentially the wash in terms of tax liability for you?
**A. No.**
Q. What did you learn about that when you called him?
**A. Actually I didn't -- I don't understand taxes too well. Basically Mr. Renza said he knew about it and I wasn't being incorrectly taxed or something like that.**
Q. You weren't paying additional tax because of the interest income?
**A. Basically he said that everything was okay.**
Q. To your knowledge did you ever receive the K-1 for 2006 the actual document?
**A. I don't know.**
Q. To your knowledge did you ever receive the actual K-1 for 2007?
**A. I really don't know.**
Q. Have you learned that if you received a loan from Votta & Votta that you would have no tax obligation for that?
**A. Not specifically.**

Page 95

Q. Have you learned that in any respect?
MR. DELUCA: You mean other than other than discussions with me.
THE WITNESS: Other than discussions with you?
MR. DELUCA: Yes.
**A. No.**
Q. Have you learned that in the event that your shares in Votta & Votta were bought out in 2006 that you would have tax liability for the buyout?
**A. I'd have to ask my accountant about that.**
Q. Has anybody told you that?
MR. DELUCA: Other than me.
**A. No one other than Mr. DeLuca.**
Q. So let me just back up. Mr. Renza did not give you advice that a loan from Votta & Votta would not have tax liability, but a buyout would, correct?
**A. No, he never told me that.**
Q. He never told you that. As I understand your testimony today, the only advice you received or the only information you have in that

Page 96

regard you received from your attorney, correct?
**A. In regard to what regard? I don't understand what you mean.**
Q. About the tax liability for a loan versus a buyout?
**A. Yeah.**
Q. When did you receive that information?
**A. This morning.**
Q. This morning as you were preparing for the deposition?
MR. DELUCA: Don't answer that.
Q. Did you meet with Mr. DeLuca in preparation for the deposition?
**A. Yeah.**
Q. Did you meet with him this morning?
**A. Yes.**
Q. Did you have additional meetings with Mr. DeLuca specifically regarding this deposition?
**A. No.**
Q. Have you had --
MR. DELUCA: That's not accurate. We met last week regarding this deposition.
THE WITNESS: We did?