# EXHIBIT I

Volume I
Pages 1-78

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
Civil Action No. 07-410-ML

VOTTA & VOTTA LAW OFFICES, LTD., Plaintiff,

vs.

UNUM LIFE INSURANCE COMPANY OF AMERICAN, ALIAS, Defendant.

* * * * *

DEPOSITION OF STEVEN J. VOTTA, called as a witness by counsel for the Defendant, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Carol S. Kershaw, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at the Law Offices of Bernard P. Healy, 750 East Avenue, Pawtucket, Rhode Island, on Thursday, June 5, 2008, commencing at 1:35 p.m.

************************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters

One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX: (508) 752-4611

*************************



APPEARANCES:

LAW OFFICE OF BERNARD P. HEALY
BY: Bernard P. Healy, Esq.
750 East Avenue
Pawtucket, Rhode Island 02860
(401) 312-3751
for the Plaintiff.

MIRICK, O'CONNELL, DeMALLIE & LOUGEE, LLP
BY: Joan O. Vorster, Esq.
100 Front Street
Worcester, Massachusetts 01608-1477
(508) 791-8500
jovorster@modl.com
for the Defendant.

ALSO PRESENT:
Jill S. Votta
Michael J. Mesolella

INDEX

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| STEVEN J. VOTTA | | | | |
| By Ms. Vorster | 4 | | | |



EXHIBITS

| Exhibit No. | Description | For I.D. |
|---|---|---|
| 1 | Notice of Deposition for Steven J. Votta | 23 |
| 2 | Rule 30(b)(6) Notice of Deposition for Votta & Votta Law Offices | 23 |
| 3 | Letter Dated 3-3-06 From Steven Votta to UNUM | 23 |
| 4 | Letter Dated 3-15-06 From UNUM to Steven Votta | 48 |
| 5 | Letter Dated 5-18-06 From Steven Votta to UNUM | 49 |
| 6 | Fax Transmittal Dated 6-1-06 From UNUM to Steven Votta | 50 |
| 7 | Letter Dated 8-9-06 From Steven Votta to UNUM | 55 |
| 8 | Letter Dated 8-21-06 From UNUM to Steven Votta | 56 |
| 9 | Letter Dated 8-31-06 From Steven Votta to UNUM | 57 |
| 10 | Fax Dated 9-27-06 From UNUM to Steven Votta | 59 |
| 11 | Letter Dated 10-13-06 From Steven Votta to UNUM | 60 |
| 12 | Letter Dated 10-16-06 From UNUM to Steven Votta | 63 |
| 13 | Letter Dated 11-2-06 From Steven Votta to UNUM | 64 |
| 14 | Letter Dated 12-7-06 From UNUM to Steven Votta and Deluca & Weizenbaum | 66 |
| 15 | Letter Dated 6-22-07 From Atty. Healy to UNUM | 68 |
| 16 | Joseph Votta's K-1 for 2005 | 76 |

(Exhibits retained by Attorney Vorster.)



PROCEEDINGS

* * * * *

STEVEN J. VOTTA,

having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows to

DIRECT EXAMINATION

BY MS. VORSTER:

Q. Good morning. Actually, good afternoon.

**A. Yes.**

Q. Steven, I'm Joan Vorster and I represent UNUM Life Insurance Company of America, and I'm going to ask you some questions that pertain to the lawsuit that your firm has filed against UNUM.

We are going to take your deposition individually today as well as the topics on the Rule 30(b)(6) notice for which you are the designated witness.

For your deposition, I'm going to mark as the first exhibit the notice of taking of your deposition, and I'm going to show you a copy of the notice, and I expect that you have seen that, is that correct.

**A. Yes, I have.**



a2894fb7-5305-4dc6-8a22-f574c3b82019

**A. Every time I ask the question, he says he doesn't know.**
Q. Now, as owners in Votta & Votta, did you have responsibilities for business expenses?
**A. We had responsibilities to generate income that went into the general account which paid the bills. If someone was unable to work, you know, that was taken into account at the end of the year, but we were all responsible to show up for work and do our jobs.**
Q. If you were unable to work, how was that accounted for at the end of the year?
**A. It only happened once prior to this where my sister Jill was out for medical leave.**
Q. Okay.
**A. And we at that time applied the "If you don't work, you don't get paid and if you don't work, you don't receive a bonus for the period you are not here," which was the standard that we set from 2003.**
**And with Joe's untimely departure, we just carried on the same way.**
Q. Was that policy, If you don't work, you don't get paid, and you don't get a bonus, was that something that the three of you agreed upon verbally?



**A. Yes.**
Q. No partnership agreements at your firm?
**A. No.**
Q. No employment agreement between any of you?
**A. No.**
Q. You were employees of Votta & Votta?
**A. I think, yeah, you would have to classify us, I got a weekly paycheck, so I was an employee.**
Q. Got a weekly paycheck and, as your sister indicated earlier, you would get a bonus from the net profit at the end of the year?
**A. Correct.**
Q. Did you receive a W-2?
**A. I believe so, yeah.**
Q. Did you also receive a K-1 as an owner of Votta & Votta?
**A. I believe so, yes.**
Q. Do you have a recollection of receiving a K-1?
**A. The same accountant did my tax returns as did the corporate tax returns, so that's a document that they generated and they would just put it with my return. I know it was there.**



Q. It was not ever provided to you in an envelope at the office before the tax return was prepared?
**A. No.**
Q. To your knowledge, did that accountant also perform your brother Joseph's personal return?
**A. I believe so, yes.**
Q. So in terms of your monthly business expenses, as an owner, do you have an obligation to make any payment for business expenses on a monthly basis?
**A. No.**
Q. Did you receive any kind of a notice at the end of the year that your billings had not exceeded your share of the monthly expenses, if that was indeed the case?
**A. No.**
Q. At the end of the year, in terms of allocating the net profit, did anybody determine whether one of the owners had worked more than the other and therefore should be entitled to more profit?
**A. No, there were just one or maybe two years that were exceptional for a particular attorney that it wasn't done equally. It would be rare for someone to have, you know, an exceptional year.**



**Our attitudes were that if we were all working and showing up every day and doing the best we could, we would just all share in it together. Some years I may do more, some years Joe may do more, some years Jill may do more, and it would find its own level.**
Q. What about if somebody had an exceptionally bad year and did not generate enough revenue to cover their expenses, were they expected to provide personal funds?
**A. I can honestly say that never happened.**
Q. That was something that was never discussed or contemplated?
**A. No.**
Q. Now, in terms of at any time after March 31, 2005, has Votta & Votta asked you to make any contribution towards the firm's expenses?
**A. No.**
Q. Did you make any request to Joe to pay any portion of the firm's expenses after March 31, 2005?



a2894fb7-5305-4dc6-8a22-f574c3b82019

Page 17

A. **No.**
Q. You understand that the UNUM business overhead policy that's the subject of this case and that was issued to Joe only provides for two years of benefits, correct?
A. **Yes.**
Q. So those benefits would be exhausted at some point in 2007, correct, given that Joe left in March of 2005, right?
A. **Clearly you're saying in theory.**
Q. Right, in theory, in the event that every penny was paid under that policy, those benefits would have been exhausted in 2005.
MR. HEALY: 2007.
Q. Excuse me, 2007.
Is it your position that Joe remained an owner of Votta & Votta after 2007?
A. **Absolutely.**
Q. And as an owner of Votta & Votta after 2007, would you expect him to contribute towards the expenses of Votta & Votta?
A. **Would I expect him to contribute if he wasn't working and he was out on medical leave and under disability?**

Page 18

Q. Yes.
A. **I wouldn't require it from him as I didn't require it from my sister.**
Q. Okay.
A. **As long as we're staying above water, everything is okay with me.**
Q. So in that respect, you haven't made any demand on Joe to contribute to the business expenses?
A. **No, he had enough problems.**
Q. Since March 31, 2005, Joe has not made any payments to Votta & Votta for business expenses, correct?
A. **No.**
Q. Has he made any payments to Votta & Votta at all since March 31, 2005?
A. **Not that I know of.**
Q. Have you had any conversations with him about the payment of business expenses since March 31, 2005?
A. **I've told him that business wasn't good at times because of the policies not getting paid, because I was the only attorney working and we still carried the full load of staff.**

Page 19

Q. After Joe stopped working at the firm at the end of March, did you let any staff go?
A. **No.**
Q. Kept everybody on?
A. **I had to.**
Q. Why did you have to?
A. **Because the work was there.**
Q. It was just all being performed by you as a single attorney?
A. **Yeah, so I was having long days.**
Q. Did you consider hiring an attorney to help you with that work?
A. **We had discussed it. We chose to get through it, and we did.**
Q. So you didn't hire an associate part time, full time, any time after March?
A. **I would not have been able to pay him.**
Q. Okay.
Now, in terms of the K-1s that are issued to the owners of Votta & Votta, do you know if the K-1s have been issued for the tax year 2007?
A. **Yes.**
Q. Do you know if Joseph received a K-1 for 2007?

Page 20

A. **I was told he did.**
Q. Who told you that?
A. **My accountant.**
Q. Do you know how that K-1 is being delivered to Joseph?
A. **I assume that Joseph's using the same accountant, and that's between him and his accountant how it's getting to him.**
Q. It's not a matter that you or anybody from the firm mailed a copy of the K-1 to him?
A. **No.**
Q. What about the tax year 2006, did Joseph receive a K-1 for that year?
A. **Yes, he did, and that's been forwarded on to your company.**
Q. Now, did Joseph receive any compensation through the K-1 for 2006?
A. **I don't think so.**
Q. What about for 2007, did he receive any compensation?
A. **I honestly have never seen it, so I can't say.**
Q. The K-1 for tax year 2006, that would have been made available through you for the law firm

**yours, I'll take mine; whoever needs it, take it.**
Q. When you say that you and Joe had been talking about doing this, I think that's what you said in one of your previous answers, what is the "this" that you were talking about?
**A. Signing his deed, signing the deeds from my father, figuring out what was owed to him to get the money to him. This was predominantly done to appease my mom, who was a mess over this whole situation.**
Q. Do you recall speaking to your mom about getting the money owed to Joe to him?
**A. My conversations with my mother after August of '05 was, Mom, stay out of this. This is between us and the business.**
Q. Do you recall having any conversations with your mom where she said to you, Joe needs some money?
**A. She would say it to me almost daily in tears.**
Q. Okay.
Do you know, was your mom talking to Joe daily?
**A. Not daily, no. Joe was not able to speak with us for whatever reason, and I still don't know**



**why. Whatever conversations I had with Joe were extremely abbreviated and most of the time they ended with him hanging up, okay?**
Q. Okay.
**A. Everything here was done on Joe's schedule.**
Q. So your conversations with your mom after August of '05 were that she should stay out of it?
**A. Actually, after he sent this letter, which was addressed to my mother --**
Q. She's the Cam?
**A. She's the Cam -- I said we need to talk. I met with my brother and said, You need to stop putting mom in the middle of this. You need to deal with me or Jill about business issues.**
Q. So in response to the note from Joe dated August 2nd, 2005 marked as Exhibit 8 to Jill's deposition, you had a conversation with Joe about that?
**A. I actually had a meeting.**
Q. A meeting with him?
**A. Uh-huh.**
Q. Did you talk to him at that time that he didn't have anything left from the bonus for 2003 and 2004?



**A. Yes.**
Q. What about his claim here in this note that he had $40,000 from a $100,000 business overhead policy?
**A. That was something he had concocted in his head, okay?**
Q. Okay.
**A. I don't know where that came from. We had had many conversations when Joe was working prior to his departure anticipating the payment under Jill's overhead policy, which has never seemed to come in again. Insurance companies seem to do this a lot. You would have to ask him on that.**
Q. When you had the meeting with Joe after receiving that note of August 2nd, was that a meeting where you discussed the money that would be owed to Joe and what you were thinking about doing in that respect?
**A. No.**
Q. What was the purpose of this meeting?
**A. To leave my mother out of this.**
Q. And to have him communicate with you and Jill?
**A. Yes.**



Q. Did he do that?
**A. Yes, he did.**
Q. How did things start getting into play so that you had the April 13, 2006 meeting? How did you communicate with Joe about that?
**A. Here again, we were trying to help my brother, and my mother would still whine to us about the situation.**
Q. Even though you asked her to stay out of it?
**A. No, she's a typical Italian mother over a son who was troubled and hasn't worked in a year.**
Q. Right.
**A. So this was something that we wanted to do and we tried to figure out what we could do. We talked to the accountant. I wish I could have given him more, but No. 1, we really didn't have it; No. 2, based on whatever accounting principles they applied, they came up with I think they call it the book value of the company and that that's what the one-third represents. It doesn't represent the value of the stock; it was the book value of the company.**
Q. Okay.
**A. Okay?**



a2894fb7-5305-4dc6-8a22-f574c3b82019

Page 33

Q. Got it.
A. And we just wanted to put as much money in his pocket as we could, because I'm sure he was hurting for it.
Q. Did Joseph ever ask you for money, aside from that note?
A. God, yes.
Q. In conversations that you had with him, would he ask?
A. He was under an impression that we owed him money.
Q. Okay.
A. And I told him to talk to the accountant, and whatever conversations they had, you would have to talk to them.
Q. Did Joe ask you for a loan?
A. No.
Q. Was it a matter that he was asking you for money that he was owed, was that the tenor of his conversation?
A. No.
Q. What were the words that he used?
A. I couldn't tell you.
Q. Close to it?

Page 34

A. I couldn't tell you. I mean, after this, it's like, Joe, I don't know what you're thinking. You received all the money, as I did all of my bonus. It's not on the books; it's not there.
Q. In terms of the three checks that were here, actually the two checks, the AAA account and the money that's designated as a loan to stockholder, was this something that you raised to him or was it something that he asked for?
A. Something we raised to him.
Q. How did you raise it to him? What did you say to him?
A. Again, after Jill and I spoke, after we spoke to the accountant and he came up with this and he said this is what you can do and this is how you can do it, that is when I told Joe, This is what we're going to do. Okay? And that's what happened.
Q. And --
A. There was never a conversation, Well, that's not enough, I want more. It was just, Fine, and we met and we did it.
Q. So in terms of when you had that meeting in April of 2006 and Joe received the three checks that we have on Exhibit 9, the first check that's on the

Page 35

top here for the $33,000, which I'm going to round down to make it easier, for the $33,000, that represented what?
A. A loan from the corporation to Joseph Votta, Jr. as the stockholder.
Q. Okay.
A. And as for collateral for that loan, he pledged what he had, which was his stock.
Q. Now, in terms of it being a loan, was that something that the accountant told you that you could do?
A. Yeah.
Q. Okay.
Did the accountant explain to you why it was a loan?
A. We weren't just going to give him money.
Q. What was the repayment obligation for the loan?
A. We didn't discuss that. I wanted my brother to get healthy and to get back to work. I honestly didn't think that my brother would not be returning to the practice.
Q. Did you have any conversation with him? Did you ever talk to him?

Page 36

A. His answer always was, I can't tell you that. I can't answer that.
Q. What about talking to his wife?
A. What about it?
Q. Did you ever talk to her about his coming back?
A. I called, I left messages, I went up there, I was met with hostility. I was asked to stay away and don't call, so I gave up trying.
Q. So your expectation was that this was a loan and you never expected that Joe would not return to work?
A. My belief, not my expectation, is that this is a loan, okay?
Q. Yes.
A. My expectation as far as my brother returning to work, I thought he would.
Q. If he did return to work, do you have any expectation that he would repay the $33,000?
A. We would deal with that just as every other corporation does with loans on the books.
Q. You figured when the time came you would deal with it then?
A. We'd deal with it, yeah.

Q. No promissory note, he's your brother, right?
A. That's why I have a receipt. That's why I took his stock.
Q. So no promissory note, though?
A. No.
Q. No discussion about terms of repayment?
A. No.
Q. No interest rate?
A. No.
Q. Why did you get the receipt that we marked earlier?
A. So that clearly this was a loan.
Q. Did you prepare the document that's the receipt that's marked as Exhibit 10?
A. We did, my sister and I did.
Q. Both your sister and you?
A. We did; we discussed all of this.
Q. Then so at the meeting that you had on April 13, Joseph signed the receipt that's marked as Exhibit No. 10, right?
A. Uh-huh.
Q. You gave him the three checks that we've marked as Exhibit No. 9?



A. Uh-huh.
Q. Now, we've talked about the first check on Exhibit 9, which was the $33,000. What was the second check for $6,831?
A. We talked about that, also. That's the AAA account. However they figure it out, it's on the books, it could be paid to him, so we did it.
Q. What does AAA stand for?
A. I couldn't tell you.
Q. What was your understanding of what this $6,800 represented?
A. It represented money that the corporation some how, some way pays for the benefit of the stockholder that is inputted as income to us for which we pay taxes on. Beyond that, talk to an accountant.
Q. This was money that your accountant felt that you could pay Joe at that time?
A. That was money that was on the books that was due him in his AAA account, and we all have them, that we could pay to him that was basically his money.
Q. So when you had that meeting in April of 2006, these three checks represented all of the money



-- were these three checks representative of all of the money due to Joe?
A. No.
Q. Were these two checks, the $6,800 and the bonus check of the $10,828, were those two checks the amount of money that was due to Joe on the books of Votta & Votta?
A. No. This isn't due. The AAA isn't due. That's a paper transaction. It usually doesn't get paid out. We chose to pay it out to put money in his pocket.
This was the one-quarter bonus for his three months of employment in 2005.
Q. And then the way that your accountant came up with the number for the $33,000 was his one-third share of the book value of the corporation?
A. One third of the book value, correct.
Q. Now, after April 13, 2006, has Votta & Votta issued any other payments to Joe?
A. No, not that I know of, no.
Q. And Joseph hasn't made any other payments to Votta & Votta?
A. No.
Q. Have you personally issued any loans to



Joe?
A. No.
Q. Has Joe made any payments to you personally?
A. No.
Q. Now, also at the meeting on April 13, 2006, Joe signed the stock agreement, right?
A. Correct.
Q. By signing the stock agreement -- let me back up.
What was the purpose of him signing the stock agreement?
A. To pledge it for the loan. That's the only way to take security in it.
Q. So he gives Votta & Votta the stock back?
A. No, he did not. He pledged it.
Q. He pledged it. Did you sign any kind of a pledge agreement?
A. No.
Q. How come?
A. We didn't need it.
Q. Why didn't you need it?
A. He's my brother.
Q. So he -- and I noted that the stock



a2894fb7-5305-4dc6-8a22-f574c3b82019

Page 41

certificate is not signed. It was signed on April 13?
A. It's not dated.
Q. It's not dated.
A. That was signed at that time.
Q. It's signed, but not dated?
A. Yes.
Q. And it was signed at that meeting?
A. Yeah.
Q. So if I'm looking at this stock certificate, how do I know that it is pledged to the company?
A. You have to look at it with the totality of the documents.
Q. If I look in the totality of the documents, I'm looking at the receipt?
A. Yes.
Q. I'm looking at the check to Joe for the $33,000?
A. Yeah.
Q. And I have to look at this document?
A. Yeah.
Q. Does anywhere on the stock certificate it say that it is a pledge rather than an assignment

Page 42

back to Votta & Votta?
A. No.
Q. Now, you're aware from some of the communications with UNUM that your brother has informed some people that his interest in Votta & Votta was bought out in April of 2006, are you aware of that?
A. I'm not aware of that language, no.
Q. Let's look at the letter from Attorney Deluca that we marked in your sister's deposition, and I believe the language that he used is that --
MR. HEALY: It's 13, Joan.
Q. -- that he no longer had an interest in the Votta & Votta Law Offices.
A. Yes, I'm aware of that letter.
Q. And aware of that statement that's in that letter from Attorney Deluca?
A. Yes.
Q. After receiving that letter, did you speak to your brother Joe about whether he had any ongoing interest in Votta & Votta?
A. I think I attempted to call him, yeah.
Q. And he didn't speak to you?
A. No, he didn't speak to me.

Page 43

Q. Did you communicate, either in writing or verbally, with Attorney Deluca regarding the statement in there that he no longer has an interest?
A. No, I believe Jill did.
Q. Jill had the communication?
A. Yeah.
Q. Was there anything in writing with Attorney Deluca about the status of Joe's interest in Votta & Votta?
A. I don't think so.
Q. Do you recall receiving a letter from UNUM at the end of 2006, in December of 2006, where UNUM indicated that your brother Joe had told some of his health care providers that he no longer had an interest in Votta & Votta?
A. There were several requests made upon me to put in writing issues and facts that I kept referring to them to show me in the policy where I need to abide by this request.
Q. Do you recall receiving information from UNUM --
A. Yes, I do.
Q. -- that, indeed, Joseph was telling others

Page 44

that he no longer had an interest in Votta & Votta?
A. I ultimately received a letter that had an excerpt in it from a medical report, which I believe was from an IME, stating that, not that he sold -- I forget the verbiage. If you had the letter, it would speak for itself.
Q. You recall receiving something like that?
A. Yes, I did, absolutely.
Q. Now, tell me, in that meeting in April 2006, did you have any conversations with Joe about repayment of the loan?
A. Once again, no.
Q. Did he say to you, What if I don't want to pay it back?
A. I said, Then we'll cross that bridge when we get to it.
Q. So he did ask you that?
A. Yes, we had a conversation about this.
Q. And your answer to him was we'll cross that bridge when we get there?
A. Yeah.
Q. Did he ask you to put anything in writing about his repayment obligation?
A. I spoke with Bernie about this. I'm

**agonizing over this. I thought we had discussed possibly giving him a receipt that said that if you don't return, you don't have to worry about it, so that he wouldn't anguish over this. I was worried about putting money in his pocket and not burdening him with thinking that he's taking money that he would have to repay.**

**I don't think we actually rendered it to writing.**

Q. You don't think you put it in writing?

**A. Yeah, I don't think I did. I would have a copy of it if I did, but I know I remember having a conversation with Joe about it.**

Q. Joe had asked, What if I don't repay this?

**A. Yes.**

Q. And you said to him, We'll cross that bridge when we get there?

**A. Yeah.**

Q. And your recollection is that possibly you executed a document stating that?

**A. I might have given him a note that I just scribbled and said, Here, if this makes you sleep better, something like that.**



Q. What do you think you wrote on that note?

**A. I would have, I might have said, Paid in full, something like that, but I don't think I did it.**

Q. If that document was written, you don't have a copy of it, right?

**A. Right.**

Q. Who would?

**A. I would have given it to Joe would have been the only person, but I don't think we did it. I know we talked about it, but I don't think we did it.**

Q. So you're not sure if a document was executed, but you are certain that you had the conversation with Joe about what happens if he doesn't repay it?

**A. Right.**

Q. At any time during that conversation did you say to Joe that the company, that the firm would seek to collect repayment on that note if he didn't return to work?

**A. Did I ever say that to him?**

Q. Yes.

**A. No, I told you what I said.**

Q. Did you understand at that time when you



met with him in April of 2006 that he had applied for disability benefits?

**A. I assumed he had.**

Q. Did you know whether he was receiving any disability benefits?

**A. I do not know.**

Q. Did you have any expectation that after he received disability benefits that he would then repay the loan?

**A. Absolutely not.**

Q. So is it a matter that if Joe never repaid the loan, the $33,000, that that's acceptable to Votta & Votta?

**A. Like I said, we would have to cross that bridge and discuss it as a family and as a corporation to decide what we were going to do.**

Q. It's been two years now since you gave that loan to Joe.

**A. That's right.**

Q. Has he made a payment?

**A. No.**

Q. Have you demanded any payment?

**A. No.**

Q. Have you had any discussions internally



about whether to ask for repayment?

**A. No. My brother is still ill.**

Q. Do you have any expectation, you personally, of Joe returning to work?

**A. I have less of an expectation than I had three years ago.**

Q. What about you personally, would you ask Joe to repay that note if two years from now he doesn't return to work?

**A. Probably not.**

Q. All right, I'm going to ask you some questions about some of the letters that you received from UNUM, sir. I'm going to show you a letter dated March 15, 2006, and we're going to mark that as the next exhibit.

(Exhibit No. 4 marked for identification.)

Q. Do you recall receiving the document that we marked, the letter dated March 15, 2006 that we marked as Exhibit No. 4?

**A. Yes.**

Q. Is this the letter that UNUM wrote to you in response to your request for payment under the business overhead policy?

**A. Yes, it appears to be, yeah.**
Q. Now, at the time that UNUM wrote this letter, your firm had a copy of the business overhead policy, correct?
**A. I believe we had the original policy.**
Q. You had the original policy. And you'll note that in the letter there's also a description of the language in the policy, correct?
**A. Yeah.**
Q. I'm going to show you as the next exhibit a letter dated May 18, 2006, which we'll mark as Exhibit No. 5.
(Exhibit No. 5 marked for identification.)
Q. I'm going to draw your attention to the second page of Exhibit No. 5, Steve.
**A. I'm sorry, say that again, please?**
Q. I direct you to the second page of Exhibit No. 5, the second to the last paragraph there. And you write to UNUM that Mr. Votta is a one-third owner and shareholder of the Votta & Votta Law Offices and, as such, is responsible for one-third of the expenses, correct?
**A. Yes.**



Q. The letter that we've marked as Exhibit 5 is dated May 17, 2006, correct?
**A. Yes.**
Q. By the time you wrote the letter that we've marked as Exhibit No. 5, your brother Joseph had executed the stock certificate marked as Exhibit No. 11 to Jill Votta's deposition, correct?
**A. Correct.**
Q. And then I'm going to show you as the next exhibit a fax transmittal sent from UNUM directed to you, which we're going to mark as the next exhibit, which will be No. 6.
(Exhibit No. 6 marked for identification.)
Q. This is the exhibit marked as Exhibit No. 6. Do you recall receiving this fax, Steve?
**A. Yes, I do.**
Q. In it the disability benefits specialist at UNUM is asking for either a copy of the purchase and sale agreement or a copy of both sides of Mr. Votta's stock certificate, is that right?
**A. Yes.**
Q. Did you send them a copy of the stock certificate?



**A. I don't believe I did, no.**
Q. How come?
**A. I would have to see the next letter that I responded to them to refresh my recollection, but I did respond to this.**
Q. When you got this in June of 2006, you at that time did not send him a copy of the stock certificate?
**A. That's right.**
Q. Do you ever remember sending the stock certificate to UNUM?
**A. I know we did in discovery. I don't know about prior to that.**
Q. What about prior to that, the document that we marked as Exhibit 11 --
**A. I think I had requested for that part of the policy that authorized the demand of these things.**
Q. That's your recollection, which was your response?
**A. I believe so.**
Q. So why not just send them the stock certificate?
**A. Why not just pay the claim?**



Q. They are asking for information to support the claim.
**A. And I had given them the information to support the claim.**
Q. Was it a matter that you didn't want to give them the stock certificate?
**A. No. I didn't feel they were entitled to it. Just like they wanted other financial information that I deferred to in my previous letter, the Exhibit No. 5, when I said I couldn't provide other information to them for various different reasons.**
Q. By the time you received this fax from UNUM that was dated June 1, 2006, you had the stock certificate signed by Joseph that we've marked as Exhibit No. 11, correct?
**A. Uh-huh.**
Q. Because that had been signed that April, right?
**A. Correct.**
Q. This stock certificate was certainly in your possession, wasn't it?
**A. Yes, I'm not denying that.**
Q. Do you recall receiving a telephone

**A. Correct.**
Q. In it you want to know under what section of the policy they are asking for the written statement regarding your brother's ownership in Votta & Votta, correct?
**A. Correct.**
Q. Now, at this point, this point being October 13, 2006, what documents did you have to show your brother's ownership in Votta & Votta?
**A. What documents do I have to show? We have his application for insurance.**
Q. Okay.
**A. We have the stock certificate itself.**
Q. Yes.
**A. We have tax returns. We have my brother's personal tax returns; we have the K-1s attached thereto. We have all the communications, which I forwarded to your company. And I can't think of anything else.**
Q. But, certainly, one of the documents that would evidence your brother's ownership in Votta & Votta is the stock certificate that we've marked as Exhibit No. 11, correct?
**A. Uh-huh.**



Q. Is that a yes?
**A. I believe it's 11, yes, okay.**
Q. This is the stock certificate where your brother sold, assigned, or transferred stock to Votta & Votta, correct?
**A. No, it's not correct.**
Q. But that's what the document says, right?
**A. That's what the document says, but he signed it as a pledge for a loan from us.**
Q. In any event, that document was signed in April of 2006.
**A. Uh-huh.**
Q. So in October 2006, was that the most recent document evidencing your brother's ownership in Votta & Votta?
**A. I don't know how to answer that.**
Q. Okay.
**A. Is that the most recent document to establish it? No, I think all the documents establish it.**
Q. Which was the one that was generated closest to the letter of October 13?
**A. I don't know of any document that's going to establish ownership by signature.**



Q. The stock certificate won't?
**A. No, the stock certificate was issued long before the policy was purchased.**
Q. What about the stock certificate with the endorsement that we've marked as Exhibit 11 to Jill Votta's deposition, doesn't that give us information about your brother's ownership in Votta & Votta?
**A. Yes, it does.**
Q. As of October 13, 2006, your law office certainly hadn't prepared any of its tax documents for the year 2006, had it?
**A. No.**
Q. Now, the next letter I have to mark as an exhibit is dated October 16, 2006. And we're going to mark that as the next exhibit, which is Exhibit 12.
(Exhibit No. 12 marked for identification.)
(Short recess taken.)
Q. We've marked as Exhibit 12, Steve, a letter from UNUM to you dated October 16, 2006. Do you recall receiving this?
**A. Yes.**
Q. Again, if you look at the third paragraph



in that letter, UNUM has enclosed a check that represents payment for the period of December 2004 to May 1, 2006, correct?
**A. I believe there's an error in their calculation, but assuming the benefits are what they paid, but, yes, that is the second check that they sent.**
Q. They again asked for confirmation of Mr. Votta's ownership so that additional benefits could be considered, correct?
**A. Yup.**
Q. Is that right?
**A. Yup.**
Q. In response to this letter of October 16, 2006, did you provide UNUM with any information regarding Joseph's ownership in Votta & Votta?
**A. I don't remember what my reply was.**
Q. Okay.
And you wrote a letter to UNUM dated November 2nd, 2006, which I'm going to mark as the next exhibit, Exhibit No. 13.
(Exhibit No. 13 marked for identification.)
Q. Here's the letter dated November 2nd, 2006,

which is written in reply to a letter of October 19, 2006. I believe that may be a typographical error.

MR. HEALY: It's not.

MS. VORSTER: Is there an October 19 letter?

MR. HEALY: Yes, there is.

Q. On the November 2nd, 2006 letter you again requested the identification of the policy that would require Mr. Votta to be an owner of Votta & Votta to consider ongoing benefits, is that correct?

**A. Yes.**

Q. Did you provide UNUM at this time, November 2nd, 2006, with any information regarding your brother's ownership of Votta & Votta, other than what you've already given them?

**A. No.**

Q. The only thing that you had given them at that point was a verbal statement that your brother remained an owner of Votta & Votta, correct?

**A. Correct.**

Q. And the one letter of May 17, 2006 where you put that in writing?

**A. Correct.**

Q. I'm going to show you now a letter dated



December 7, 2006, which we will mark as the next exhibit.

(Exhibit No. 14 marked for identification.)

Q. Here's the letter dated December 7, 2006, and this is a letter, sir, from UNUM and it is written to both Deluca & Weizenbaum, attention to Attorney Deluca, and also to you, correct?

**A. Correct.**

Q. Do you recall receiving this letter?

**A. Yes, I do.**

Q. In this letter UNUM writes about the IME physician speaking with one of your brother's health care providers, where the health care provider indicates, and I'm looking at the top of Page 2 now, that he met with Mr. Votta on April 18, 2006 and that Mr. Votta had just sold his share of the business and was relieved by it.

Do you see where I'm reading that?

**A. Yeah.**

Q. So April 18th, 2006 is about what, five days after you had the meeting with your brother where the checks were provided to him and the stock certificates signed as well as the receipt,



correct?

**A. Uh-huh.**

Q. Is this a yes?

**A. Yes.**

Q. Do you recall reading this portion of the letter where your brother said, apparently said to a health care provider that he sold his share of the business?

**A. Yes.**

Q. Do you recall having any sense about why your brother would make those kinds of statements?

**A. Not at all.**

Q. At the bottom of Page 2 of the letter dated December 7, 2006, UNUM was asking for information in writing regarding your brother's status as an owner of the Votta & Votta Law Firm, correct?

**A. Yes.**

Q. Did you, in response to their letter of December 7, provide UNUM with any information regarding your brother's ownership in Votta & Votta?

**A. I think at that time I had no further communications directly with the company.**

Q. After that you retained counsel, Attorney



Healy, to represent your firm, is that correct?

**A. Yes, I did.**

Q. As you understand it, there were a number of letters back and forth between UNUM and Attorney Healy?

**A. Correct.**

Q. At some point, and I believe it was in June of 2007, I show you -- this is going to be the next exhibit, a letter from Attorney Healy to UNUM dated June 22, 2007.

(Exhibit No. 15 marked for identification.)

Q. Do you recall receiving a copy of the letter dated June 22, 2007?

**A. If I received a copy of Mr. Healy's letter?**

Q. Do you recall seeing it at some point?

**A. Honestly, no.**

Q. Okay.

In 2006 -- we'll get to this letter in a minute, but in 2006, did you speak with your firm's accountant about UNUM's request for information regarding your brother's ownership of Votta & Votta?

**A. Speak to the accountant?**



a2894fb7-5305-4dc6-8a22-f574c3b82019

Page 69

Q. Yes.
**A. I don't recall that, no.**
Q. Aside from any conversations with your attorney, did you speak to anyone about what documentation was available to you to show your brother's ownership in Votta & Votta?
**A. I don't think so, no.**
Q. Now, are you aware that after -- we had talked earlier about after you retained counsel for Votta & Votta there were a number of letters back and forth with UNUM regarding the topic of whether ownership information about your brother needed to be disclosed. Are you aware that that was the tenor of the letters?
**A. Yes, I think there was also in some of the letters that I sent directly before his involvement, yeah.**
Q. Right.
But now in June, on June 22, 2007, your firm is providing information about Joe's ownership in Votta & Votta, is that correct?
**A. That appears what this is. I haven't read the entire letter.**
Q. Your firm provided a K-1 to evidence

Page 70

ownership of Joseph --
**A. Well, no, the accountant provided that. That came from the accountant.**
Q. Okay.
Enclosed with the letter dated June 22, 2007 that we've marked as Exhibit 15, your attorney provided to UNUM on behalf of Votta & Votta a copy of the K-1 for your brother Joseph, correct?
**A. Correct, yes.**
Q. That K-1 became available, what, sometime in the first quarter of 2007?
**A. That would be my guess, yes.**
Q. And it is that K-1 document that Votta & Votta says establishes that, certainly one of the documents that establishes that Joe remains an owner of Votta & Votta, correct?
**A. It's one of the documents, yes.**
Q. And that K-1 was not available to you in the fall of 2006 when UNUM was asking for information regarding your brother's ownership in Votta & Votta, correct?
**A. Correct.**
Q. At any time did either you or anyone acting on behalf of Votta & Votta, before the lawsuit was

Page 71

filed, provide UNUM with a copy of the stock certificate that was signed by Joseph on April 13, 2006?
**A. I don't recall, but I don't think so.**
Q. At any time prior to the institution of the lawsuit, did anybody provide UNUM with a copy of the receipt that was signed on April 13, 2006?
**A. No.**
Q. Did anybody, either you or anyone on behalf of UNUM -- on behalf of Votta, indicate that your brother had asked whether the loan needed to be repaid?
**A. Say that again.**
Q. I'm sure that was a lousy question. Let me re-ask it.
Did you at any time tell UNUM, either you or your counsel, tell UNUM that when your brother had received the loan that he had asked whether it needed to be repaid?
**A. No.**
Q. With regard to any information regarding the loan, did you provide UNUM any information that, in fact, there was no repayment obligation?
**A. We never said there was no repayment**

Page 72

**obligation.**
Q. Is there?
**A. I said we would cross that bridge when we came to it.**
Q. You've never established -- you don't have an established repayment obligation as we sit here today, correct?
**A. No.**
Q. Is that correct?
**A. That's correct, yeah.**
Q. Looking at the K-1 that is attached to Exhibit No. 15, it talks about your brother Joseph having ordinary business income of $10,000 in 2006. Do you know what that is?
**A. No.**
Q. Was that something that the accountant put together?
**A. Absolutely.**
Q. Do you recall whether any kind of a check -- and I'm no accountant, so this is all Greek to me, and un-understandable to me -- do you know whether any kind of a check was cut by Votta & Votta to your brother for ordinary business income?
**A. No, none known to me.**