# EXHIBIT T

Volume I
Pages 1-106

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
Civil Action No. 07-410-ML

VOTTA & VOTTA LAW OFFICES, LTD.,
Plaintiff,

vs.

UNUM LIFE INSURANCE COMPANY OF AMERICAN, ALIAS,
Defendant.

* * * * *

DEPOSITION OF JILL S. VOTTA, called as a witness by counsel for the Defendant, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Carol S. Kershaw, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at the Law Offices of Bernard P. Healy, 750 East Avenue, Pawtucket, Rhode Island, on Thursday, June 5, 2008, commencing at 11:11 a.m.

***********************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters

One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX: (508) 752-4611

*************************



APPEARANCES:

LAW OFFICE OF BERNARD P. HEALY
BY: Bernard P. Healy, Esq.
750 East Avenue
Pawtucket, Rhode Island 02860
(401) 312-3751
for the Plaintiff.

MIRICK, O'CONNELL, DeMALLIE & LOUGEE, LLP
BY: Joan O. Vorster, Esq.
100 Front Street
Worcester, Massachusetts 01608-1477
(508) 791-8500
jovorster@modl.com
for the Defendant.

ALSO PRESENT:
Steven J. Votta
Michael J. Mesolella

INDEX


| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JILL S. VOTTA | | | | |
| By Ms. Vorster | 4 | | | |




EXHIBITS


| Exhibit No. | Description | For I.D. |
|---|---|---|
| 1 | Notice of Deposition for Jill Votta | 5 |
| 2 | Rule 30(b)(6) Notice of Deposition for Votta & Votta Law Offices | 5 |
| 3 | Letter Dated 6-1-06 From Votta & Votta to Joseph Votta | 40 |
| 4 | Letter Dated 11-29-05 From Deluca & Weizenbaum to Jill Votta | 48 |
| 5 | Letter Dated 12-27-05 From Deluca & Weizenbaum to Jill Votta With the Authorization to Release Information | 50 |
| 6 | Letter Dated 2-16-06 From Jill Votta to Deluca & Weizenbaum With Authorization and Assignment | 52 |
| 7 | Letter Dated 2-27-06 From Deluca & Weizenbaum to Jill Votta With the Executed Assignment and Authorization | 54 |
| 8 | Note Dated 8-2-05 From Joseph Votta To Cam, Steve, and Jill | 54 |
| 9 | Copies of Three Checks Issued to Joseph Votta | 60 |
| 10 | Receipt For Check No. 6189 in the Amount of $33,690.67 For a Loan Dated 4-13-06 | 75 |
| 11 | Votta & Votta Stock Certificate Signed by Joseph Votta For Five Shares of Stock | 77 |
| 12 | Handwritten Notes, Deeds, Nine Pages, Dated 12-22-05 | 86 |
| 13 | Letter Dated 10-31-06 From Deluca & Weizenbaum to Jill Votta | 91 |


(Exhibits retained by Attorney Vorster.)



PROCEEDINGS

* * * * *

MS. VORSTER: Before we start the deposition, we'll include on the record that counsel has very kindly stipulated to the court reporter having notary in Massachusetts and not Rhode Island, so the court reporter will be able to swear the witness in.

* * * * *

JILL S. VOTTA,
having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows to

DIRECT EXAMINATION

BY MS. VORSTER:

Q. Good morning, Jill. I'm Joan Vorster, and I represent the UNUM Life Insurance Company of America, and I have some questions today about the lawsuit brought by Votta & Votta Law Offices against UNUM.

We have noticed your deposition for today, and I'm going to give you a copy of your deposition notice that we'll mark as the first exhibit. Have you seen a copy of your deposition notice, ma'am?



cb70e989-f408-4e27-9d60-ea9ba1f35fdd

Page 9

Q. How fast time goes by, huh?
**A. Uh-huh.**
Q. And the license has been in active status since then?
**A. Yes.**
Q. And you currently practice law with Votta & Votta?
**A. Yes.**
Q. Have you practiced law anywhere else?
**A. No.**
Q. When you received your Rhode Island license in 1975, did you form Votta & Votta at that time?
**A. No, I was by myself, and it was just me.**
Q. When it was just you, how did you practice law at that time? What was your name?
**A. Jill S. Votta.**
Q. When did you form Votta & Votta?
**A. I believe it was -- I think Votta & Votta came into being around 1979.**
Q. Who was the second Votta to join you in the law firm?
**A. Joseph S. Votta, Jr.**
Q. And Joseph is your brother?
**A. Yes.**

Page 10

Q. And then did your brother Steve join you in the practice at some later time?
**A. Yes.**
Q. Now, what is the corporate organization of Votta & Votta? Is it a partnership, a limited liability corporation?
**A. It's a corporation, professional corporation.**
Q. Professional corporation.
Staying within the time frame starting with 2005, January 1 of 2005, how many -- do you call, the owners of the company, do you call them shareholders, partners? What is the wording that you use at Votta & Votta?
**A. We didn't call each other anything; we were just all in it together.**
Q. As of January 1, 2005, who were the owners of Votta & Votta?
**A. Jill and Joe and Steve.**
Q. How many shares of stock did each of you have?
**A. We all had an equal number, and I can't remember.**
Q. That's okay, but it was an equal number for

Page 11

each of you?
**A. We each had an equal number.**
Q. Were there any other owners --
**A. No.**
Q. -- as of January 1, 2005?
**A. Never happened.**
Q. How long had that been the case that it was the three of you that were the owners of the law firm?
**A. Since years, I don't know.**
Q. Many years?
**A. Many years, yeah.**
Q. As of January 1, 2005, who were the attorneys that practiced at Votta & Votta?
**A. The three of us.**
Q. Did that change at any point?
**A. Joe left -- Joe, in 2005, yes.**
Q. So Joe stopped practicing with Votta & Votta in 2005?
**A. Right.**
Q. Do you recall about when it was in 2005?
**A. The end of March 2005.**
Q. Is there anything about something that happened at the end of March that helps you remember

Page 12

that that's when it was?
**A. I just know it.**
Q. Again, has your brother Joe, has he practiced with the firm at any time since March of 2005?
**A. No.**
Q. So did he effectively leave the firm in 2005?
**A. No, he never left the firm.**
Q. What do you mean by that?
**A. He just physically wasn't there.**
Q. So he hasn't physically been at the firm's offices since March of 2005?
**A. Correct.**
Q. Hasn't walked through the doors at all of Votta & Votta since March of 2005?
**A. Never.**
Q. Never.
What happened with Joe's cases at the time that he left the firm? Were they reassigned?
**A. He was disabled. He didn't leave the firm. You keep saying leaving the firm; he never left the firm.**
Q. So he stopped working at the firm?

Page 33

Q. Now, as I understand it, there is the business overhead policy issued to your brother from UNUM, correct?
**A. Yes.**
Q. And from looking at documentation, UNUM paid benefits under that business overhead policy up until May of 2006, does that jibe?
**A. I don't know what; I know they paid some of what they owe.**
Q. Some of what they owe and there's still a certain amount outstanding that's the subject of this case, correct?
**A. Right.**
Q. After UNUM stopped paying, did anyone from Votta & Votta ask your brother to contribute to the overhead expenses at the law firm?
**A. No, we knew he couldn't, but we also had placed the policy, the overhead policy, in place and paid the premiums for decades expecting that if this happened that the overhead policy would have paid as the usual course of business.**
Q. Now, but no demand has been placed on Joe since the policy has ceased payments?
**A. He's still disabled.**

Page 34

Q. I'm just asking if a demand had been made. Has either of you asked him, Joe, UNUM has not been paying, you are still an owner in this firm and we need you to contribute to your one share of the expenses? Has anybody asked him to do that?
**A. I haven't spoken to him about that, no.**
Q. So you haven't asked him, correct?
**A. Yes.**
Q. And to your knowledge, no one at Votta & Votta has asked him, correct?
**A. Right.**
Q. When was the last time that your brother Joe was at any kind of an owners meeting or partners meeting at Votta & Votta?
**A. I have no idea.**
Q. Would it have been before the end of March 2005?
**A. We didn't have partners meetings.**
Q. When is the last time that you sat down with Joseph, to your recollection, and talked to him about the management of your law firm?
**A. I have no idea. It was definitely before he left, but I have no idea.**
Q. That would have been before he left at the

Page 35

end of March 2005, correct?
**A. Probably years before.**
Q. Why would you say years before?
**A. Because I was out on medical leave myself.**
Q. Because of your illness, okay.
How long were you out on medical leave?
**A. From August 26, 2003 until I believe May of '06. I can't remember the exact date.**
Q. And the last time your law firm would have billed for any of Joseph's legal services would have been for work performed prior to the end of March 2005?
**A. Right.**
Q. Now, the UNUM business overhead expense policy, as you know, provides for two years of benefits, correct?
**A. Yes.**
Q. Is it your position that Joseph is still an owner of Votta & Votta?
**A. Absolutely.**
Q. Is it also your position that he, as an owner of Votta & Votta today, is still responsible for payment of one third of the firm's expenses?
**A. Yes.**

Page 36

Q. In terms of, he's certainly been away from work now for nearly three years, is it your expectation that he will pay for the business expenses incurred by the firm, or his share of those, after the expiration of the UNUM policy and up to the present time?
**A. I don't know. We never had that conversation.**
Q. So you never thought that one through?
**A. We've never had this situation.**
Q. And you, yourself, have made no demand on Joseph, even as of the expiration of the policy limits for the UNUM policy, to pay for overhead expenses for Votta & Votta?
**A. Right.**
Q. The reason that you have not made any demand on Joseph to pay for his third of the business, his one-third share of the business expenses, is because he's disabled at this time?
**A. He's disabled and he can't even talk about it.**
Q. What do you mean he can't even talk about it?
**A. He can't talk about anything to do with the**

**stress of the work yet.**
Q. But you're aware that your brother is certainly represented by counsel, correct?
**A. Yes.**
Q. And you've had numerous communications, letters, phone conferences with that attorney after you came back to work in 2006?
**A. Yeah, I've had some communication with him, yes.**
Q. I think the communications were actually in 2005, so I misspoke there, but you have spoken with your brother Joseph's attorney, correct?
**A. Yes.**
Q. Now, as of 2005, did Votta & Votta pay for the professional liability insurance for its owners?
**A. Yes.**
Q. For 2006, was Joseph covered under the professional liability policy?
**A. I believe we had to notify them that he was inactive, but I can't recall exactly.**
Q. Do you know if he has been covered under Votta & Votta's professional liability policy from the end of March 2005 up until the present time?



**A. He would have been on the 2005 one.**
Q. Okay.
**A. For sure, but I believe what we did was check with the company and they said you have to notify us if someone is out on extended medical leave, and that's what we did. I do remember that now.**
Q. Now --
**A. And they said, Let us know when he comes back, and we said, Okay.**
Q. In terms of insurance benefits for the owners who were employees, did Votta & Votta pay for health insurance premiums for the owners as of January 2005?
**A. Yes.**
Q. How about life insurance?
**A. I'm not sure who had life insurance. I think no, because -- no. No, no life insurance benefit. That's right.**
Q. What about disability benefits?
**A. No.**
Q. Those were paid by the individual partner?
**A. Right. As was any life insurance that**



**anybody may have had. I'm not sure what.**
Q. But the firm issued the check for the health insurance for the employees, correct?
**A. Yes.**
Q. And that health insurance would have also included the owners who were also employees, correct?
**A. Yes.**
Q. Now, I understand that at some point Votta & Votta terminated or stopped paying for your brother Joseph's health insurance?
**A. Yes.**
Q. Do you remember when that occurred?
**A. I think around July of '06, but I'm not sure.**
Q. Why did Votta & Votta stop paying for Joseph's health insurance?
**A. Because UNUM didn't pay on the policy and we couldn't afford to keep doing it. It's extremely expensive.**
Q. So I'm going to show you, Jill, a letter that I received in the response to the request for production of documents from Votta & Votta. Is your signature on this letter?



**A. Yes.**
MS. VORSTER: I'm going to mark the letter as our next exhibit, which would be Exhibit No. 3.
(Exhibit No. 3 marked for identification.)
Q. Here is the letter that we've marked as Exhibit No. 3. Certainly you've seen this letter before, correct?
**A. Yes.**
Q. And so according to the letter that we've marked as Exhibit No. 3, Votta & Votta stopped paying for Joseph's health insurance coverage as of July 31, 2006, correct?
**A. Yes.**
Q. Now, as I understand it, you are saying that the reason Votta & Votta stopped making these payments was because UNUM didn't pay?
**A. We couldn't afford it. We just didn't have the money to do it. If UNUM had paid, we might have been able to keep doing it.**
Q. When did Votta & Votta submit the claim to UNUM for the business overhead insurance?
**A. I don't know the exact date.**

Page 57

**A. Whenever it was paid, I don't know. I have no idea.**
Q. By the time you received that note in August of 2005, any bonus that your brother Joe had been due in 2003 and 2004 had already been paid, correct?
**A. Correct.**
Q. Where he is requesting a bonus for -- payment of my bonus for 2003 and 2004, was he mistaken at the time of what was due to him?
**A. Oh, absolutely.**
Q. Then he goes on -- so let me just back up.
He didn't receive any bonus money for 2003 and 2004 in 2005 after he wrote this note?
**A. Correct. There was none.**
Q. There was none.
**A. Nothing due.**
Q. Then he goes on and asks to receive the $40,000 that he was supposed to receive as a 2004 bonus from the $100,000 overhead insurance benefit paid to Votta & Votta in January 2004.
**A. Again, he wasn't owed any $40,000. He wasn't owed any money for 2003 or 2004, or 2005 at that point.**

Page 58

Q. That was the $100,000 overhead insurance benefit paid to V & V in January 2005?
**A. I don't believe there was any overhead insurance benefit paid in January of '05. I don't know when any benefits would have been paid. I think he was referring -- I mean, I don't know what he was thinking, but I think he was referring to an overhead insurance policy which was promptly paid -- well, I should strike the word promptly and take it back -- which was paid as a result of my medical problems.**
Q. So the overhead insurance benefit you think is the benefit that would have been paid because of your medical problems?
**A. Oh, I know.**
Q. And the time that you were out from work?
**A. Yeah.**
Q. Was there any written response from Votta & Votta to Joe as a result of this note from him?
**A. I don't think so.**
Q. Did anybody speak to him from Votta & Votta?
**A. I think our mother may have.**
Q. Was there any kind of communication with his attorney regarding his request for these funds?

Page 59

**A. Maybe, but I don't remember.**
Q. And you believe your mother might have spoken to him about the note?
**A. I cannot remember.**
Q. But you didn't speak to him, right?
**A. About this, no.**
Q. And to your knowledge, Steven didn't speak to him?
**A. About this? I don't think so, but I don't know. I'm pretty sure no.**
Q. As a result of this note, no funds were paid to Joe, correct?
**A. Correct.**
Q. Did you ever talk to your mother about any conversation with Joe about this note?
**A. No, I did not. She saw this, and what she did on her own, we don't know.**
Q. So you don't know what your mom did in response to this note, but what you do know is you didn't speak to your brother?
**A. Right. I'm pretty sure I never spoke to him about this.**
Q. And you don't know whether Steven did?
**A. I just don't know. If he talked to Joe at**

Page 60

**any points, I wasn't there, usually.**
Q. So as far as you know, in response to this note, the only one who spoke to Joe was your mom?
**A. I cannot remember speaking with him about this. I just can't, and if I did, I don't remember.**
Q. But no payments were made to him, as a result of this note, from Votta & Votta?
**A. That's correct.**
Q. Now I'm going to show you some copies of checks that I have received from you in discovery in this matter, and we're going to mark that page with the three checks as the next exhibit, please.
(Exhibit No. 9 marked for identification.)
Q. So I'm going to show you the checks that we've marked as Exhibit No. 9. We have a check, if you look at the one at the bottom of the page, Jill, a check dated 12/29/05, is that right?
**A. Yes.**
Q. And this is a check that is in the amount of $10,828.25, right?
**A. Right.**
Q. The notation up at the top of the check says, 2005 Bonus In Full, right?

**A. Right.**
Q. So was this is a bonus check issued to Joe by the law firm?
**A. Right.**
Q. In 2005, did he receive the same bonus as you or Steven?
**A. No, he did not.**
Q. Did he receive a reduced bonus because he only worked for three months, the first quarter of the year?
**A. He received a proportionate bonus for working for one quarter of the year.**
Q. In 2005, did Votta & Votta, did their fiscal year end on December 31?
**A. I think so, yes.**
Q. Then at the top of the page there's two checks, both of which are dated 4/11/06, and my question for you on the first check that is in the amount of $33,690.66, why was that check issued to Joe Votta?
**A. That was a loan to him.**
Q. And did he ask Votta & Votta for a loan?
**A. He -- our mother came to us and said that he needed money, so we went to the accountant and**



**said, Look, what can we do? And the accountant basically told us what we could do, so we did it.**
Q. Now, the accountant that you went to, what was his name?
**A. The same firm.**
Q. Was it the same gentleman whose name you gave me earlier, John Renza?
**A. Yes.**
Q. When you say your mother came to us, did she speak to you and Steven?
**A. I can't remember. I know she spoke to Steven. I think she spoke to Steven and Steven spoke to me and then we probably all spoke.**
Q. Of you, between you and Steven, who spoke with the accountant?
**A. I think we both did.**
Q. You both spoke to the accountant?
**A. I think so.**
Q. This is Mr. Renza?
**A. I think so, yes.**
Q. How did you decide on this number, $33,690.66?
**A. You know how accountants do whatever they do to figure out what something is worth. A CPA -- I**



**don't know exactly how they did it, but he said that he could loan him up to this amount because it would be what his stock was worth, and that way he could still stay in the business and corporation.**
Q. So the $33,690 was what Joseph's stock was worth as of that time?
**A. Something like that.**
Q. And this was something that was determined by your accountant, right?
**A. Yes, absolutely.**
Q. Okay.
Now, going to this next check that was issued as well on 4/11/06, that check is in the amount of $6,831.63?
**A. Yeah.**
Q. What was that check for?
**A. The AAA account of the Votta and Votta Law Offices, according to the CPAs.**
Q. When you say AAA account, what is that?
**A. That's what CPAs do. In accounting fashion, in corporations, the CPA said there's a AAA account or a basis account, and it was -- Joe's was exactly this amount, so that was what -- and that we could pay it in a separate check.**



Q. What does the AAA stand for?
**A. I don't have any idea.**
Q. When you say it's a basis account, is that his --
**A. You would have to talk to the CPA, I really don't know. I know that they have been talking that language and I've been listening to it for 33 years and I still don't understand it.**
Q. As an owner, is it your capital in the corporation?
**A. I don't know.**
Q. In any event, your understanding of the check in the amount of $6,831 was --
**A. His share of the AAA account.**
Q. -- his share of the AAA account. And you don't know what the AAA account means?
**A. I don't remember. I would be lying to you. Steven might know better than I would. I think he majored in more of this stuff.**
Q. So, now, going back to the $33,000 check -- let me just back up a second. The handwriting -- let me back up.
The two checks on the top of the page, the $33,690 and the $6,831, are signed by Steven?



cb70e989-f408-4e27-9d60-ea9ba1f35fdd

Page 81

Q. And in terms of the loan, I see that the receipt that we marked as Exhibit No. 10 talks about the $33,000 represents a loan payable from Votta & Votta. Was any kind of a promissory note signed that day?
**A. No, but you asked me before why was this done. It was to make it clear that this was a loan.**
Q. Okay, and that's why you had the receipt, to make it clear that it was a loan?
**A. I mean, it recites what it is, we're just confirming it. And that may have been one of the reasons we did it at the time. No question about it, it was a loan.**
Q. But no promissory note signed that day?
**A. No.**
Q. No loan agreement, right?
**A. I don't know what you mean by loan agreement, but there's no --**
Q. No documentation whatsoever setting forth what the terms of the loan were?
**A. There's this -- right, right. I know what you mean.**
Q. What were the repayment terms on the loan?

Page 82

**A. We didn't know; we were just trying to help out our brother.**
Q. And your understanding at the time was that he was disabled and needed money, correct?
**A. Yes.**
Q. Did you have an understanding as to whether he had applied for disability benefits?
**A. We knew he had policies. I don't know when he applied.**
Q. At this time you didn't know whether he had applied or not?
**A. '06? No, I don't remember when. All I knew is that he had them.**
Q. When you had the meeting with Joseph that day, did you or did you and Steven have any discussion with Joseph about repayment of the loan?
**A. I don't believe so.**
Q. Did Joseph say anything to you about what if I don't want to pay you back?
**A. No. I don't think so, no.**
Q. Was there any other documentation signed by Joseph that day?
**A. No. I don't think so.**
Q. So the only thing he signed was the receipt

Page 83

and the stock certificate, and that's it?
**A. And endorsed the checks, yeah.**
Q. Do you know if he endorsed the checks that day?
**A. I don't know when he did that. I can't think of anything else that he could have signed.**
Q. In terms of the loan to Joseph, what documentation do you have for the loan?
**A. This is what I have.**
Q. The receipt and the stock certificate?
**A. This is what you have and this is what we have.**
Q. The only documentation for the loan is the receipt marked as Exhibit No. 10 and the stock certificate that was marked as Exhibit No. 11, correct?
**A. Uh-huh, and the endorsed check that says, Loan To Stockholder.**
Q. And the endorsed check, right.
Was there any interest on the loan?
**A. No.**
Q. Never had a discussion with Joseph about any interest that would accrue on the loan?
**A. No.**

Page 84

Q. Didn't have any discussion with him about when he was going pay this back?
**A. No.**
Q. Did you have any discussion with him that he didn't have an obligation to pay this back?
**A. No.**
Q. Did you have any understanding with him that if he returned to work he would pay it back?
**A. No, we definitely didn't talk about that.**
Q. Did you have any discussion with him that if he received disability benefits that he would then pay this back?
**A. No.**
Q. No discussion with Joseph whatsoever about repayment of the loan?
**A. No.**
Q. And the $33,690.67 that's on the receipt is his, the value of his shares in Votta & Votta?
**A. Yes, correct.**
Q. As determined by your accountant?
**A. What the accountant said, right.**
Q. Did you have any discussions before this loan occurred with Joseph's attorney?
**A. I don't think so. I don't think we ever**