# EXHIBIT V

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
No. 07-420-ML
VOTTA & VOTTA LAW OFFICES, LTD.
Plaintiff,
vs.
UNUM LIFE INSURANCE COMPANY OF AMERICA, ALIAS
Defendant.

KEEPER OF THE RECORDS DEPOSITION OF KAHN, LITWIN, RENZA & CO., LTD., AND JOHN S. RENZA, JR., AND ROBERT DAVIES INDIVIDUALLY, taken in behalf of the defendant, before Charlene Jones, duly appointed Commissoner within and for the State of Rhode Island, at the offices of Kahn, Litwin, Renza & Co., Ltd., 951 North Main Street, Providence, Rhode Island, on Monday, June 23, 2008, commencing at 1:06 p.m.

FLYNN REPORTING ASSOCIATES
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303



APPEARANCES:

LAW OFFICES OF BERNARD P. HEALY
(by Bernard P. Healy, Esq.)
750 East Avenue
Pawtucket, Rhode Island 02860;
for the Plaintiff.

LAW OFFICES OF MIRICK O'CONNELL
(by Joan O. Vorster, Esq.)
100 Front Street
Worcester, Massachusetts 01608;
for the Defendant.



INDEX


| Deposition of: | Page |
|---|---|
| JOHN S. RENZA, JR. | |
| Examination by Ms. Vorster | 5 |
| Examination by Mr. Healy | 77 |
| And | |
| ROBERT DAVIES | |
| Examination by Ms. Vorster | 79 |
| Examination by Mr. Healy | 102 |
| Examination by Ms. Vorster | 105 |




EXHIBITS


| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Subpoena | 5 |
| 2 | Subpoena | 5 |
| 3 | Copies of Checks | 5 |
| 4 | Receipt | 5 |
| 5 | Stock Certificate | 5 |
| 6 | 2005 K-1 | 5 |
| 7 | 2006 K-1 | 76 |
| 8 | 2006 Tax Returns | 80 |
| 9 | 2007 Tax Returns | 81 |
| 10 | Working Trial Balance | 84 |
| 11 | Cash Receipts/Cash Disbursements of 2006 | 87 |
| 12 | Working Trial Balance | 94 |
| 13 | Cash Receipts/Cash Disbursements of 2006 | 94 |
| 14 | Invoice dated 5/30/06 | 97 |
| 15 | 2005 K-1 | 98 |

That's why he's still a partner in the firm. So that if he should get better, it gives him an opportunity to come back whenever he wants. It's a working situation. It's like these small practices only work if each partner is producing income.
Q. In terms of Joe getting what he was entitled to --
A. Yeah.
Q. -- certainly he must have had some concerns about getting his share --
A. Yes.
Q. -- of the profits --
A. Yes.
Q. -- given that he did work for the first quarter of the year?
A. Yeah, yeah.
Q. Was he also concerned about anything else that he felt that he was entitled to at that time?
A. One of the questions he did ask me is, what would the value of the practice be, and basically we said, you know, this is a small practice. They did not want to pay us to do a



formal valuation because the intent was he was not going to leave. He was probably going to stay or to come back, just not work right now until he got better hopefully. So our point was, hey, listen you have what they call, you know, this work in process, time that you've spent on that you haven't collected, receivables perhaps maybe on a case. The value of the equipment was really not worth very much. It's really a small practice.
Q. So Joe had asked the question about what would the value of the practice be --
A. Right.
Q. -- in the event that he was to not return to the practice; is that the premise that it came out of?
A. Maybe. I mean it's like anything else. When you look at these small businesses what are they worth. They're really worth the ability of each professional to generate income from which they primarily earn a living. So at the end of the day when everything is said and done, what is left in relationship to non-cash assets or receivables or work in process. It's the value



of the tables and the chairs, which we all know is not -- I don't know if you've ever been to their practice, but it's a small tiny practice. It probably occupies, I want to say, I don't know, 1,500 square feet. It's a small little place.
Q. So in terms of before the meeting that you had --
A. Yes.
Q. -- and I understand that there was a meeting in April of 2006 --
A. Right.
Q. -- with the three Vottas?
A. Right.
Q. I want to say children, but that's not the right -- the three Votta partners --
A. Partners, yeah, who are also brothers and sister.
Q. Right. How many conversations do you think you had with Joe leading up to that meeting?
A. I think a -- you know, let's put it this way. It was at least three, maybe five, and I probably say that with each of them, and again, I



don't remember exactly because I know we did have the ultimate meeting when all of those checks were signed and the pledge agreement was signed in this room right here. This is where we did it.
Q. Before the meeting, did you have some back and forth with Joe about the numbers?
A. Oh, yeah, we did. Yes. Yes.
Q. And did you or your firm --
A. Yeah.
Q. -- make any effort to determine what the book value of Votta & Votta was?
A. Yeah, we did.
Q. Who asked you to do that?
A. I think they all wanted me to do that.
Q. Why did they want you to do that?
A. Just to get an idea of what value is there. Should Joe need some money, he could have pledged the stock and have gotten some money. That was actually what I recommended because I think what their intention was to, "leave the door open", if Joe ever wanted to come back. That's what we did or tried to do in the process.
Q. Certainly you also spoke with Jill and

Page 29

Stephen --
A. Yes.
Q. -- before the meeting?
A. Yes.
Q. What do you recall talking to Jill about?
A. Basically the same question that Joe had. I think at this point perhaps they were not really talking maybe, and again, I was trying to be a mediator to help the brothers and sister get along and work this thing out, and it probably, when I say, "probably", you could certainly -- Bob Davies, if you'd like to ask him, a book value calculation, and I think that's what that big check is that you see, the 33,000, and we came up with an approximate value. We said, "Listen, your assets, your cash, your receivables, your net of your liabilities, you got a value of about 100 grand in this place. If you need some money, one of the things you can do is pledge your stock. We'll give you a check. If you want to come back, you're welcome back any time you want to come back." That's why to this day he still gets a K-1. He's still listed as a

Page 30

shareholder. He's just not getting any money because he's not working, and they are agreed to that by the way.
Q. So before the meeting in April, one of the tasks that you had to facilitate things between the Votta partners --
A. Right.
Q. -- was to determine what Joe's profit distribution would be --
A. Correct.
Q. -- for 2005 --
A. Yes, those three months that he worked. That's right.
Q. -- because he only worked a quarter of the year?
A. Yes.
Q. And also to determine that if he wanted some money, what would be his share of the book value of the corporation?
A. Correct, exactly.
Q. Now I also under that there is a AAA account?
A. Yes, an Accumulated Adjustment Account.
Q. What is that?

Page 31

A. Basically this is a tax thing. It's confusing to try to explain it to people, but when you're an S-Corporation what basically happens is a couple of things. Let's just use a round number to try to explain the point. Let's just say that partners during the year take salaries based on what their work ethic is or cases that they settle or whatever the case might be. So what might happen, you might have three partners not making the same salary, okay.
Q. Okay.
A. At the end of the year, what will happen, and this is part of our year-end planning exercise, we will sit down and say to the partners, we have a pool of let's call it another 100,000 -- well, let's call it that 100,000 for the sake of discussion. That 100,000 the partners will then say, okay, let's go equally with it or let's not go equally because I should have gotten more because I didn't get enough on this case. I mean some of these meetings get hot and heavy I might add, which is fine. I mean that's typically what happens when you put partners in a room when it comes time to divvy up

Page 32

at the end of the year. Whatever would have been left at the end of the year, and to keep the numbers round, let's just say after they make these agreements among the three of them, there's $9,000 left. A AAA account is what reflects a partner's shareholder's percentage amount. So in this case there were three partners and those three partners would pick up $3,000 each as part of their Accumulated Adjustment Account. Their AAA account, which is almost like the retained earnings account. That's another way to look at. In a C-Corporation it would be called retained earnings.
So what then happens is one of the things that we've got to be very careful of in order not to void an S-Election because as you know an S-Election taxes are only paid once at the personal level.
If it were a C-Corporation, taxes are paid twice. Profits are paid in the corporate level on the 9,000 and when you distribute that 9,000, it would be a dividend and they get taxed again. This is not a C-Corporation.
This is an S, but in order not to void the

above it, it's in the amount of 6,831 and change?
A. Right.
Q. And it's dated April 11, 2006?
A. Correct.
Q. That check the memo says, "AAA account in full"?
A. Correct.
Q. So who determined the number that's on that check?
A. We would have. We would have. Actually Bob Davies would have the calculation.
Q. And this check represents Joseph's one-third share of the firm's AAA account?
A. Generally the answer would be yes to that, but remember when I spoke about earlier relative to disproportionate amounts?
Q. Okay.
A. We have to look at the analysis of each shareholder's AAA account. This is what we needed to make it equal, and again, Bob Davies would be able to show you that much better.
Q. Is there one AAA account?
A. No. Each shareholder has their own AAA



account. That's how you monitor what they're earning, what goes into it, and what comes out of it.
Q. But in any event the memo on the check says, "AAA account in full"?
A. In full, correct.
Q. So the 6,831.63 would be the value of Joe's AAA account in full, correct?
A. Exactly. After this check the balance should be zero.
Q. Now on that day did either Jill or Stephen receive disbursement from their AAA account?
A. They probably did, but that's why I was saying the amounts could be different depending on what we had to do to make it proportionate. See, if you have a disproportionate distribution in a AAA account, that's what would void the S-Election, and if you were ever audited -- by the way this only happens if you get audited -- if you were ever audited, they'd look at that and they'd say, "hey, wait a minute, it's disproportionate, you voided your S-Election." So now what happens is all of income gets taxed



twice. It gets taxed like a dividend for the shareholder.
Q. So when you talk about making the AAA account proportionate --
A. Yeah.
Q. -- would Jill and Stephen that day have received a check in the same amount?
A. Maybe. Maybe not. Bob can show you that because he'd have the exact numbers. Again, let me tell you the reason I say that. During the year, you might recall I say earlier, shareholders are entitled to take money out of their AAA account. They generally don't do it altogether, which means that, you know, one might take a check for 1,000, another might take a check for 5,000, one may not take a check, but at the end of the year you've got to at some point reconcile these to show that they are in fact proportional.
Q. So that when you talk about them being proportional, it's so that each shareholder has the same amount?
A. Same balance.
Q. Same balance?



A. Same ending balance, exactly. So if they all started with 30,000 and some of them took different numbers out, but their objective is either to have it zero at the end of the year -- let's use zero. It makes it a little easier to understand it. During the year you got 30,000, 10,000 in each shareholder. If one shareholder took out all their money, you got a problem. You got to make sure all the other shareholders take our their 10. If the second shareholder took out 4,000, that shareholder may only be entitled to 6 to bring it to zero.
If the shareholder with the ten took nothing, they should get ten. If the other shareholder took 1,000, 1,000 for eight months and there's 2,000 left, in order to square that out at the end, you've got to give one 2. You've got to give one 6 and one 10.
Q. So it could be that Joe received 6,831, but Jill or Stephen might have received a number more or less as long as the numbers all became the same?
A. At the end of the day -- at the ending balance became the same.

Q. Do you know whether Jill or Stephen received a check on the 13th as well?
A. Bob would have that. He would have that in the work papers and he can show you that.
Q. Now after Joseph received his AAA account in full --
A. Right.
Q. -- on the 13th of April --
A. Right.
Q. -- did he have any other kind of similar account, retained earnings, anything like that in Votta & Votta?
A. The only think that would have been left was what we felt was the value. That's that $100,000 number I was rounding out at.
Q. Okay.
A. Because he needed cash, that's the purpose of this check of 33,690.
Q. So the check on the top, the 33,690.66 dated April 11th --
A. Right.
Q. -- this is Joe's share of the book value of the corporation?
A. That's one way to look at it, but it was



treated as a loan.
Q. But to come up with the 33,690 number you had to calculate the book value?
A. Right. We came up with what we thought a fair book value would be, yeah.
Q. And then gave him one-third of that?
A. Correct, yeah. Again, not redemption of his stock, but as a loan.
Q. So at the top there on the top check there for the 33,690 --
A. Right.
Q. -- it says under the memorandum that it's a loan to stockholder?
A. Right.
Q. Whose handwriting is that at the top?
A. I'm not sure.
Q. Now in terms of the -- as I understand it, this 33,690 check was a loan to Joe?
A. Yes.
Q. Were any of the other checks loans?
A. No. This was income and this was his AAA account.
Q. The AAA account would that be W-2 income?



A. No. That's tax free money because keep in mind the example I gave you earlier.
Q. Because he's already paid taxes on it?
A. You got it. This is the net after tax amount that he's entitled to because he's already paid taxes on it. The reality is, if this were 6,000 and there's a 50 percent bracket, it was really 12, but 6 came out to Joe to go pay his taxes or whatever, and this is the balance. This is after tax money.
Q. So the 6,000 is tax free?
A. Correct.
Q. And then the loan, did that go into W-2 earnings?
A. No, no. It's a loan.
Q. It's a loan?
A. Just like when you borrow money, you don't pay taxes on the money you get.
Q. So that would be tax free money to Joe?
A. Tax free money to Joe, yeah.
Q. Now I'm going to show you a document that's called a receipt that we've marked as Exhibit Number 4.
(Handing of document)



A. Right.
Q. Did you or anybody from your firm prepare that document?
A. You know, I don't know who prepared it to be quite honest. I don't know.
Q. Do you recall seeing it --
A. Yes.
Q. -- at that meeting?
A. Yes.
Q. Do you recall it being signed at that meeting?
A. Yes.
Q. Was there any discussion regarding that document at the meeting?
A. Not really. I mean it was a very quick meeting to be quite honest.
Q. How long did the meeting last?
A. 20 minutes maybe. I don't think it was a very long meeting. Particularly that time of the year for me, I was probably more anxious to move them in and out than they were.
Q. Was Mr. Davies present at the meeting?
A. You know what, I don't recall. You can ask him though. I don't think he was. I think

Page 57

**else because I really don't remember.**
Q. I'm trying to see if there is something else. So as I understand it, the only things that were signed as to the loan that you're talking about, the $33,000, was the receipt --
**A. Yeah.**
Q. -- the document we marked receipt that we've marked as Exhibit Number 4?
**A. Yes.**
Q. And this stock certificate that we marked as Exhibit Number 5?
**A. Correct.**
Q. And that's all you can remember about this loan?
**A. Yep.**
Q. Just so that I'm clear, when you talk about a pledge agreement being signed, you're referring to the stock certificate?
**A. The fact that they had the stock, yeah.**
Q. And you're saying that Joe and Stephen's idea was to give Joe a loan --
**A. The money.**
Q. -- of the $33,000 --
**A. Right, which approximated what we all**

Page 58

**thought was the value of the company.**
Q. And he would pledge his stock back --
**A. Correct.**
Q. -- as security for the loan?
**A. Correct. He would still be listed and held as a shareholder, which he is.**
Q. So if I understand it correctly, if Joe was to next week payoff the $33,000 --
**A. Right.**
Q. -- he would get his stock back?
**A. Correct, exactly.**
Q. And if he never pays off the $33,000, then the stock is then reassigned to Votta & Votta?
**A. Right. But at some point if he were to do that, he would have to pay taxes on that money because remember no taxes have been paid on the 33,000.**
Q. So if Joe determines that he's never returning --
**A. Right.**
Q. -- then he'd have to pay taxes on the 33,000?
**A. He would, yes. And it would be**

Page 59

**long-term capital gain.**
Q. So he wouldn't be paying --
**A. He wouldn't be paying the highest rate. He'd be paying roughly 15 percent.**
Q. He wouldn't be paying ordinary income?
**A. Correct.**
Q. He'd be paying long-term capital gain?
**A. Capital gain, correct.**
Q. At the meeting in April, was Joseph aware that he was going to get a loan before he came to the meeting?
**A. Yeah. There were no surprises for anyone at the meeting.**
Q. Okay. In terms of the discussion with Jill and Stephen and Joe about the loan, whose idea was it to be a loan?
**A. Probably ours.**
Q. Is there a financial or an accounting benefit to calling this a loan as opposed to a buyout?
**A. Well, there's certainly an advantage to Joe that he's not paying any taxes on it, and it keeps the door open for him to have the ability to come back, and that was his sister and**

Page 60

**brother's intention, hoping he would get better and come back.**
Q. And what about to Votta & Votta, is there an advantage to the law firm --
**A. Not really.**
Q. -- to calling it a loan?
**A. It's really a detriment to the law firm because they're out-of-pocket of cash of 33,690. It would be like, you know, me and my practice. If one of my partners says, you know, "I want out. Can I have a check?" "Sure, we'll give you the check, but you know, you're going to come back hopefully some day." But if we knew they'd never come back, we'd want to take that as part of basis and let them pay the taxes on it.**
Q. Now how long -- so if Joe -- I mean how long can the law firm call this a loan --
**A. It's a good question.**
Q. -- if he never comes back?
**A. It's a good question. I think at some point down the road they're going to all have to face this how we're going to deal with this. Certainly the question becomes, if you're not coming back and you don't want to be a**

A. If you look at the Section 179 deductions of 11,550, plus other deductions on line A, and Bob could tell you what that is, the sum of these approximates that number. So he's not paying any income taxes on any of this money. It flows through his return. This comes back to what I was saying earlier. An S-Corporation profits and losses are characterized by the IRS to be handled differently, and what I mean by that is, you take the example of interest income. This interest income of $1,632 represents one-third of the interest income earned by Votta & Votta, but remember I said that the corporation does not pay taxes. So the 1099 that was issued to Votta & Votta, Votta & Votta does not pay taxes on it, so they have to flow it through proportionately to each shareholder; hence the 1,632. If you looked at Jill's K-1 and Steve's K-1, they're all exactly the same.
Q. Exactly the same.
A. So when you look at these numbers, this would be go on his Schedule B, I believe it is, on his tax return as interest income. This ordinary business income would flow from this K-1



to I believe it's Schedule E on his 1040. This Section 179 deduction of 11,550 I believe also goes on his Schedule E -- that's where you list partnerships, S-Corporations, real estate -- and that would offset these numbers, this other deduction. Like I said, I don't remember what it is. Bob would know what that is, but what ends up happening is they net out against each other.
Q. So basically the K-1 that's issued to the shareholder is essentially a wash?
A. It is. And if you look at '05, you'll see the same thing.
Q. Is that because when you got an S-Corporation, the earnings are distributed to the shareholders --
A. Shareholders, correct.
Q. -- as compensation, W-2 compensation?
A. Well, no. This has nothing to do with W-2. This has to do with earnings of the corporation, and what happens is, the IRS characterizes different types of income differently coming through a K-1 as to where these -- you know, for example -- let me just see it. I was trying to think of what I can -- let's



just assume this other deduction A is contribution. Contribution would flow through their personal return. If something were a miscellaneous itemized, it would flow through their personal, but it would be limited to that 7 percent rule. So it's Uncle Sam's way, I call it a self tax increase sometimes, the way the government picks it up here, but doesn't let you get it all here.
Q. Regardless of which, with the K-1 for the stockholders, Jill, Stephen and Joe, it's essentially a wash?
A. Yes.
Q. It doesn't result in any extra income --
A. No.
Q. -- to them --
A. It should not.
Q. -- that they would then have to pay taxes?
A. Correct. It should not.
Q. So if I look at the K-1 for 2005 for Joe attached to Exhibit Number 6 and the 2006 K-1, which we're going to mark as the next Exhibit, neither one of those documents would result in



extra income for Joe?
A. It should not.
Q. It should not.
A. It should not for any shareholder. Because keeping in mind again, it's a service business, and service businesses earn their money by the productivity of each shareholder or each partner.
Q. Do you know with respect to Joe whether either one of these K-1's resulted in any extra tax liability?
A. It should not have.
Q. It should no have?
A. No, it should not have.
MS. VORSTER: I'm going to mark the 2006 K-1 for Joseph Votta as the next exhibit, which would be I believe 7.
(Document marked Exhibit No. 7 for identification.)
Q. And would that be the same as well in 2007 --
A. Yes, it would.
Q. -- that the K-1 issued to Joe would not result in any extra tax liability for him?

Page 81

Q. Now staying with the 2006 tax returns that we've marked as Exhibit Number 8, did Mr. Joseph Votta receive a K-1 --
**A. Yes, he did.**
Q. -- that year? And also in terms of any loans from shareholders?
**A. There were loans recorded.**
Q. Is there an entry in the tax return regarding loans from shareholders?
**A. There's a line item shown as a net liability that is combined payables to two of the shareholders and a receivable for Joe Votta.**
Q. If you could show me where that is on the tax return?
**A. It's right here on this line.**
Q. So we're looking at line Number 19?
**A. Yes.**
Q. That's line Number 19. Which of those entries shows the receivable from Joe Votta?
**A. As I said, this is a net number recorded with loans payable and loans receivable from shareholders.**
Q. So the number that you're looking at is

Page 82

$103,000 and this is for the previous year?
**A. This is for the current year.**
Q. So the previous year would be loans in 2005?
**A. Yes.**
Q. And the current year would be loans in 2006?
**A. Right.**
Q. So the 2006 loans was a --
**A. Net loan.**
Q. -- net loan? Where would I look to see any receivables from Joe Votta?
**A. The trial balances.**
Q. So in looking at line item Number 19, does any of that reflect any loan receivable from Joe Votta?
**A. Yes. On line 19 of 2006, I'd have to look at the 2005, but I think though it does include a loan receivable for 2006.**
Q. But if the loan's not made until 2006 --
**A. This is the end of 2006.**
Q. So did Joe have any outstanding loans at the end of the year 2005 for any receivable?
**A. I'd have to look at the trial balance.**

Page 83

Q. So when you look at the trial balance --
**A. You want to look at 2006 because it would have comparative years on there.**
Q. Great. Let me hand you then the trial balances that you've given me.
**A. Okay. At the end of 2006 there was 40,522 recorded as a receivable from Joe, Joe Votta, and there were payables to Steve Votta of 35,309 and change, and a loan payable to Jill Votta of 26,309 and change, and that netted out to the 21,096 that you see here on the tax return.**
Q. So let me just identify the documents that you were looking at, and these are the trial balances for the period ending December 31, 2006?
**A. '06.**
Q. Now I have a document called, "Working Trial Balance"?
**A. Yes.**
Q. And that's what you were looking at?
**A. Yes.**
MS. VORSTER: So we're going to mark that as the next exhibit, which would be Exhibit 10.

Page 84

(Document marked Exhibit No. 10 for identification.)

Q. Let's look at the Working Trial Balance. As I understand it, on the first page that we've marked as Exhibit Number 10, as I understand on the first page there is under, "other payables", there's a loan to Joe Votta --
**A. Yes.**
Q. -- right? And that's 40,000 --
**A. 40,522.29.**
Q. -- 522.29. And what does that represent?
**A. As I recall that represents two checks that were issued to Joe during 2006.**
Q. And then the loans reference for Stephen Votta and Jill Votta, are those loans that Jill and Steve have to the firm?
**A. That's correct.**
Q. So they have outstanding loans as well?
**A. Yes, loans payable to the firm.**
Q. Were the obligations --
**A. I'm sorry, loans -- there is a loan receivable for Joe, and loans payable to Jill and Steve.**